**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
**www.flsb.uscourts.gov**

In re:

|  |  |
|---|---|
|  | Chapter 11 |
| **FF FUND I, L.P.** | Case No. 19-22744-BKC-LMI |
| **F5 BUSINESS INVESTMENT** | |
| **PARTNERS, LLC** | Case No. 20-10996-BKC-LMI |
| Debtors. | |
|  | (Jointly Administered Under Case No. 19-22744-BKC-LMI) |

_____/

**FIRST AMENDED DISCLOSURE STATEMENT FOR FIRST AMENDED CHAPTER 11 PLANS OF REORGANIZATION**
**PROPOSED BY FF FUND I, L.P. AND F5 BUSINESS INVESTMENT PARTNERS, LLC**

**GENOVESE JOBLOVE & BATTISTA, P.A.**
Paul J. Battista, Esq.
Florida Bar No. 884162
Heather L. Harmon. Esq.
Florida Bar No. 013192
100 SE 2nd Street, 44th Floor
Miami, FL 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

_Counsel for the Debtors-in-Possession_

Dated: February 1, 2021

## **DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF EACH OF THE FOLLOWING: (I) *FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY FF FUND I, LP,* AND (II) *FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY F5 BUSINESS INVESTMENT PARTNERS, LLC,* EACH DATED FEBRUARY 1, 2021 (AS DEFINED HEREIN, INDIVIDUALLY A "PLAN" AND COLLECTIVELY, THE "PLANS"),[1] AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLANS.  NO SOLICITATION OF VOTES TO ACCEPT THE PLANS MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE APPLICABLE PLAN(S) ***IN THEIR ENTIRETY*** BEFORE VOTING TO ACCEPT OR REJECT THE PLAN(S).  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN THIS DISCLOSURE STATEMENT ("RISK FACTORS IN CONNECTION WITH THE PLANS") BEFORE VOTING TO ACCEPT OR REJECT THE PLAN(S). PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN(S) AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH DOCUMENTS. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN(S).  ALTHOUGH THE DEBTORS BELIEVE AND HAVE MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLANS, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE CONTENT OF THE PLANS. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLANS AND THE SUMMARY OF THE PLANS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLANS SHALL CONTROL.  ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLANS IN THEIR ENTIRETY.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST OR EQUITY INTEREST IN EITHER DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN(S) IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THIS DISCLOSURE STATEMENT SHALL NOT BE

---

[1] Unless otherwise defined, capitalized terms used herein shall have the meaning ascribed to such terms in the Plans.

CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF ANY DEBTOR AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTEREST IN SUCH DEBTOR.

AS TO ANY CONTESTED MATTERS OR OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING ANY DEBTOR OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, ANY DEBTOR AND DEBTOR-IN-POSSESSION IN THE CHAPTER 11 CASES.

NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO ANY DEBTOR, ITS RESPECTIVE PROPERTY OR ANY PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND (I) THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF, AND (II) THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE PLANS.   NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING ANY DEBTOR OR ANY PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THE DISCLOSURE STATEMENT. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLANS NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLANS OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES.  THE FINANCIAL PROJECTIONS ATTACHED TO THIS DISCLOSURE STATEMENT WERE PREPARED SOLELY BY FF MANAGEMENT, THE GENERAL PARTNER OF FF FUND, AND HAVE NOT BEEN VERIFIED OR APPROVED BY THE DEBTORS' CHIEF RESTRUCTURING OFFICER, SONEET R. KAPILA.

ALTHOUGH THE PROFESSIONALS (INCLUDING THE CRO) EMPLOYED BY THE DEBTORS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF, INCLUDING SPECIFICALLY IN CONNECTION WITH THE INFORMAITON CONTAINED IN THE FINANCIAL PROJECTIONS ATTACHED TO THIS DISCLOSURE STATEMENT.  THE PROFESSIONALS (INCLUDING THE CRO) EMPLOYED BY THE DEBTORS SHALL HAVE NO LIABILITY FOR THE INFORMATION IN THIS DISCLOSURE STATEMENT OR IN THE EXHIBITS ATTACHED HERETO.

THE DEBTORS RESERVE THE RIGHT TO OBJECT TO ANY CLAIM PRIOR TO THE DATE ESTABLISHED BY THE BANKRUPTCY COURT.  ON AND AFTER THE EFFECTIVE DATE OF THE PLANS, THE REORGANIZED DEBTORS WILL BE VESTED WITH FULL AUTHORITY TO UNDERTAKE THE CLAIMS OBJECTION PROCESS WITH RESPECT TO ALL CLAIMS THAT HAVE NOT BEEN PREVIOUSLY RESOLVED BY COURT ORDER OR OTHERWISE (INCLUDING, BUT NOT LIMITED TO, GENERAL UNSECURED CLAIMS).  THE ACTUAL AMOUNTS OF THE DISTRIBUTIONS UNDER THE PLANS TO THE HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS THAT ARE OBJECTED TO BY THE DEBTORS OR THE REORGANIZED DEBTORS, AS THE CASE MAY BE, WILL BE DETERMINED AFTER COMPLETION OF THE CLAIMS OBJECTION PROCESS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON ANALYSES PERFORMED BY FF MANAGEMENT, THE GENERAL PARTNER OF THE FF FUND DEBTOR.  THE DEBTORS AND THEIR PROFESSIONALS (INCLUDING THE CRO) HAVE NOT PREPARED ANY SUCH ANALYSES AND THEREFORE CANNOT AND DO NOT MAKE ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER REGARDING THE ACCURACY OF THE INFORMATION.

**IRS CIRCULAR 230 NOTICE:**  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT

OR UPON THE MERITS OF THE PLANS. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT ANY PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.

**THE DEBTORS BELIEVE THAT THE PLANS PROVIDE THE BEST POSSIBLE RESULT FOR ALL HOLDERS OF CLAIMS. THE DEBTORS ALSO BELIEVE THAT THE PLANS WILL ENABLE THE DEBTORS TO ACCOMPLISH THE OBJECTIVES OF REORGANIZATION UNDER CHAPTER 11 AND THAT ACCEPTANCE OF THE PLANS ARE IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THUS, IT IS THE OPINION OF THE DEBTORS THAT THE TREATMENT OF CREDITORS UNDER THE PLANS CONTEMPLATE A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED THROUGH LIQUIDATION OF THE DEBTORS.**

**IF YOU ARE ENTITLED TO VOTE TO APPROVE ANY PLAN(S), YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE DEBTORS STRONGLY URGE CREDITORS TO VOTE TO <u>ACCEPT</u> THE PLANS.**

TABLE OF CONTENTS

Page

ARTICLE I - INTRODUCTION AND OVERVIEW ....................................................1

ARTICLE II -BACKGROUND AND HISTORY OF THE DEBTORS .......................6

ARTICLE III - EVENTS LEADING TO THE CHAPTER 11 CASES .....................11

ARTICLE IV - MATERIAL EVENTS OCCURRING DURING CHAPTER 11
CASES ........................................................................................14

ARTICLE V - SUMMARY OF THE PLANS ........................................................17

ARTICLE VI - MEANS OF PLAN IMPLEMENTATION.........................................28

ARTICLE VII - MEANS OF PLAN IMPLEMENTATION - LIQUIDATING
TRUST ALTERNATIVE ................................................................31

ARTICLE VIII - PRESERVATION OF CAUSES OF ACTION................................36

ARTICLE IX - PROVISIONS GOVERNING DISTRIBUTIONS................................40

ARTICLE X - DISPUTED CLAIMS .....................................................................44

ARTICLE XI - TREATMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES ..................................................................45

ARTICLE XII - CONDITIONS PRECEDENT TO EFFECTIVE DATE ...................48

ARTICLE XIII - EFFECT OF CONFIRMATION; INDEMNIFICATION,
INJUNCTIVE AND RELATED PROVISIONS..............................49

ARTICLE XIV - RETENTION OF JURISDICTION.................................................52

ARTICLE XV- RISK FACTORS IN CONNECTION WITH THE PLANS ...............54

ARTICLE XVI - MISCELLANEOUS PROVISIONS ...............................................56

ARTICLE XVII - CONFIRMATION REQUIREMENTS ...........................................58

ARTICLE XVIII - ALTERNATIVE TO THE PLANS .............................................62

ARTICLE XIX - CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF
THE PLAN ...................................................................................63

ARTICLE XX - CONCLUSION.............................................................................65

i

## <u>EXHIBITS</u>

EXHIBIT 1          Summary and Description of Assets and Investments.

EXHIBIT 2          Revised Listing of Holders of Limited Partner Equity Interests.

EXHIBIT 3          Financial Projections, with assumptions.

EXHIBIT 4          Liquidation Analysis, with assumptions.

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

# ARTICLE I
# INTRODUCTION AND OVERVIEW

### A.    General Terms of the Plans

FF Fund I, L.P. ("FF Fund" or the "FF Fund Debtor") and F5 Business Investment Partners, LLC ("F5 Business" or the "F5 Business Debtor," and together with FF Fund, the "Debtors") as debtors and debtors in possession, hereby transmit this First Amended Disclosure Statement (as may be amended, supplemented or otherwise modified from time to time, the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), in connection with the Debtors' solicitation of votes (the "Solicitation") to confirm the First Amended Chapter 11 Plan of Reorganization of FF Fund I, L.P. (the "FF Fund Plan") and the First Amended Chapter 11 Plan of Reorganization of F5 Business Investment Partners, LLC (the "F5 Business Plan" and together with the FF Fund Plan, each as may be amended, the "Plans") each dated as of February 1, 2021.

This Disclosure Statement and the other documents described herein are being furnished by the Debtors to Creditors and Limited Partners in the Debtors' respective Chapter 11 Cases pending before the Bankruptcy Court. This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Debtors' Creditors and Limited Partners to make an informed judgment about the Plan applicable to them, including whether to accept or reject such Plan. This Disclosure Statement sets forth certain information regarding: (i) each Debtor's prepetition operating and financial history; (ii) each Debtor's need to file for relief under chapter 11 of the Bankruptcy Code; (iii) significant events that have occurred during the each Debtor's Chapter 11 Case; (iv) the terms of the Plans; (v) the manner in which distributions will be made under the Plans; (vi) certain effects of confirmation of the Plans; (vii) certain risk factors associated with the Plans; and (viii) the confirmation process and the voting procedures that holders of Claims and Equity Interests entitled to vote under the Plans must follow for their votes to be counted.

The Debtors are advancing the Plans described in this Disclosure Statement to enable the Debtors to emerge from the Chapter 11 Cases as reorganized entities, which the Debtors anticipate will occur in early 2021. In order to do so, the Plans are premised on the provision (i) by FF Management, the general partner of FF Fund, on the Effective Date of an Investment Guarantee Amount in the amount of $4.0 million in cash, and (ii) by the Exit Lender of the Exit Financing in the form of a line of credit in the amount of $1.5 million. In exchange for the Investment Guarantee Amount, FF Management will retain its General Partner Equity Interest in FF Fund, will be issued the New Limited Partner Equity Interests in the FF Fund Debtor and will manage the Debtors' Assets in the ordinary course of their businesses after the Effective Date. The Investment Guarantee Amount and the Exit Financing will be used by the Reorganized Debtors to finance: (i) the Distributions required under the Plans, including to Holders of Allowed Claims and Allowed Limited Partner Interests, as applicable, (ii) the Debtors' anticipated working capital needs for operations, and (iii) new and existing investments.

As a further inducement to Holders of Allowed Claims to accept the Plans, FF Management has agreed to (i) subordinate its $2,000,000 claim against the FF Fund Debtor to all Allowed General Unsecured Claims against the FF Fund Debtor and the F5 Business Debtor (but not to the

Holders of Limited Partner Equity Interests) as part of the Plans, and (ii) reduce such claim to $1,000,000 provided that FF Management or its designee is the provider of the Investment Guarantee Amount.

Holders of Allowed General Unsecured Claims against each Debtor will be Impaired and will receive 100% of their Allowed Claims over a three year period, including a 20 percent Distribution on or shortly after the Effective Date of the Plans. Holders of the Limited Partner Equity Interests in the FF Fund Debtor shall receive on account of their Limited Partner Equity Interests, one or more Distributions on a Pro Rata basis, during and/or before the end of the fifth year after the Effective Date in the aggregate amount of $2 million (the "LP Payment"), *provided further,* that the Reorganized Debtors shall pay interest on the LP Payment in an amount equal to two (2%) percent per annum, which interest payments shall commence on the one year anniversary of the Effective Date and continue annually thereafter on the same date until the LP Payment is paid in full.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the applicable Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLANS. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE APPLICABLE PLAN**.

The summary of the Plans provided herein is qualified in its entirety by reference to each Plan. To the extent that the information provided in this Disclosure Statement and the Plans (including any Plan Supplements) conflict, the terms of the applicable Plan (including any Plan Supplements) will control. Terms not otherwise specifically defined herein will have the meanings attributed to them in each Plan. Each definition in this Disclosure Statement and in the Plans includes both the singular and plural. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

### B.    The Liquidating Trust Alternative.

In the event that (i) the Investment Guarantee Amount is not funded in advance of the Confirmation Hearing as set forth herein, (ii) the Debtors are not able to secure the Exit Financing prior to the Confirmation Hearing as set forth herein, or (iii) certain of the events described in the Risk Factors set forth in Article XV below prevent Confirmation of the Plans, then the Debtors reserve the right, in their sole discretion, to abandon those aspects of the Plans that seek to enable the Debtors to emerge from these Chapter 11 Cases as Reorganized Debtors and instead proceed to Confirmation of the Plans under the Liquidating Trust Alternative discussed below. In the event the Debtors exercise this right, then the Debtors will provide notice to the Bankruptcy Court, all Holders of Claims and Equity Interests in the Debtors and all other parties in interest that the Debtors intend to proceed to Confirmation of the Plans under the Liquidating Trust Alternative discussed below.

Under the Liquidating Trust Alternative, in lieu of the transfer of all Assets of the Estates to the Reorganized Debtors on the Effective Dates of the Plans, the Debtors will transfer and vest any and all Assets of the Estates of each Debtor into their respective Liquidating Trusts to be created under each Plan, each Liquidating Trust under the direction and control of Soneet R. Kapila as the Liquidating Trustee therein.  The Liquidating Trustee shall have those powers and duties set forth in the Plans, including all of the powers and duties of a chapter 7 trustee or a chapter 11 trustee, including under Sections 704 and 1106 of the Bankruptcy Code.

Pursuant to the Liquidating Trust Alternative, the Debtors will not have the benefit of the Investment Guarantee Amount or the Exit Financing.  Rather, the Debtors will use the Assets of the Estates to fund confirmation of the respective Plans.  In addition, FF Management, Andrew Franzone and any of their affiliates will not have any obligations or rights under the Plans, other than the rights afforded to all Holders of Claims against and/or Equity Interests in one or both of the Debtors.  However, under the Liquidating Trust Alternative, FF Management (and its affiliates) will continue to agree to reduce their General Unsecured Claims (including the General Unsecured Claim of FF Management in the amount of $2,000,000) against the FF Fund Debtor to an amount not greater than $1,000,000 and also subordinate such Claims to all Allowed General Unsecured Claims against the FF Fund Debtor and the F5 Business Debtor (but not to the Holders of Limited Partner Equity Interests).

Under the Liquidating Trust Alternative, the Liquidating Trusts will be created solely to implement the terms of the respective Plans.  The primary purposes of the Liquidating Trusts will be to collect and liquidate the Assets of each Estate, pursue those claims and Causes of Action transferred to, and vested in, the respective Liquidating Trust and to distribute to the respective Liquidating Trust Beneficiaries all proceeds from the liquidation of the Assets of each Estate pursuant to the terms of the applicable Plan and in accordance with Treasury Regulation Section 301.7701-4(d).  Under no circumstances shall the Liquidating Trustee have any power to engage in any trade or business or any other activity except as specifically provided in the Plans otherwise reasonably necessary and advisable for the orderly liquidation and distribution of the Assets.

Under the Liquidating Trust Alternative, the Debtors will not cancel or extinguish the Limited Partner Equity Interests in the FF Fund Debtor.  Rather, the Plans provide that the respective Liquidating Trust shall issue beneficial interests in such Liquidating Trust to the respective Liquidating Trust Beneficiaries.  Under the FF Fund Plan, (i) the Class A Beneficial Interests in the FF Fund Debtor's Liquidating Trust will be issued to the Holders of all Allowed Unsecured Claims against the FF Fund Debtor, (ii) the Class B Beneficial Interests in the FF Fund Debtor's Liquidating Trust  will be issued to the Holders of the Subordinated Claim against the FF Fund Debtor, and (c) the Class C Beneficial Interests in the FF Fund Debtor's Liquidating Trust will be issued to the Holders of the Limited Partner Equity Interests in the FF Fund Debtor.

Under the F5 Business Plan, (i) the Class A Beneficial Interests in the F5 Business Debtor's Liquidating Trust will be issued to the Holders of all Allowed Unsecured Claims against the F5 Business Debtor, and (ii) the Class B Beneficial Interests in the F5 Business Debtor's Liquidating Trust will be issued to the Holders of the Equity Interests in the F5 Business Debtor.

The Liquidating Trustee shall make Distributions from each Liquidating Trust in accordance with the respective Plan to the Liquidating Trust Beneficiaries, in each case on a Pro

Rata basis within Class A, Class B or Class C as applicable, provided that the Holders of the Class B Beneficial Interests in each Liquidating Trust shall be subordinated in all respects to the Holders of the Class A Beneficial Interests in each such Liquidating Trust, and provided further that the Holders of the Class C Beneficial Interests in the FF Fund Debtor's Liquidating Trust shall be subordinated in all respects to the Holders of the Class A and Class B Beneficial Interests therein. The Liquidating Trustee shall be deemed to have been appointed as the representative of each Estate by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

In the event the Debtors elect to implement the Liquidating Trust Alternative, then the Debtors reserve the right to seek a continuance of the Confirmation Hearing and/or to amend or modify the Plans to accomplish such result consistent with the terms described herein.

**C.      Overview of Chapter 11 and the Plan Confirmation Process**.

Chapter 11 of the Bankruptcy Code allows debtors to reorganize or to liquidate and wind up their affairs for the benefit of the debtors and their creditors. Upon the commencement of a chapter 11 case, an estate is created comprised of all the legal and equitable interests of a debtor as of the date the petition is filed, and the current owner(s) and management typically remain in control of the debtor as a debtor-in-possession. The debtor remains in possession of its property without the oversight of a trustee.

Pursuant to section 362 of the Bankruptcy Code, the filing of a chapter 11 petition imposes an automatic stay of all attempts by creditors or third-parties to collect or enforce prepetition claims against a debtor or otherwise interfere with its property or business, unless relief from the automatic stay is obtained from the bankruptcy court.

The Bankruptcy Code is designed to encourage the parties-in-interest in a chapter 11 case to negotiate the terms of a chapter 11 plan so that it may be confirmed. A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and the interests in the debtor. Confirmation of a chapter 11 plan makes it binding on the debtor and all of its creditors and the prior obligations owed by the debtor to such parties are compromised in exchange for the obligations specified in the plan.

After a chapter 11 plan has been filed, the holders of impaired claims against the debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against the Debtor entitled to vote under section 1125 of the Bankruptcy Code in connection with the Proponents' solicitation of votes on the Plan.

**D.      Summary of Voting Requirements for Plan Confirmation**.

**1.      In General.**

Creditors should refer only to this Disclosure Statement and the Plans and any Court approved solicitations to determine whether to vote to accept or reject the applicable Plan. Under the Bankruptcy Code, only holders of Claims that are "impaired" are entitled to vote to accept or

reject the applicable Plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof, or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

An impaired class of creditors votes to accept a plan if the holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of those creditors that actually cast ballots vote to accept such plan.  Those classes that are not impaired are not entitled to vote and are deemed to accept a plan.  Those classes that are not entitled to a distribution and will not retain property under a plan are deemed to reject a plan.

A class of equity interest holders is deemed to accept a plan if the holders of at least two-thirds (2/3) in amount of those interest holders that actually cast ballots vote to accept such plan. A class of equity interest holders is impaired, not entitled to vote, and deemed to reject the plan if the plan treats such holders by providing that they will retain no property and receive no distributions under the plan.

**Any Claim in an Impaired Class that is subject to a pending objection or is scheduled as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing the Claim for the purpose of voting on the applicable Plan.**

Pursuant to the Bankruptcy Code, only creditors who actually vote on each Plan will be counted for purposes of determining whether the required number of acceptances have been obtained for each such Plan.  Failure to deliver a properly completed ballot by the Voting Deadline (as defined herein) will result in an abstention; consequently, the vote will neither be counted as an acceptance or rejection of the applicable Plan.

### 2.    Impaired Classes Entitled to Vote.

The FF Fund Plan contains five (5) Classes.  Claims in Classes 2 and 3 and the Limited Partner Equity Interests in Class 5 are Impaired and therefore are entitled to vote on the FF Fund Plan.

The F5 Business Plan contains three (3) Classes.  Claims in Class 2 are Impaired and therefore are entitled to vote on the F5 Business Plan.

### 3.    Unimpaired Classes Deemed to Accept the Plans.

For the FF Fund Plan, Claims in Class 1 and the General Partner Equity Interests in Class 4 are Unimpaired, and as such will not be solicited and will be deemed to have accepted the FF Fund Plan pursuant to Section 1126(f) of the Bankruptcy Code.

For the F5 Business Plan, Claims in Class 1 and the Equity Interests in Class 3 are Unimpaired, and as such will not be solicited and will be deemed to have accepted the F5 Business Plan pursuant to Section 1126(f) of the Bankruptcy Code.

### 4. Voting Deadline.

If a Creditor holds a Claim classified in a voting Class of Claims under a Plan, the Creditor's acceptance or rejection of such Plan is important and must be in writing and submitted on time.  The record date for determining which Creditors may vote on the applicable Plan is _____ ___, 2021 (the "**Voting Record Date**").  The voting deadline is _____ ___, 2021, at 4:00  p.m. (prevailing Eastern Time) (the "**Voting Deadline**").

### 5. Voting Instructions.

**IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RETURNED TO THE CLERK OF THE COURT OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF FLORIDA (MIAMI DIVISION) BY THE VOTING DEADLINE AT THE ADDRESS PRINTED ON THE BALLOT.**

### 6. Ballots.

Creditors must use only the Ballot or Ballots sent to them with the notice of this Disclosure Statement.  If a Creditor has multiple Claims that it is entitled to vote, it should receive multiple Ballots.  **IF A CREDITOR RECEIVES MORE THAN ONE BALLOT, THEN THE CREDITOR SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM AND SHOULD COMPLETE AND RETURN ALL OF THEM.**

### 7. Additional Information.

If you have any questions about (i) the procedure for voting on your Claim, (ii) the package of materials that you have received, (iii) the amount of your Claim, (iv) obtaining or replacing a Ballot, or (v) obtaining an additional copy of the Plans, this Disclosure Statement, or any exhibits to such documents, please contact the Debtors' counsel, Genovese Joblove & Battista, P.A., 100 S.E. Second Street, 44th Floor, Miami, FL 33131, Attn: Heather L. Harmon, Esq., telephone: 305.349.2300, email: hharmon@gjb-law.com, and provide a copy of your inquiry to Paul J. Battista, Esq., email: pbattista@gjb-law.com.

### ARTICLE II
### BACKGROUND AND HISTORY OF THE DEBTORS[2]

### A. The Debtors' Business Operations

FF Fund is a limited partnership that was formed in August, 2010.  FF Fund's general partner is FF Management.  FF Fund's offering documents identified a broad range of investment

---

[2] The information contained in this Article II was provided to the Debtors by FF Management.

strategies to achieve its stated objectives of "capital appreciation and current income." The offering documents explained without limitation that: "[t]o attempt to minimize the portfolio's overall volatility and exposure to exchange traded market risk, [FF Fund] will also invest a portion of its capital in a portfolio of non-exchange traded assets, including but not limited to: private investments, direct real estate and real estate partnerships, direct loans, other collateral-backed investment vehicles and securities lending partnerships. In addition, [FF Fund] may invest in real estate or other private investments thru wholly owned subsidiaries. These investments seek to enhance [FF Fund's] return, either through capital appreciation and/or stable current income streams that may be uncorrelated to [FF Fund's] other publicly traded investments."

FF Fund's offering documents further provided that FF Management "is not limited by the above discussion of the investment program. Further, the investment program is a strategy as of the date of this Memorandum only. [FF Management] has wide latitude to invest or trade [FF Fund's] assets, to pursue any particular strategy or tactic, or to change the emphasis without obtaining the approval of the Limited Partners. The investment program imposes no significant limits on the types of instruments in which [FF Management] may take positions, the type of positions it may take, its ability to borrow money, or the concentration of investments" and that "[t]he foregoing description is general and is not intended to be exhaustive. Prospective investors must recognize that there are inherent limitations on all descriptions of investment processes due to the complexity, confidentiality, and subjectivity of such processes. In addition, the description of virtually every trading strategy must be qualified by the fact that trading approaches are continually changing, as are the markets invested in by [FF Management]." A more thorough description of the risks and disclaimers associated with FF Fund is available through FF Fund's offering documents, copies of which may be obtained on request to FF Management.

As of the Petition Date, FF Fund had thirteen subsidiaries and affiliates that FF Management set up and routinely evolved over the roughly ten years since FF Fund's formation for various accounting, tax, audit, insurance, regulatory, liquidity, operational, and administrative reasons based on the advice, requirement, input, and suggestion of best practices by the FF Fund's pre-petition legal counsel and/or service providers, including, among others, auditors, accountants, administrators, and advisors. As of the Petition Date, the thirteen subsidiary and affiliates were as follows (the "Subsidiaries"):

- F1 General Trading Partners, LP
- F2 Standard Infrastructure Partners, LLC
- F3 Real Estate Partners, LLC
- F4 Global Volatility Partners, LLC
- Debtor, F5 Business Investment Partners, LLC
- F6 Standard Securities Partners, LLC
- F7 Group Operating Partners, LLC
- F8 Commercial Venture Partners, LLC
- F9 World Property Partners, LLC
- F10 Consolidated Holding Partners, LLC
- FF Fund Management, LLC
- FF Trading Management, LLC
- FF Reserve Account, LLC

As a limited partnership, FF Fund has several Limited Partners who invested directly into FF Fund and hold the Limited Partner Equity Interests in FF Fund. Prior to the Petition Date, based on the advice of FF Fund's pre-petition legal counsel, on July 25, 2019, FF Fund issued a wind-down notice to its Limited Partners, which FF Fund's pre-petition legal counsel advised FF Management to do in order to effectively convert the fund from an open-ended fund to a closed-end fund, along with various other effective changes, including, but not limited to, certain advancement rights to the General Partner as well as certain requirements on future capital call obligations. As a general course of business, however, FF Fund transferred funds received from its Limited Partners into the various Subsidiaries and affiliates in order to enable such entities to procure investments based on their stated purpose.

Specifically and for example, F3 Real Estate Partners, LLC ("F3") was established to invest in real estate primarily from 2011 through 2019. Prior to the CRO's appointment, F3 purchased and then sold a residential complex containing 87 condominium units in West Palm Beach, FL, which sale transaction closed in May 2019.

As of the Petition Date, the F5 Business Debtor held and currently owns the majority of the current investments made by FF Fund with monies received from the Limited Partners. The investments made by the F5 Business Debtor consisted mainly of (i) illiquid, non-tradeable privately held shares in early stage or start-up companies, (ii) minority interests in real estate partnerships, or (iii) unsecured promissory notes.

As of the Petition Date, F6 Standard Securities Partners, LLC ("F6") held liquid hedge fund investments (subject to appropriate redemption notices).

As of the Petition Date, the remainder of the above Subsidiaries had nominal investments.

**B.    Service Providers**

As of the Petition Date, FF Management, often on the advice of legal counsel, or as required by regulatory or insurance or best practice reasons or requirements, engaged a number of third-party companies to aggregate, organize, and manage the information and data of FF Fund, including information received from the Limited Partners, various investments or other third parties (collectively, the "Service Providers").

**C.    Officers**

Immediately prior to the Petition Date, FF Fund engaged Soneet R. Kapila as chief restructuring officer (the "CRO") pursuant to the terms of a September 24, 2020 engagement letter with FF Management. The CRO filed the Chapter 11 Case for FF Fund on September 24, 2019 after signing that engagement letter. The CRO was thereafter approved by the Bankruptcy Court to act as the Debtor's chief restructuring officer by Orders dated October 25, 2019 and October 31, 2019 respectively. The CRO then sought and obtained approval from the Bankruptcy Court to file the Chapter 11 Case for the F5 Business Debtor. The CRO filed the Chapter 11 Case for the F5 Business Debtor on January 24, 2020 and thereafter sought and obtained approval from the Bankruptcy Court to act as the CRO for the F5 Business Debtor.

**D.    Summary of Prepetition Indebtedness**

As of the Petition Date, the Debtors did not have any Creditors asserting Secured Claims. With respect to General Unsecured Claims, the Debtors estimate that the ultimate amount of Allowed General Unsecured Claims (i) that will remain against FF Fund will be approximately $2.7 million in class 2 and $2.0 million in class 3, with the class 3 claim subject to subordination and a cap pursuant to and as set forth in the Plans, and (ii) that will remain against the F5 Business Debtor will be approximately $4.5 million.

### E.    The Debtors' Investments

As stated above, the investments/assets that existed as of the Petition Date are generally held in the name of FF Fund, the F5 Business Debtor and F6. With a few exceptions, the investments/assets are generally held in early stage businesses which were and are inherently speculative and illiquid in nature. The following is an overall summary of the investments:

### 1.    FF Fund

In addition to the Subsidiaries, FF Fund currently holds three direct investments: (i) two investments that are privately held shares not tradeable in the open market and illiquid; and (ii) a special purpose vehicle investment.  Attached as Exhibit 1 hereto is a summary and description of the assets and investments held the Debtors, including the FF Fund Debtor.

### 2.    F6

As of the Petition Date, F6 held liquid hedge fund investments. On January 6, 2020 and pursuant to the approval of the Bankruptcy Court, the CRO submitted redemption requests to each such hedge fund in order to redeem F6's interests therein. To date, three of the four hedge fund positions have been liquidated, resulting in approximately $175,000 being received by F6.

### 3.    The F5 Business Debtor

As of the Petition Date, the F5 Business Debtor held approximately 46 investments, many of which are either illiquid, consist of non-tradeable privately held shares in early stage or start-up companies, are minority interests in real estate partnerships or are unsecured promissory notes with non-long term maturities.

Based on the records and information received to date by the CRO on the Investments, the CRO and his Professionals have reviewed and analyzed each of the Investments for the following information:

- The type of Investment, e.g. equity, convertible security or promissory note;

- The specifics of the equity interest held by the F5 Business Debtor;

- The amount invested and/or loaned by the F5 Business Debtor;

- The capital call obligations ("Capital Calls"), if any, that might require the F5 Business Debtor to fund future amounts in connection with any such Investments.

- The ownership group in the Investment, including the principal(s) thereof.

- A description and understanding of the Investment; and

- The various withdrawal, liquidation and/or assignment rights of the F5 Business Debtor therein based on the Investment Subscription Agreements, Operating Agreements and/or Promissory Notes.

Certain of the Investments that consist of equity interests in various companies require approval from either the manager or members of such companies in order for the F5 Business Debtor to be able to sell, assign or transfer the F5 Business Debtor' interest therein.

A summary and description of the assets and investments held by the F5 Business Debtor are included in Exhibit 1 attached hereto.

One of those investments in Exhibit 1 that is held by the F5 Business Debtor consists of a loan and equity investment made in Acadaca, LLC, which is a New York limited liability company, which is under the direct or indirect control of Mr. Jason Feingold.  The investment made by the F5 Business Debtor in Acadaca, LLC consists of (i) loans made by the F5 Business Debtor to Acadaca as evidenced by a $500,000 Promissory Note, dated December 1, 2015 and a $6,250,000 Promissory Note, dated May 21, 2017 (the "Acadaca Promissory Notes"), each issued by Acadaca in favor of the F5 Business Debtor, and (ii) money invested by the F5 Business Debtor into Acadaca in exchange for a 10% membership interest in Acadaca (the "Equity Interest").  Prior to the Petition Date, on June 22, 2019, the F5 Business Debtor and Acadaca entered into a certain Agreement, pursuant to the terms of which the F5 Business Debtor and Acadaca agreed to release each other from and against any and all obligations under the above loans, the Acadaca Promissory Notes and the Equity Interest (the "Release Agreement").  The Debtors have been engaged in extended settlement discussions with Acadaca and certain related parties in an effort to resolve and settle issues between the Debtors and such parties, including specifically related to the Release Agreement so as to reinstate the above loans, the Acadaca Promissory Notes and the Equity Interests in accordance with their original terms (the "Acadaca Claims").  The Debtors have reached an agreement in principle on the material terms of such settlement and anticipate bringing such settlement, once finalized and documented, to the Bankruptcy Court approval under Bankruptcy Rule 9019.  The settlement with Acadaca will be conditioned on confirmation of the Plans and the occurrence of the Effective Dates thereunder.

A second investment listed in the attached Exhibit 1 consists of a number of investments made pre-petition by the Debtors through Mike Skinner Properties, LLC, Michael Skinner and Angie Skinner (collectively, the "Skinners").  Such investments made by the Debtors through the Skinners included funding the purchase of an airplane hangar known as the Cessna property ($795,000), a condominium known as the Cornell property ($176,000) and in a loan made to an individual named Mr. Hoobler ($72,000).  The Cessna property and the Cornell property have been sold by the Skinners and the loan to Mr. Hoobler has been collected by the Skinners and only a portion of such proceeds have been remitted to the Debtors.  The Debtors were in extended settlement discussions with the Skinners related to claims that have been asserted by and between the Debtors and the Skinners, including related to the proceeds from the assets/investments described above that have not been turned over to the Debtors by the Skinners (the "Skinner

Claims"). In February, 2020, the Skinners, in partial resolution of the claims asserted by the Debtors related to the above assets, transferred an amount equal to approximately $375,000 to the Debtors. The Skinners have also asserted claims against the Debtors and Mr. Franzone, including (i) set off claims related to the proceeds from the sale of the above assets, and (ii) claims that the Skinners invested in certain of the Florence Capital Partner entities set forth on Exhibit 1 hereto through the Debtors and did not receive an assignment of such interests or proceeds paid in connection therewith. Michael Skinner also holds a Limited Partner Equity Interest in the FF Fund Debtor and asserts that he properly redeemed such Equity Interest prior to the Petition Date, which Mr. Skinner asserts entitles him to a General Unsecured Claim against the FF Fund Debtor in an amount equal to approximately $250,000. The Debtors dispute the claims asserted by the Skinners, including in respect of the asserted redemption claim. The Skinner Claims are being preserved hereunder and will be pursued either before and/or after the Effective Date.

## ARTICLE III
## EVENTS LEADING TO THE CHAPTER 11 CASES

A.    **Generally.**

Prior to the Petition Date, the Debtors were controlled by Andrew Franzone, who is the managing member of FF Management. As set forth further herein, since their respective petition dates, Soneet R. Kapila as CRO has controlled the Debtors. The Prepetition Events described below happened before the CRO was in place with the Debtors.

On July 25, 2019, FF Management announced a fund wind down and started the process of returning capital to all of the 85+ investors in FF Fund – a process that FF Management projected to take approximately three years due to the illiquid nature of many of the investments in FF Fund's portfolio. The parameters of the wind down announcement are governed by the offering documents of FF Fund.

FF Management was advised by FF Fund's pre-petition legal counsel to announce the wind down after FF Fund's largest investor, the Linden West Trust (the "LW Trust") through Dennis S. Hersch ("Hersch") as trustee, which had approximately $34 million, or roughly 70%, of FF Fund's Limited Partner Equity Interests filed a full redemption request shortly before that wind down announcement.

B.    **Litigation – Pre-petition and post-petition**.

On August 6, 2019, Hersch, as trustee for the LW Trust, brought an action against FF Management, Andrew Franzone and FF Fund in Delaware Chancery Court seeking, among other things, (i) dissolution of FF Fund, (ii) the appointment of a liquidating agent/trustee over FF Fund and (iii) damages for alleged fraud, breach of fiduciary duty and breach of contract against FF Management and Franzone (the "Hersch Delaware Litigation"). None of the allegations in the Hersch Delaware Litigation have been litigated and/or proven. A copy of the Complaint in the Hersch Delaware Litigation may be obtained by sending an email to Debtors' counsel, Paul J. Battista, Esq. (pbattista@gjb-law.com) and/or Heather L. Harmon, Esq. (hharmon@gjb-law.com).

As a result of the Hersch Delaware Litigation, on September 24, 2019, FF Management, also on the advice of legal counsel, retained Soneet R. Kapila as CRO to function as an independent

person who would take control over FF Fund and its assets, and to, among other things, preserve the value of such assets and to attempt to monetize such assets.  The filing of the Chapter 11 Cases provided immediate benefits to FF Fund, including because it stayed the Delaware litigation.

As set forth below, on December 1, 2020, Hersch, as trustee for the LW Trust, notified the Debtors that the LW Trust and the HKW 2018 Trust (Mr. Harry K. Wexner) elected to abandon and forfeit the entirety of their respective Limited Partner Equity Interests in the FF Fund Debtor.

On October 28, 2020, Dennis Hersch, individually and not as trustee for the LW Trust, filed a lawsuit in the United States District Court for the Southern District of New York, Case No, 20-cv-09047, against Franzone and FF Management alleging fraud, breach of duty and breach of contract in connection with Hersch's individual Limited Partner Equity Interest in the FF Fund Debtor (the "Hersch New York Litigation").  Franzone and FF Management have denied the allegations in the Hersch New York Litigation and have sought to dismiss the Hersch New York Litigation and Hersch has responded and objected to such dismissal.  The Court has not ruled on such motion as of the date hereof.  A copy of the Complaint and related pleadings in the Hersch New York Litigation may be obtained by sending an email to Debtors' counsel, Paul J. Battista, Esq. (pbattista@gjb-law.com) and/or Heather L. Harmon, Esq. (hharmon@gjb-law.com).

On December 4, 2020, Hersch, in his capacity as the trustee for the LW Trust, his son Gregory A. Hersch, FloCap, LLC, the HKW Trust, Michael and Angela Skinner and certain other plaintiffs filed a lawsuit in the Court of Chancery Court for the State of Delaware against Franzone and the following four limited liability companies of which Franzone was and is the managing member: Florence Capital Advisors SPV II, LLC, Florence Capital Advisors SPV IV, LLC, Florence Capital Advisors SPV V, LLC, and Florence Capital Advisors SPV VI, LLC (the "FloCap Litigation").  Pursuant to the FloCap Litigation, the plaintiffs sought to remove and replace Franzone as the sole managing member of such entities, and for damages for his alleged breach of duty.  Franzone has denied these allegations. Franzone also asserts that he acted as the sole managing member at the request of G. Hersch, FloCap, Hersch.  Franzone asserts that he received no compensation for such role.  Franzone also asserts that he assumed such role in order to, among other reasons, help protect the Debtors' interests in these entities.  A copy of the Complaint in the FloCap Litigation may be obtained by sending an email to Debtors' counsel, Paul J. Battista, Esq. (pbattista@gjb-law.com) and/or Heather L. Harmon, Esq. (hharmon@gjb-law.com).

### C.    The Debtors' Relationship With Gregory Hersch

Gregory Hersch ("G. Hersch"), Dennis Hersch (who is G. Hersch's father) and Andrew Franzone have had a long standing personal and professional relationship.

G. Hersch is the principal and the owner of Florence Capital Advisors, LLC ("FloCap"). FloCap is a Delaware limited liability company that is an investment adviser firm registered with the Securities and Exchange Commission under SEC #801-106523.

On December 23, 2015, FloCap and the FF Fund Debtor entered into a Discretionary Wealth Management Agreement, pursuant to the terms of which FloCap, by and through G. Hersch, provided the FF Fund Debtor with investment management and advisory services in connection with the FF Fund Debtor's investment of its assets (the "Investment Services

12

Agreement"). The Investment Services Agreement has been amended five times, with the most recent amendment dated July 1, 2018.

Pursuant to the Investment Services Agreement, the FF Fund Debtor paid monthly advisory fees to FloCap that ranged from $30,000 per month to $60,000 per month. From November 7, 2016 through April 11, 2019, the FF Fund Debtor paid a total of $851,866.51 in advisory fees to FloCap (the "Hersch Transfers").

Based on investment advice from FloCap and G. Hersch, the FF Fund Debtor and the F5 Business Debtor invested in excess of $3.9 million in several investments. Included in Exhibit 1 attached hereto is a listing of the investments made by the Debtors based on investment advice from FloCap and G. Hersch.

On October 9, 2020, FloCap and G. Hersch were sued in the Superior Court of the State of California, Case No. 20STCV32965, by Theresa Hughes, as trustee for the Blake Mallen 2013 Trust (the "Mallen Litigation"). The plaintiffs in the Mallen Liitgaiton have alleged breach of fiduciary duty, constructive fraud, fraud – intentional misrepresentation, fraud-concealment, negligent misrepresentation and negligence against FloCap and G. Hersch in connection with advice given to them by G Hersch to invest in the FF Fund Debtor. Neither the Debtors nor Franzone are listed as defendants in the Mallen Litigation. The Mallen Litigation was recently dismissed in favor of an private arbitration based on the agreement of the parties thereto. The Debtors understand that the arbitration is on-going. A copy of the Complaint in the Mallen Litigation may be obtained by sending an email to Debtors' counsel, Paul J. Battista, Esq. (pbattista@gjb-law.com) and/or Heather L. Harmon, Esq. (hharmon@gjb-law.com).

D.    **Investigation by the Securities and Exchange Commission**.

The Debtors understand that the Securities and Exchange Commission (the "SEC") has commenced an investigation that involves the Debtors and perhaps others related to the Debtors. The Debtors do not know the scope or extent of such investigation, or who is the subject of such investigation. The Debtors also do not know the status of such investigation and whether and/or when it may lead to the filing of any actions by the SEC.

The Debtors received a subpoena from the SEC on April 27, 2020 for the production of documents related to the Debtors and their investments. The Debtors fully responded to the subpoena. The Debtors also understand that the SEC has issued subpoenas to various other parties related to the Debtors, but do not know who and/or whether such discovery is ongoing. The Debtors will continue to cooperate with the SEC in connection with its investigation.

The SEC has filed a protective proof of claim in these Chapter 11 Cases in an amount to be determined. Pursuant to the SEC Claim, the SEC asserts that the "monetary remedies may be imposed against FF Fund I, L.P. … for potential violations of the federal securities laws." In addition, the Debtors agreed to the entry of an order further extending the deadline for the SEC to file an action seeking to determine the non-dischargeability of any debt owed to the SEC. Pursuant to an Order of the Bankruptcy Court, dated October 21, 2020, the current deadline for the SEC to bring any such action is February 1, 2021.  [ECF No. 177].

# ARTICLE IV
## MATERIAL EVENTS OCCURRING DURING CHAPTER 11 CASES

On September 24, 2019, FF Management retained the CRO to manage FF Fund. FF Management was and is controlled by Franzone.

On September 24, 2019 (the "Petition Date") and at the direction of the CRO, FF Fund filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Florida, Miami Division (the "Bankruptcy Court"), Case No. 19-22744-BKC-LMI. In connection therewith, FF Fund filed certain "first day" motions, including a motion to approve Soneet R. Kapila as the CRO, together with personnel at KapilaMukamal, LLP ("KM") to provide advisory services to the CRO, and to employ Paul J. Battista, Esq. and the law firm of Genovese Joblove & Battista, P.A ("GJB") as bankruptcy counsel to the Debtor, FF Fund.

The Bankruptcy Court granted the motion to approve Soneet R. Kapila as the CRO, including the use of personnel at KM, and the employment of GJB initially on an interim basis and then on a final basis by Orders dated October 25, 2019 and October 31, 2019 respectively, all effective as of the Petition Date.

On October 17, 2019, Mr. Franzone filed a Motion For Order Granting Relief From Automatic Stay, To Extent Applicable, To Permit Certain Insurance Carriers To Pay Certain Defense Costs To The Movants Under Debtor's Insurance Policy. On December 31, 2019, the Bankruptcy Court entered an order granting the motion (DE 53). Since then, the Bankruptcy Court entered a further order authorizing an increase in the amounts to be paid from the policy [DE 66]. To date, approximately $500,000 of the policy limit of $1,000,000, subject to the $150,000 retainer which was satisfied in advance by FF Management has been used and approved by the insurance carrier, leaving $500,000 of the policy still available for any potential future derivative claims.

On December 30, 2019, at the request of the CRO, the Bankruptcy Court entered an order granting FF Fund's motion (i) to vote its equity interest in F5 Business to remove the then manager of F5 Business, Mr. Franzone, and replace him with the CRO, and (ii) to file a Chapter 11 bankruptcy petition for F5 Business.

In addition, on December 30, 2019, at the request of the CRO, the Bankruptcy Court entered an order granting FF Fund's motion (i) to vote its equity interest in F6 Standard Securities Partners, LLC ("F6") to remove the then manager of F6, Mr. Franzone, and replace him with the CRO, and (ii) to authorize F6 and the CRO to liquidate the remaining assets of F6, and transfer the proceeds therefrom to FF Fund, subject to addressing any liabilities in F6.

On January 24, 2020 (a "Petition Date") and consistent with the Bankruptcy Court's order, the CRO caused F5 Business to file a voluntary petition under Chapter 11 of the Bankruptcy Code the Bankruptcy Court under Case No. 20-10996-BKC-LMI. On January 30, 2020 the Debtors filed a motion seeking an order seeking joint administration of the Debtors' two bankruptcy cases (DE 89). On February 4, 2020 the Bankruptcy Court entered an order (DE 98) approving the motion.

On January 31, 2020, the Debtors sought to extend the CRO's engagement to the F5 Business Debtor and filed the Application to Employ Soneet R. Kapila as Chief Restructuring

Officer for F5 Business Investments Partners, LLC and Other Professionals at KapilaMukamal, LLC to Provide Advisory Services (DE 91).  On February 27, 2020, the Bankruptcy Court entered an order approving this Motion (DE 116).

On January 31, 2020, the F5 Business Debtor filed its Application for Authority to Employ and Retain Paul J. Battista and the Law Firm of Genovese Joblove & Battista, P.A. as General Bankruptcy Counsel (DE 92). On February 27, 2010, the Bankruptcy Court entered an order approving this application (DE 117).

Upon his appointment, the CRO began to go through the records underlying and supporting the various investments which were held by one or more of the Service Providers.  After a labor intensive and complex undertaking by KM and GJB over the course of several months, including multiple requests and follow up requests for documents and information on FF Fund, the F5 Business Debtor and their various investments, KM and GJB were able to procure a substantial volume of records from numerous sources, including the use of formal document discovery through subpoenas issued under Bankruptcy Rule 2004.

The CRO, through GJB and KM, requested records from as many as 11 of the Service Providers, either directly or through the issuance of Bankruptcy Rule 2004 subpoenas.  The CRO, through KM, identified 81 separate bank or brokerage accounts for FF Fund, FF Management and other entities related to them and Mr. Franzone over the ten year period from 2010 through the Petition Date (the "Bank Accounts"). Thirty-one of such Bank Accounts were maintained at SunTrust Bank.  At the direction of the CRO, GJB issued Bankruptcy Rule 2004 subpoenas to the various financial institutions who maintained the Bank Accounts in order to obtain bank statements, opening and closing documents, cancelled checks, wire transfer information and underlying support. The process of obtaining documents from the various financial institutions in respect of the Bank Accounts has been extensive and labor-intensive. A substantial number of such documents have been produced.

In addition to obtaining financial records of the Bank Accounts, KM contacted representatives of over 40 of the underlying investments that FF Fund and the F5 Business Debtor had made in order to procure investment records, current financial statements and information, and the status of each such investment. KM undertook such efforts so as to evaluate the potential recovery to FF Fund and/or the F5 Business Debtor from each such investment. The process of evaluating each such investment required substantial time and energy on the part of KM, including multiple follow-up calls and emails, providing confirmation of the CRO's authority over FF Fund and the F5 Business Debtor in order to request and receive such records, and at times, needing the assistance of Mr. Franzone to intercede on behalf of the CRO with such investment principals, which assistance Mr. Franzone provided.

Shortly after the respective Petition Dates, the CRO established separate Debtor-in-Possession bank accounts in the name of FF Fund and the F5 Business Debtor, along with bank accounts for the remaining Subsidiaries. The combined bank balance as of September 9, 2020 for the FF Fund and the Subsidiaries was $1,045,258. The principal sources of such funds on deposit are from: (i) funds in the Bank Accounts that the CRO closed after his appointment, (ii) dividends received post-petition from certain of the investments, (iii) proceeds from the liquidation of the hedge fund positions at F6, and (iv) proceeds from investments whose underlying asset has been

liquidated or sold. The CRO files monthly Debtor-in-Possession operating reports for FF Fund and the F5 Business Debtor that include receipts and disbursements for the prior month, including on an aggregate basis. Such reports can be obtained on the Bankruptcy Court's PACER docket.

As against FF Fund, the Bankruptcy Court established February 10, 2020 as the general bar date to file proofs of claim and March 23, 2020 as the governmental bar date to file proofs of claim. As against the F5 Business Debtor, the Bankruptcy Court established June 3, 2020 as the general bar date to file proofs of claim and July 22, 2020 as the governmental bar date to file proofs of claim.

On December 1, 2020, the Debtors received written notice from The Linden West Trust and HKW 2018 Trust (Mr. Harry K. Wexner) that they elected to abandon and forfeit the entirety of their respective Limited Partner Equity Interests in the FF Fund Debtor, which Limited Partner Interests represent in excess of $34 million and 70% of the total Limited Partner Equity Interests in the FF Fund Debtor. In connection therewith, on January 14, 2021, the Debtors filed an Agreed Ex-Parte Motion to Strike and Disallow Proofs of Claims/Interests [ECF No. 211]. On January 15, 2021, the Court entered an Order granting such motion [ECF No. 212].

As a result of the forfeiture of the Limited Partner Equity Interests by The Linden West Trust and HKW 2018 Trust (Mr. Harry K. Wexner) as set forth above, over 70% of the Limited Partner Equity Interests have been eliminated. To that end, the remaining Holders of Limited Partner Equity Interests have had their ownership percentages increased. Attached hereto as Exhibit 2 is a revised listing of the Holders of the Limited Partner Equity Interests.

On January 20, 2021, Genovese Joblove & Battista, P.A.. as counsel to the Debtors, filed its First Interim Application for Compensation and Reimbursement of Expenses [ECF No. 214] seeking fees in the amount of $393,331 and expenses in the amount of $10,164.09.

On January 20, 2021, Soneet R. Kapila, as the CRO for the FF Fund Debtor, filed his First Interim Application for Compensation and Reimbursement of Expenses [ECF No. 215] seeking fees in the amount of $499,984.20 and expenses in the amount of $5,056.81.

On January 20, 2021, Soneet R. Kapila, as the CRO for F5 Business Debtor, filed his First Interim Application for Compensation and Reimbursement of Expenses [ECF No. 216] seeking fees in the amount of $278,925.00 and expenses in the amount of $1,021.24.

On January 20, 2021, a Limited Objection and Reservation of Rights to the Debtors' Disclosure Statement [ECF No. 217] was filed by the Securities and Exchange Commission (the "SEC Limited Objection").

On January 20, 2021, an Objection to the Debtors' Disclosure Statement [ECF No. 221] was filed by Florence Capital Advisors, LLC, Gregory A. Hersch, Richard Grausman, Brian Stein, the Ann Lewin Revocable Trust, Angie Skinner, Michael Skinner, the Kimple 2009 Trust, Lewis Hall, Stalene Hall and Ashleigh Aungst.

On January 20, 2021, an Objection to the Debtors' Disclosure Statement [ECF No. 222] was filed by Dennis S. Hersch, individually.

In response to the above Objections, on February 1, 2021, the Debtors filed a First Amended Disclosure Statement [ECF No. ___], a First Amended Chapter 11 Plan of Reorganization Proposed by FF Fund I, L.P. [ECF No. ___] and a First Amended Chapter 11 Plan of Reorganization Proposed by F5 Business Investment Partners, LLC [ECF No. ___].

On February 4, 2021, the Bankruptcy Court conducted a hearing on the approval of the First Amended Disclosure Statement.  At such hearing, the Debtors announced, among other things, that they will terminate exclusivity under Section 1121 of the Bankruptcy Code so as to enable any party-in-interest to file and seek confirmation of a competing plan.

## ARTICLE V
## SUMMARY OF THE PLANS

### A.    Summary

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLANS.  THE DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLANS AND THE EXHIBITS AND SCHEDULES THERETO.**

The Plans classify Claims and Equity Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Equity Interests. Claims and Equity Interests shall be included in a particular Class only to the extent such Claims or Equity Interests qualify for inclusion within such Class.  The Plans separate the various Claims (other than those that do not need to be classified) into five (5) separate Classes in the case of the FF Fund Plan and three (3) separate Classes in the case of the F5 Business Plan.  These Classes take into account the differing nature and priority of Claims against, and Equity Interests in, the respective Debtor.  Unless otherwise indicated, the characteristics and amounts of the Claims or Equity Interests in the following Classes are based on the books and records of the Debtors.

The Plans are intended to enable the Debtors to continue their present operations without the likelihood of a subsequent liquidation or the need for further financial reorganization.  FF Management believes that the Debtors will be able to perform all of their obligations under the Plans and meet their expenses after the Effective Date without further financial reorganization. Also, FF Management believes that the Plans permit fair and equitable recoveries, while expediting the reorganization of the Debtors.

Other than as specifically provided in the Plans, the treatment under the Plans of each Claim and Equity Interest will be in full satisfaction, settlement, release and discharge of all Claims or Equity Interests.  The Reorganized Debtors will make all payments and other distributions to be made under the Plans unless otherwise specified.

### B.    Exit Financing and the Investment Guarantee Amount

The Plans are premised on the provision by (i) FF Management, the general partner of FF Fund, on the Effective Date of an Investment Guarantee Amount in the amount of $4.0 million in cash, and (ii) the Exit Lender of the Exit Financing in the form of a line of credit in the amount of $1.5 million. In exchange for the Investment Guaranty Amount, FF Management will retain its General Partner Equity Interest in FF Fund, will be issued the New Limited Partner Equity Interests in FF Fund and will continue to manage the Debtors' Assets in the ordinary course of business after the Effective Date. The Investment Guarantee Amount and the Exit Financing will be used by the Reorganized Debtors to finance: (i) initial Distributions under the Plans, including to Holders of Allowed General Unsecured Claims, (ii) the Debtors' anticipated working capital needs for operations, and (iii) new and existing investments.

The Investment Guarantee Amount is being made available by FF Management to the Debtors pursuant to Section 3.8 of that certain 3rd Amended and Restated Limited Partnership Agreement of FF Fund I, L.P. dated December 12, 2013, as may be modified in the Plan Supplement. Pursuant thereto, FF Management (as the general partner of FF Fund) may, if it determines that a material event that negatively impacts FF Fund's financial prospects or results has occurred, guarantee all or a portion of an investment by either depositing cash into FF Fund's bank account, waiving all or a portion of management and performance fees for investors in FF Fund that were affected by such material event, or some combination of the foregoing. FF Management has up to 180 days following the date upon which FF Management makes an affirmative determination to invoke the Investment Guarantee Amount to decide the form of the Investment Guarantee Amount.

As set forth above and in the Plans, FF Management will contribute the Investment Guarantee Amount, which is in the aggregate amount equal to $4,000,000, to the FF Fund Debtor and the F5 Business Debtor on the Effective Date, which amount will be allocated between the FF Fund Debtor and the F5 Business Debtor as determined by FF Management, provided that there shall be at least a sufficient amount available to each of the FF Fund Debtor and the F5 Business Debtor to pay the obligations of the FF Fund Debtor and the F5 Business Debtor in accordance with the Plans on the Effective Dates thereof. The Investment Guarantee Amount shall be used solely to fund the Debtors' obligations under the Plans (including Allowed Administrative Claims, Professional Fees, Allowed Claims and Allowed Equity Interests), to fund the Reorganized Debtors' operations and to fund new and existing investments by the Reorganized Debtors. The Investment Guarantee Amount shall be deposited into the attorneys' trust account of Genovese Joblove & Battista, P.A., as counsel to the Debtors, on the date that is at least five (5) business days prior to the Confirmation Hearing. Such funds shall only be used to fund the Investment Guarantee Amount required to be funded by FF Management on the Effective Date of the Plans. In the event the Plans are not confirmed on or before 15 business days after the Investment Guarantee Amount has been deposited into such trust account, then FF Management shall have the right to withdraw such funds from such trust account upon written notice to the Debtors and counsel to the Debtors, Genovese Joblove & Battista, P.A., which notice shall be filed with the Bankruptcy Court. Upon receipt of such notice, Genovese Joblove & Battista, P.A. shall return the Investment Guarantee Amount to FF Management. In such event, the Debtors reserve the right to withdraw the Plans.

As a further inducement to Holders of Allowed Claims, FF Management has agreed to (i) subordinate its $2,000,000 claim against the FF Fund Debtor to all Allowed General Unsecured Claims against the FF Fund Debtor and the F5 Business Debtor (but not to the Holders of Limited

Partner Equity Interests) as part of the Plans, and (ii) reduce such claim to $1,000,000 provided that FF Management or its designee is the provider of the Investment Guarantee Amount.

### C. Provisions for Treatment of Unclassified Claims

#### 1. Administrative Expense Claims

Pursuant to each Plan, the Debtors shall pay each holder of an Allowed Administrative Claim, in satisfaction of such Allowed Administrative Claim, the full unpaid amount of such Allowed Administrative Claim in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (3) at such time and upon such terms as may be agreed upon by such holder and the applicable Debtor; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that any Claim seeking administrative expense status included as a part of a proof of claim filed in this Chapter 11 Case shall not qualify as an Administrative Claim.  The treatment of Allowed Administrative Expense Claims shall be the same under the Liquidating Trust Alternative, if applicable.

#### 2. Professional Fee Claims

On or prior to the deadline set by the Bankruptcy Court for Professionals to file final fee applications, each Professional shall file with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the applicable Petition Date through the Confirmation Hearing.  Pursuant to each Plan, the Debtors shall pay the Allowed Professional Fee Claim of each Professional from Available Cash in accordance with the Orders of the Bankruptcy Court, unless otherwise agreed to by the Holders of such Allowed Professional Fee Claims.  From and after the Confirmation Date until the Effective Date, the Debtors, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, shall pay the reasonable fees and necessary and documented expenses of the Professionals during such period.  The treatment of Allowed Professional Fee Claims shall be the same under the Liquidating Trust Alternative, if applicable.

#### 3. Priority Tax Claims

Pursuant to each Plan, the Debtors shall pay each holder of an Allowed Priority Tax Claim, in satisfaction of such Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law; provided, however, that the Debtors shall not pay any premium, interest or penalty in connection with such Allowed Priority Tax Claim.  The treatment of Allowed Priority Tax Claims shall be the same under the Liquidating Trust Alternative, if applicable.

### 4.    Statutory Fees

Notwithstanding any other provisions of the Plans to the contrary, the Debtors shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), within ten (10) days of the entry of the order confirming each Plan, for pre-confirmation periods and simultaneously file all the Monthly Operating Reports for the relevant periods, indicating the cash disbursements for the relevant period.  The Reorganized Debtors shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6), based upon all post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Reorganized Debtors, until the earlier of the closing of the applicable Chapter 11 Case by the issuance of a Final Decree by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing such case or converting such case to another chapter under the United States Bankruptcy Code, and the Reorganized Debtors shall provide to the United States Trustee upon the payment of each post-confirmation payment, and concurrently filed with the Court, Post-Confirmation Quarterly Operating reports indicating all the cash disbursements for the relevant period.  The treatment and payment of the fees due to the Office of the United States Trustee shall be the same under the Liquidating Trust Alternative, if applicable, provided that the Liquidating Trustee shall be responsible to pay the post-confirmation fees and file the post-confirmation reports.

The table below provides a summary of the classification, treatment and estimated recoveries of Claims and Equity Interests under the Plans.  This information is provided in summary form below for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, and is qualified in its entirety by reference to the provisions of the Plans.

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS AND
ESTIMATED RECOVERIES**

A.      **The FF Fund Plan**

| Class | Treatment of Claims and Interests | Estimated Aggregate Claims | Estimated Percentage Recovery |
|---|---|---|---|
| Class 1: Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim has been paid by either Debtor prior to the Effective Date or agrees to a different classification and treatment, each holder of an Allowed Other Priority Claim shall receive the full unpaid amount of such Allowed Other Priority Claim in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law; provided, however, that the Debtors shall not pay any premium, interest or penalty in connection with such Allowed Other Priority Claim. The treatment of Other Priority Claims shall be the same under the Liquidating Trust Alternative, if applicable. | $0 | 100% |
| Class 2: Allowed General Unsecured Claims | In full and final satisfaction of their Allowed Class 2 General Unsecured Claims, each holder of an Allowed Class 2 General Unsecured Claim shall receive (i) a Distribution in an amount equal to twenty (20%) percent of their respective Allowed Class 2 General Unsecured Claim on the Effective Date or as soon as reasonably practicable thereafter, (ii) a second Distribution in an amount equal to twenty (20%) percent of their respective Allowed Class 2 General Unsecured Claim on the one year anniversary of the Effective Date, (iii) a third Distribution in an amount equal to twenty (20%) percent of their respective Allowed Class 2 General Unsecured Claim on the second anniversary of the Effective Date, and (iii) a final Distribution in an amount equal to forty (40%) percent of their respective Allowed Class 2 | $2,700,000 | 100% |

21

| | | | |
|---|---|---|---|
| | General Unsecured Claim on the third anniversary of the Effective Date. | | |
| Class 3: Allowed Subordinated Claims | In full and final satisfaction of its Allowed Class 3 Subordinated Claims, FF Management shall receive Distributions at such times and in such amounts as the Reorganized Debtor shall determine in the exercise of its best business judgment, provided that no Distributions will be made to FF Management on account of the Allowed Subordinated Claims unless and until all Allowed Administrative Claims, all Allowed Priority Tax Claims and all Allowed Claims in Classes 1 and 2 have been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the Distribution at issue, and provided further that any proposed Distribution on the Allowed Subordinated Claims shall not adversely affect the Reorganized Debtor's ability to comply with its obligations to the holders of Class 5 Limited Partner Equity Interests under this Plan. | $1,000,000 (After taking into account the reduction consented to by the Holder of Class 3 Subordinated Claim in accordance with the terms of this Plan). | 100% |
| Class 4: General Partner Equity Interests | On the Effective Date, the legal, equitable and contractual rights of the General Partner Equity Interests shall be unaltered and the holder of the General Partner Equity Interests in the Debtor, which is FF Management, shall retain its General Partner Equity Interests in the Reorganized Debtor from and after the Effective Date. | N/A | N/A |
| Class 5: Limited Partner Equity Interests | On the Effective Date, all Limited Partner Equity Interests in the Debtor as of the Effective Date shall be cancelled and extinguished, *provided however*, that the holders of Allowed Limited Partner Equity Interests in the Debtor shall receive on account of their Limited Partner Equity Interests, one or more Distributions on a pro rata basis, during and/or before the end of the fifth year after the Effective Date in the aggregate amount of $2 million (the "LP Payment"), *provided further,* that the Reorganized Debtor shall pay interest on the LP Payment in an amount equal to two (2%) percent per annum, which interest payments shall commence on the one year anniversary of the Effective Date and continue annually thereafter on the same date until the LP Payment is paid in full. | N/A | N/A ($2,000,000 in the aggregate for the Class). |

| | | | |
|---|---|---|---|
| | Except for the payment of accrued interest as set forth above, all Distributions to the holders of Class 5 Limited Partner Interests shall be subordinated to the Distributions to the Holders of Allowed Claims in Classes 1, 2 and 3 above and no such Distributions shall be made to Holders of Class 5 Limited Partner Equity Interests unless and until all Allowed Administrative Claims, all Allowed Priority Tax Claims and all Allowed Claims in Classes 1, 2 and 3 have been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the Distribution at issue. | | |

## B.    The F5 Business Plan

| Class | Treatment of Claims and Interests | Estimated Aggregate Claims | Estimated Percentage Recovery |
|---|---|---|---|
| Class 1: Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim has been paid by the Debtor prior to the Effective Date or agrees to a different classification and treatment, each holder of an Allowed Other Priority Claim shall receive the full unpaid amount of such Allowed Other Priority Claim in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law; provided, however, that the Debtor shall not pay any premium, interest or penalty in connection with such Allowed Other Priority Claim.  The treatment of Other Priority Claims shall be the same under the Liquidating Trust Alternative, if applicable. | $0 | 100% |
| Class 2: Allowed General Unsecured Claims | In full and final satisfaction of their Allowed Class 2 General Unsecured Claims, each holder of an Allowed Class 2 General Unsecured Claim shall receive (i) a Distribution in an amount equal to twenty (20%) percent of their respective Allowed Class 2 General | $4,500,000 | 100% |

| | | | |
|---|---|---|---|
| | Unsecured Claim on the Effective Date or as soon as reasonably practicable thereafter, (ii) a second Distribution in an amount equal to twenty (20%) percent of their respective Allowed Class 2 General Unsecured Claim on the one year anniversary of the Effective Date, (iii) a third Distribution in an amount equal to twenty (20%) percent of their respective Allowed Class 2 General Unsecured Claim on the second anniversary of the Effective Date, and (iii) a final Distribution in an amount equal to forty (40%) percent of their respective Allowed Class 2 General Unsecured Claim on the third anniversary of the Effective Date. | | |
| Class 3: Allowed Equity Interests | On the Effective Date, the legal, equitable and contractual rights of the Equity Interests shall be unaltered and the holder of the Equity Interests in the Debtor, which is the FF Fund Debtor, shall retain its Equity Interests in the Reorganized Debtor from and after the Effective Date. | N/A | N/A |

### C.      Classification of Claims and Equity Interests Under the Plans

The following table designates the Classes of Claims against and Equity Interests in the Debtors under the Plans, and specifies which Classes are (a) Impaired or Unimpaired by the Plans, (b) entitled to vote to accept or reject the Plans in accordance with section 1126 of the Bankruptcy Code, or (c) deemed to accept or reject the Plans.

### I.  The FF Fund Plan

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | No | No, Deemed to Accept |
| 2 | General Unsecured Claims | Yes | Yes |
| 3 | Allowed Subordinated Claims | Yes | Yes |
| 4 | General Partner Equity Interests | No | No, Deemed to Accept |
| 5 | Limited Partner Equity Interests | Yes | Yes |

### II.  The F5 Business Plan

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | No | No, Deemed to Accept |
| 2 | General Unsecured Claims | Yes | Yes |
| 3 | Allowed Equity Interests | No | No, Deemed to Accept |

### D.    The Liquidating Trust Alternative - Treatment of Claims and Equity Interests

In the event the Debtors elect to proceed with the Liquidating Trust Alternative, then in lieu of the above treatments, the Classes of Claims and Interests under the Plans shall be treated and paid as follows:

### 1.    FF Fund Plan:

**Class 2 of the FF Fund Plan - Allowed General Unsecured Claims.**  Class 2 of the FF Fund Plan consists of the Holders of Allowed General Unsecured Claims.  In full satisfaction, settlement, release, extinguishment and discharge of each such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim against the FF Fund Debtor's Estate shall receive a Class A Beneficial Interest in the Liquidating Trust created under the FF Fund Plan on a Pro Rata basis with all other Holders of Allowed General Unsecured Claims against the FF Fund Debtor.  Such Class A Beneficial Interest shall entitle such Holder to Distributions from time to time from the applicable Liquidating Trust, as determined by the Liquidating Trustee in the exercise of his business judgment after accounting for any Liquidating Trust Reserves, on a Pro Rata basis with the Holders of all Class A Beneficial Interests in such Liquidating Trust, which Distributions will be made from Available Cash on deposit from time to time with the Liquidating Trust, provided that the maximum Distributions to the Holders of Allowed General Unsecured Claims shall be the full amount of each Allowed General Unsecured Claim without interest.  The first Distribution shall be made as soon as reasonably practicable following the Effective Date, provided however, that any Distribution to the Holders of Disputed Claims shall be reserved in the Disputed Claims Fund.  No Distribution shall be made to Holders of Allowed General Unsecured Claims unless and until (i) all Allowed Administrative Claims, all Allowed Professional Fee Claims, all Allowed Priority Claims, all Allowed Priority Tax Claims, and all U.S. Trustee Fees have been paid in full, reserved or otherwise resolved, and (ii) the Liquidating Trustee has paid or reserved for all obligations of the Liquidating Trust and has established the Liquidating Trust Reserve in connection therewith.  Class 2 under the FF Fund Plan is Impaired, and therefore, the Holders of the Allowed General Unsecured Claims in Class 2 under the FF Fund Plan are entitled to vote to accept or reject such Plan.  The Debtors are not able to project an expected recovery for the Holders of Allowed Class 2 Claims under the Liquidating Trust Alternative.

**Class 3 of the FF Fund Plan - Allowed Subordinated Claims**.  Class 3 of the FF Fund Plan consists of the Holders of Allowed Subordinated Claim of FF Management and any affiliates of FF Management and/or Franzone.  In full satisfaction, settlement, release, extinguishment and discharge of each such Allowed Subordinated Claim against the FF Fund Debtor's Estate, such Holder shall receive a Class B Beneficial Interest in the FF Fund Liquidating Trust created under the FF Fund Plan on a Pro Rata basis with all such Holders of Class 3 Allowed Subordinated Claims, which Class B Beneficial Interest shall entitle such Holders to receive Distributions on a Pro Rata basis from time to time from the FF Fund Liquidating Trust, as determined by the Liquidating Trustee in the exercise of his business judgment after accounting for any Liquidating Trust Reserves, from Available Cash on deposit from time to time with the FF Fund Liquidating Trust, provided that the maximum Distributions to such Holders shall be the full amount of each Allowed Subordinated Claim without interest, provided further, that no Distribution shall be made to any Holder of an Allowed Subordinated Claim unless and until (i) all Allowed Administrative

25

Claims, all Allowed Professional Fee Claims, all Allowed Priority Claims, all Allowed Priority Tax Claims, all U.S. Trustee Fees and all Allowed General Unsecured Claims in Class 2 of each Plan have been paid in full, reserved or otherwise resolved, and (ii) the Liquidating Trustee has paid or reserved for all obligations of the Liquidating Trust and has established the Liquidating Trust Reserve in connection therewith.  Class 3 under the FF Fund Plan is Impaired, and therefore, the Holders of Allowed Subordinated Claims are entitled to vote to accept or reject the FF Fund Plan.  The Debtors are not able to project an expected recovery for the Holders of Allowed Class 3 Claims under the FF Fund Plan under the Liquidating Trust Alternative.

**Class 4 of the FF Fund Plan – Holder of Allowed General Partner Equity Interests**. Class 4 of the FF Fund Plan consists of the Allowed General Partner Equity Interests in the FF Fund Debtor held by FF Management.  On the Effective Date, the legal, equitable and contractual rights of the General Partner Equity Interests shall be unaltered, provided however, that the FF Fund Debtor will not receive a discharge as set forth below and all Assets of the Estate of the FF Fund Debtor shall have been transferred to and vested in the FF Fund Liquidating Trust.  Class 4 under the FF Fund Plan is Unimpaired and therefore is deemed to have accepted the FF Fund Plan. The Debtors do not believe that there will be any recovery to FF Management on account of the Allowed General Partner Equity Interests under the Liquidating Trust Alternative.

**Class 5 of the FF Fund Plan – Holders of Allowed Limited Partner Equity Interests**. Class 5 under the FF Fund Plan consists of the Holders of the Allowed Limited Partner Equity Interests in the FF Fund Debtor.  In full satisfaction, settlement, release, extinguishment and discharge of the Allowed Class 5 Limited Partner Equity Interests under the FF Fund Plan, each Holders of such Allowed Limited Partner Equity Interests shall receive a Class C Beneficial Interest in the FF Fund Liquidating Trust created under the FF Fund Plan, which Class C Beneficial Interest shall entitle each such Holder to receive Distributions from time to time from the FF Fund Liquidating Trust, as determined by the Liquidating Trustee in the exercise of his business judgment after accounting for any Liquidating Trust Reserves, from Available Cash on deposit from time to time with the FF Fund Liquidating Trust, provided that no Distribution shall be made to such Holders on account of the Allowed Class 5 Limited Partner Equity Interests unless and until (i) all Allowed Administrative Claims, all Allowed Professional Fee Claims, all Allowed Priority Claims, all Allowed Priority Tax Claims, all U.S. Trustee Fees, all Allowed General Unsecured Claims in Class 2 of each Plan and all Allowed Subordinated Claims in Class 3 of the FF Fund Plan have been paid in full, reserved or otherwise resolved, and (ii) the Liquidating Trustee has paid or reserved for all obligations of the Liquidating Trust and has established the Liquidating Trust Reserve in connection therewith.  Class 5 under the FF Fund Plan is Impaired, and therefore, the Holders therein are entitled to vote to accept or reject the FF Fund Plan.  The Debtors are not able to project an expected recovery for the Holders of the Allowed Class 5 Limited Partner Equity Interests under the FF Fund Plan under the Liquidating Trust Alternative.

2.    **F5 Business Plan:**

**Class 2 of the F5 Business Plan - Allowed General Unsecured Claims.**  Class 2 of the F5 Business Plan consists of the Holders of Allowed General Unsecured Claims.  In full satisfaction, settlement, release, extinguishment and discharge of each such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim against the F5 Business Debtor's Estate shall receive a Class A Beneficial Interest in the F5 Business Liquidating Trust

created under the F5 Business Plan on a Pro Rata basis with all other Holders of Allowed General Unsecured Claims against the F5 Business Debtor. Such Class A Beneficial Interest shall entitle such Holder to Distributions from time to time from the Liquidating Trust, as determined by the Liquidating Trustee in the exercise of his business judgment after accounting for any Liquidating Trust Reserves, on a Pro Rata basis with the Holders of all Class A Beneficial Interests in such Liquidating Trust, which Distributions will be made from Available Cash on deposit from time to time with the applicable Liquidating Trust, provided that the maximum Distributions to the Holders of Allowed General Unsecured Claims shall be the full amount of each Allowed General Unsecured Claim without interest. The first Distribution shall be made as soon as reasonably practicable following the Effective Date, provided however, that any Distribution to the Holders of Disputed Claims shall be reserved in the Disputed Claims Fund. No Distribution shall be made to Holders of Allowed General Unsecured Claims unless and until (i) all Allowed Administrative Claims, all Allowed Professional Fee Claims, all Allowed Priority Claims, all Allowed Priority Tax Claims, and all U.S. Trustee Fees have been paid in full, reserved or otherwise resolved, and (ii) the Liquidating Trustee has paid or reserved for all obligations of the Liquidating Trust and has established the Liquidating Trust Reserve in connection therewith. Class 2 under the F5 Business Plan is Impaired, and therefore, the Holders of the Allowed General Unsecured Claims in Class 2 under the F5 Business Plan are entitled to vote to accept or reject such Plan. The Debtors are not able to project an expected recovery for the Holders of Allowed Class 2 Claims under the Liquidating Trust Alternative.

**Class 3 of the F5 Business Plan – Holders of Allowed Equity Interests**. Class 3 under the F5 Business Plan consists of 100% of the Equity Interests in the F5 Business Debtor owned by the FF Fund Debtor. In full satisfaction, settlement, release, extinguishment and discharge of the Allowed Class 3 Equity Interest under the F5 Business Plan held by the FF Fund Debtor, the FF Fund Debtor shall receive a Class B Beneficial Interest in the F5 Business Liquidating Trust created under the F5 Business Plan, which Class B Beneficial Interest shall entitle the FF Fund Debtor to receive Distributions from time to time from the F5 Business Liquidating Trust, as determined by the Liquidating Trustee in the exercise of his business judgment after accounting for any Liquidating Trust Reserves, from Available Cash on deposit from time to time with the F5 Business Liquidating Trust, provided that no Distribution shall be made to the FF Fund Debtor on account of the Allowed Class 3 Equity Interest unless and until (i) all Allowed Administrative Claims, all Allowed Professional Fee Claims, all Allowed Priority Claims, all Allowed Priority Tax Claims, all U.S. Trustee Fees and all Allowed General Unsecured Claims in Class 2 of the F5 Business Plan have been paid in full, reserved or otherwise resolved, and (ii) the Liquidating Trustee has paid or reserved for all obligations of the Liquidating Trust and has established the Liquidating Trust Reserve in connection therewith. Class 3 under the F5 Business Plan is Impaired, and therefore, the FF Fund Debtor is entitled to vote to accept or reject the F5 Business Plan. The Debtors are not able to project an expected recovery for the FF Fund Debtor on account of the Allowed Class 3 Equity Interest under the Liquidating Trust Alternative.

**E.    Classification of Claims and Equity Interests Under the Liquidating Trust Alternative.**

The following table designates the Classes of Claims against and Equity Interests in the Debtors under the Liquidating Trust Alternative, and specifies which Classes are (a) Impaired or

Unimpaired by the Plans, (b) entitled to vote to accept or reject the Plans in accordance with section 1126 of the Bankruptcy Code, or (c) deemed to accept or reject the Plans.

### A. The FF Fund Plan – Liquidating Trust Alternative

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| 1 | Other Priority Claims | No | No, Deemed to Accept |
| 2 | General Unsecured Claims | Yes | Yes |
| 3 | Allowed Subordinated Claims | Yes | Yes |
| 4 | General Partner Equity Interests | No | No, Deemed to Accept |
| 5 | Limited Partner Equity Interests | Yes | Yes |

### B. The F5 Business Plan – Liquidating Trust Alternative

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| 1 | Other Priority Claims | No | No, Deemed to Accept |
| 2 | General Unsecured Claims | Yes | Yes |
| 3 | Allowed Equity Interests | Yes | Yes |

## ARTCLE VI
## MEANS OF PLAN IMPLEMENTATION[3]

### A. Source of Funding for Plan Distributions – Investment Guarantee Amount and Exit Financing

Distributions to the holders of Allowed Claims and Allowed Equity Interests as set forth in the Plans shall be made from (i) Cash on deposit in the respective Debtor's debtor-in-possession account on the Effective Date, (ii) the Investment Guarantee Amount, (iii) the proceeds from the Exit Financing, (iv) the Net Litigation Proceeds, and (v) Cash generated from the respective Reorganized Debtor's operations from and after the Effective Date. A consolidated cash flow pro forma of the proposed operations of the Debtors is attached to this Disclosure Statement as Exhibit 3 (the "Financial Projections").[4]

On or as soon as reasonably practicable following the Effective Date, the Reorganized Debtors will consummate the Exit Financing with the Exit Lender, which line of credit will be in accordance with the terms of this Plan and of the Exit Financing Documents. The Exit Lender is a third party lender with no present or prior affiliation with the Reorganized Debtors. The identity of the Exit Lender will be disclosed in the Exit Financing Documents to be filed with the Court prior to the Confirmation Hearing. The Reorganized Debtors shall be permitted to utilize the proceeds of the Exit Financing to fund their business operations from and after the Effective Date, including their obligations under the Plans. The Exit Financing is a line of credit facility in the maximum amount of $1,500,000, and shall be secured by a first lien on all of the assets of the

---

[3] The provisions of this Article VI shall not apply to the Liquidating Trust Alternative.
[4] The Financial Projections have been prepared solely by FF Management. The CRO has not independently verified any of the information in the Financial Projections other than the cash on hand and the amount of Claims asserted against the Estates.

Reorganized Debtors, shall be for a term of not less than five (5) years after the Effective Date, and shall accrue interest at a monthly rate equal to 2.0% on the outstanding balance thereof, which interest shall be paid monthly.

The Investment Guarantee Amount shall be funded into the Reorganized Debtors on the Effective Date by FF Management, provided that the Investment Guarantee Amount shall be deposited into the attorneys' trust account of Genovese Joblove & Battista, P.A., as counsel to the Debtors, on the date that is at least five (5) business days prior to the Confirmation Hearing. Such funds shall only be used to fund the Investment Guarantee Amount required to be funded by FF Management on the Effective Date of the Plans. In the event the Plans are not confirmed on or before 15 business days after the Investment Guarantee Amount has been deposited into such trust account, then FF Management shall have the right to withdraw such funds from such trust account upon written notice to the Debtors and counsel to the Debtors, Genovese Joblove & Battista, P.A., which notice shall be filed with the Bankruptcy Court. Upon receipt of such notice, Genovese Joblove & Battista, P.A. shall return the Investment Guarantee Amount to FF Management. In such event, the Debtors reserve the right to withdraw the Plans. FF Management will be borrowing the Investment Guarantee Amount from the Exit Lender. The Reorganized Debtors shall not be liable on the loan from the Exit Lender to FF Management in respect of the Investment Guarantee Amount. The loan by the Exit Lender to FF Management will be secured by, among other things, a pledge of the New Limited Partner Equity Interests to be issued to FF Management under the FF Fund Plan. If FF Management defaults on such loan, then the Exit Lender will have the right to foreclose on the New Limited Partner Equity Interests.

**B.      Cancellation of Limited Partner Equity Interests and Reissuance of New Limited Partner Equity Interests in FF Fund.**

On the Effective Date, all Limited Partner Equity Interests in FF Fund as of the Effective Date shall be cancelled and extinguished. Simultaneously therewith, the FF Fund Reorganized Debtor shall issue the New Limited Partner Equity Interests in the FF Fund Reorganized Debtor to FF Management or its designee in exchange for the Investment Guarantee Amount.

**C.      Section 1146 Exemption**

Pursuant to section 1146 of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any equity security or notes, or the creation, making, assignment delivery or recording of any mortgage, deed of trust, instrument of transfer, pursuant to, in implementation of or as contemplated by the Plans or any Plan Documents, or the vesting, re-vesting, transfer or sale of any property of, by or in the Debtors or their Estates or Reorganized Debtors pursuant to, in implementation of or as contemplated by the Plans or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, sales and use Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall, by the Confirmation Order, be directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any

of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### D.    Corporate Action

All actions contemplated to be performed by the Debtors or the Reorganized Debtors pursuant to the Plans, or any corporate or partnership action to be taken by or required of the Debtors or the Reorganized Debtors, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the shareholders, partners, members or managers of the Debtors or the Reorganized Debtors.  All Persons, the Reorganized Debtors, governmental units, title agencies, licensing agencies and offices of recordation may rely upon the authority vested in the Debtors' partners, officers, or managers to act on the Debtors' behalf in order to effectuate the Plans and the transactions contemplated therein.

### E.    Vesting of Assets in the Respective Reorganized Debtors

Except as otherwise provided in the Plans, all property of each Estate. pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) and (c) of the Bankruptcy Code, shall vest in the respective Reorganized Debtor as of the Effective Date free and clear of all Liens, Claims, charges, or other encumbrances.  As of the Effective Date, the Reorganized Debtors may operate their business and use, acquire, and dispose of their property, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plans and the Confirmation Order.  All privileges with respect to the property of the respective Estates, including the attorney/client privilege, to which each Debtor is entitled shall automatically vest in, and may be asserted by or waived on behalf of, the respective Reorganized Debtor.

### F.    Distributions

The Distributions will be made in accordance with the Plan by the Debtors and the Reorganized Debtors.

### G.    Surrender and Cancellation of Notes, Instruments, Certificates and Other Documents Evidencing Claims

On the Effective Date, except to the extent otherwise provided in the Plans, all notes, instruments, certificates, and other documents evidencing Claims will be cancelled and the obligations of the Debtors discharged in accordance with section 1141(d)(1) of the Bankruptcy Code.

### H.    Continued Existence of the Respective Reorganized Debtor

FF Fund, as a Reorganized Debtor, will exist after the Effective Date with all of the powers of a limited partnership under applicable law pursuant to its Limited Partnership Agreement in effect before the Effective Date, except to the extent it is amended by the FF Fund Plan, and to the extent such documents are amended, such documents are deemed to be authorized pursuant hereto and without the need for any other approvals, authorizations, actions or consents.

F5 Business, as a Reorganized Debtor, will exist after the Effective Date with all of the powers of a limited liability company under applicable law pursuant to its operating agreement in effect before the Effective Date, except to the extent it is amended by the F5 Business Plan, and to the extent such documents are amended, such documents are deemed to be authorized pursuant hereto and without the need for any other approvals, authorizations, actions or consents.

## I.    Post-Confirmation Accounts

The Reorganized Debtors may establish one or more accounts as they determine may be necessary or appropriate to effectuate the provisions of either Plan.

## J.    Management of the Debtors

On the Effective Date, the CRO shall resign from management of the Debtors and F6. From and after the Effective Date, the Debtors shall be managed directly and indirectly by the general partner of FF Fund, FF Management, under the direction and control of Andrew Franzone under and pursuant to the terms of the Limited Partnership Agreement and the Plans. On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to the Debtors as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plans. The Debtors, the Reorganized Debtors, and any other necessary party, as applicable, shall perform all actions reasonably contemplated regarding the implementation of the Plans.

From and after the Effective Date, FF Management will be authorized on behalf of each Reorganized Debtor, without the need for any further order or authority, (i) to execute, deliver, file, or record such contracts, instruments, releases, indentures, mortgages, and other agreements or documents and take such actions as may be necessary or appropriate to implement or consummate the Plans, notes or securities issued or conveyed pursuant to the Plans, and (ii) to undertake any other action on behalf of the Debtors to implement or consummate the Plans. Each of the matters provided for under the Plans involving the corporate structure of the Debtors or corporate action to be taken by or required of any Debtors will, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and (to the extent taken before the Effective Date) ratified in all respects without any requirement of further action by any partner, officer, director or manager of either Debtor.

## K.    Exemption for Issuance of the New Limited Partner Equity Interests

The New Limited Partner Equity Interests will be issued to FF Management through a private placement under Section 4(a)(2) of the Securities Act of 1933 and Rule 506(b) of Regulation D thereunder.

## ARTICLE VII
## MEANS OF PLAN IMPLEMENTATION - LIQUIDATING TRUST ALTERNATIVE

**The Liquidating Trusts**

**7.1    Creation and Vesting**.  On the Effective Date of the Plans, (i) each of the FF Fund Liquidating Trust and the F5 Business Liquidating Trust shall be created and shall be governed by the terms of the respective Liquidating Trust Agreement, (ii) the Liquidating Trust Assets of the FF Fund Debtor shall vest in, and be transferred to, the FF Fund Liquidating Trust, which Liquidating Trust shall constitute, be appointed as and be deemed a representative of the FF Fund Debtor's Estate pursuant to and in accordance with the terms of Section 1123(b)(3)(B) of the Bankruptcy Code solely for the benefit of the Beneficiaries of the FF Fund Liquidating Trust, (iii) the Liquidating Trust Assets of the F5 Business Debtor shall vest in, and be transferred to, the F5 Business Liquidating Trust, which Liquidating Trust shall constitute, be appointed as and be deemed a representative of the F5 Business Debtor's Estate pursuant to and in accordance with the terms of Section 1123(b)(3)(B) of the Bankruptcy Code solely for the benefit of the Beneficiaries of the F5 Business Liquidating Trust, and (iv) each Liquidating Trust, through the Liquidating Trustee, is and shall, among the other powers set forth herein and in the Liquidating Trust Agreement, be authorized and appointed to investigate, prosecute, enforce, pursue and settle any and all Causes of Action.

**7.2    Execution and Implementation**.    On or before the Effective Date, each Liquidating Trust Agreement shall be executed by the applicable Debtor and the Liquidating Trustee and all other necessary steps shall be taken to establish each Liquidating Trust, which shall be for the benefit of the Liquidating Trust Beneficiaries thereunder.  Each Liquidating Trust is created solely to implement the terms of the applicable Plan. The primary purposes of the Liquidating Trusts are to collect and liquidate the Assets of the respective Debtors' Estates, pursue those claims and Causes of Action transferred to, and vested in, the applicable Liquidating Trust as Assets and distribute to the respective Liquidating Trust Beneficiaries all proceeds from the liquidation of the applicable Assets pursuant to the terms of the Plans and in accordance with Treasury Regulation Section 301.7701-4(d). Under no circumstances shall the Liquidating Trustee have any power to engage in any trade or business or any other activity except as specifically provided herein or otherwise reasonably necessary and advisable for the orderly liquidation and distribution of the Assets of each Debtor's Estate.

**7.3    Liquidating Trust Assets**.  Each Liquidating Trust shall consist of the Liquidating Trust Assets from the applicable Debtor's Estate after any required Distributions by the applicable Debtor on the Effective Date.  Each Debtor shall transfer its respective Liquidating Trust Assets to its respective Liquidating Trust. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax pursuant to section 1146(a) of the Bankruptcy Code and any other applicable law. In connection with the transfer of the Liquidating Trust Assets to the applicable Liquidating Trust, such Assets, including, without limitation, Causes of Action, shall vest in the Liquidating Trustee for each applicable Liquidating Trust on the Effective Date.

**7.4    Liquidating Trustee**.  Each Liquidating Trust shall be governed by the Liquidating Trustee according to the Liquidating Trust Agreement for each Liquidating Trust.  The Liquidating Trustee for each Liquidating Trust shall mean Soneet R. Kapila, the Liquidating Trustee named to administer each Liquidating Trust, and all successor Liquidating Trustees. The Liquidating Trustee

32

shall be deemed to have been appointed as the respective Estate's representative for each Debtor by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

      **7.5**    **Powers of Liquidating Trustee**. In furtherance of and consistent with the purpose of each Liquidating Trust and the Plans, the Liquidating Trustee shall, among other things, have the rights, powers and duties of a chapter 7 trustee under Section 704 of the Bankruptcy Code and a chapter 11 trustee under section 1106 of the Bankruptcy Code and shall include, without limitation, the following: (i) to hold, manage, dispose of, sell, convert to Cash, and distribute the Liquidating Trust Assets, including investigating, prosecuting and resolving the Causes of Action; (ii) to hold the Liquidating Trust Assets for the benefit of the Liquidating Trust Beneficiaries that are entitled to distributions therefrom under the Plan, whether their Claims are Allowed on or after the Effective Date; (iii) in the Liquidating Trustee's reasonable business judgment, to investigate, prosecute, settle, liquidate, dispose of, and/or abandon the Liquidating Trust Assets, including Causes of Action; (iv) to monitor and enforce the implementation of the Plans; (v) to file all tax and regulatory forms, returns, reports and other documents and financial information required with respect to the Liquidating Trusts or the Debtors; (vi) in the Liquidating Trustee's reasonable business judgment, to reconcile and object to Claims against the Debtors or the Liquidating Trusts, and manage, control, prosecute and/or settle on behalf of the Estates and/or Liquidating Trusts' Objections to Claims on account of which the Liquidating Trustee will be responsible (if Allowed) for making distributions under the Plans; (vii) to take all actions necessary, and create any documents necessary, to wind up the affairs of the Debtors and to implement the Plans; (viii) to hold, manage, and distribute Cash or non-Cash Liquidating Trust Assets obtained through the exercise of its power and authority; (ix) to act as a signatory to the Debtors for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of the Debtors' Assets; (x) to dispose of the books and records transferred to the Liquidating Trustee in a manner deemed appropriate by the Liquidating Trustee in accordance with applicable law; provided, however, that the Liquidating Trustee shall not dispose of any books and records that are reasonably likely to pertain to pending litigation in which the Debtors or its current or former managers, partners, officers or directors are a party without further order of the Bankruptcy Court; (xi) to take all necessary action and file all appropriate motions to obtain an order closing the Chapter 11 Cases; (xii) to enter into and exercise rights under contracts that are necessary or desirable to the administration of the Liquidating Trusts and execute any documents or pleadings related to the liquidation of the Liquidating Trust Assets or other matters related to the Liquidating Trusts; (xiii) to establish and maintain bank accounts and terminate such accounts as the Liquidating Trustee deems appropriate; (xiv) to set off amounts owed to the Debtors against distributions to Liquidating Trust Beneficiaries; (xv) to bring suits or defend itself against such suits, if any, as the Liquidating Trustee determines in connection with any matter arising from or related to the Plans or the Liquidating Trust Agreements that affects in any way the rights or obligations of the Liquidating Trusts, the Liquidating Trustee or the Liquidating Trust Beneficiaries; (xvi) to obtain and maintain insurance coverage with respect to the liabilities and obligations of the Liquidating Trustee; (xvii) to take all actions necessary and appropriate to minimize any adverse state or federal tax consequences to the Liquidating Trust Beneficiaries provided such actions do not result in an adverse tax consequence to the Liquidating Trusts and are consistent with and are not contrary to the treatment of the Liquidating Trusts as a "grantor trust" for United States federal income tax purposes; and (xviii) to take such other and further actions as are permitted by the Plans and are not inconsistent with the Plans and the Liquidating Trust Agreements. In all circumstances, the Liquidating Trustee shall act in the best interests of all

beneficiaries of the Liquidating Trusts in furtherance of the purposes of the Liquidating Trusts. For the avoidance of doubt, and without limitation of the foregoing, the Liquidating Trustee shall explicitly have the authority to: (i) investigate, prosecute, settle, liquidate, dispose of, and/or abandon any and all Claims and Causes of Action; and (ii) file all tax and regulatory forms, returns, reports and other documents and financial information required with respect to the Debtors or the Liquidating Trusts, and request a prompt determination of such requests; and (iii) investigate, prosecute, settle, liquidate, dispose of, and/or abandon any and all other Claims and Causes of Action reserved in the Plans.

      **7.6**    **Costs and Expenses**.  The costs and expenses of each Liquidating Trust, and the reasonable fees and expenses of the Liquidating Trustee and the Liquidating Trustee's Professionals, United States Trustee fees, shall be paid out of the Liquidating Trust Assets for the respective Liquidating Trust.  Those Professionals shall continue to file fee applications with the Bankruptcy Court for services provided to the Liquidating Trusts and Liquidating Trustee, and all requests of Professionals retained by the Liquidating Trusts for payment of fees or expenses shall be made by means of an interim or final fee application and shall be subject to the approval of, and review by, the Bankruptcy Court to ensure that such payment conforms to the terms of any engagement agreement, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules.

      **7.7**    **Compensation of Liquidating Trustee**. The Liquidating Trustee shall be entitled to reasonable compensation at his standard hourly rates.

      **7.8**    **Retention of Professionals**.  The Liquidating Trustee may retain and compensate attorneys, accountants and other professionals (collectively, the "Professionals") to assist in his duties as Liquidating Trustee under the Plans and Liquidating Trusts on such terms (including on a contingency or hourly basis) as the Liquidating Trustee deems appropriate without Bankruptcy Court approval. Without limiting the foregoing, the Liquidating Trustee may retain any Professional that represented the Debtors or other parties in interest in these Chapter 11 Cases.

      **7.9**    **Tax Consequences of Liquidating Trusts**.  For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the respective Liquidating Trust as: (A) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to those Holders of Allowed Claims and Equity Interests receiving Beneficial Interests in the Liquidating Trusts (the "Liquidating Trust Beneficial Interests"), followed by (B) the transfer by such Liquidating Trust Beneficiaries to the applicable Liquidating Trust of the Liquidating Trust Assets in exchange for the applicable Liquidating Trust Beneficial Interests.  Accordingly, those Holders of Allowed Claims and Equity Interests receiving Liquidating Trust Beneficial Interests shall be treated for United States federal income tax purposes as the grantors and deemed owners of their respective share of the Liquidating Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. Notwithstanding the foregoing, (i) in the event that any portion of a Liquidating Trust is treated as a "qualified settlement fund" pursuant to Section 1.468B-1 of the Treasury Regulations, the United States federal income tax consequences shall be determined in accordance with the rules set forth in Section 468B of the Internal Revenue Code and the Treasury Regulations thereunder; and/or (ii) in the event that the Liquidating Trustee timely elects to treat any Liquidating Trust Assets allocable to the Disputed Claims Fund as a "disputed

ownership fund" pursuant to Section 1.468B-9(c)(2)(ii) of the Treasury Regulations, any Holders of such Disputed Claims shall, to the extent of such Disputed Claims, not be treated as having received any portion of the Liquidating Trust Assets transferred to the Liquidating Trusts hereunder and shall not be deemed as grantors of the applicable Liquidating Trust to the extent of such Disputed Claims

7.10    **Duration**.  Each Liquidating Trust shall remain in existence and continue in full force and effect until all of the following shall have occurred: (a) the Liquidating Trust Assets have been reduced to Cash or the Liquidating Trustee has determined that it is impractical or not in the best interest of the Liquidating Trust Beneficiaries to do so; (b) all costs, expenses and obligations incurred in administering the Liquidating Trusts have been paid and discharged; (c) the Liquidating Trust Assets have been distributed to the Liquidating Trust Beneficiaries in accordance with the Plans; and (d) a final report has been filed and a Final Decree closing the Chapter 11 Cases has been entered; provided, however, that the Liquidating Trusts shall not remain in existence more than five years from the date of the respective Liquidating Trust Agreement, unless extended pursuant to the terms hereof. If warranted by the facts and circumstances provided for in the Plans, and subject to the approval of the Bankruptcy Court of a motion of the Liquidating Trustee seeking an extension of the term of the Liquidating Trusts as necessary to the purpose of the Liquidating Trusts, then the term of the Liquidating Trusts may be extended for a finite term based on the particular circumstances. Each extension must be approved by the Bankruptcy Court within six months of the beginning of the extended term with notice thereof to all Liquidating Trust Beneficiaries. Notwithstanding the foregoing, the Liquidating Trusts shall in no event remain in existence for more than twenty-one years from the Effective Date.

7.11    **Indemnification**.  The Liquidating Trustee and the Liquidating Trustee's attorneys, employees, officers, directors, agents, representatives, and Professionals, as the case may be, shall be held harmless and shall not be liable for actions taken or omitted in their capacity as, or on behalf of, the Liquidating Trustee, except those acts that are determined by Final Order to have arisen out of their own intentional fraud, willful misconduct or gross negligence, and each shall be entitled to be indemnified, held harmless, and reimbursed for fees and expenses including, without limitation, reasonable attorney's fees, which such Persons and Entities may incur or may become subject to or in connection with any action, suit, proceeding or investigation that is brought or threatened against such Persons or Entities in respect of that person's or entity's or the Liquidating Trustee's actions or inactions regarding the implementation or administration of the Plans, the Liquidating Trusts or the Liquidating Trust Agreements or the discharge of their duties hereunder or thereunder, except for any actions or inactions that are determined by Final Order to have arisen from intentional fraud, willful misconduct or gross negligence. Any claim of the Liquidating Trustee and the other parties entitled to indemnification under this section, to be indemnified, held harmless, or reimbursed shall be satisfied solely from the Liquidating Trust Assets, including but not limited to the Available Cash, or any applicable insurance coverage. The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of their retained professionals regardless of whether such advice is provided in writing or verbally. Notwithstanding the foregoing, the Liquidating Trustee shall not be under any obligation to consult with his retained professionals, and his determination not to do so shall not result in the imposition of liability on the Liquidating Trustee unless such determination is based on willful misconduct, gross negligence, or intentional fraud.

**7.12**    **Bond**.  As a condition to serving as Liquidating Trustee, the Liquidating Trustee, and any successor trustee, shall post a bond in favor of the applicable Liquidating Trust in an amount that is not less than the amount of Cash held by the applicable Liquidating Trust on the Effective Date, which bond shall be in substantially the same form as is required by the United States Trustee for trustees in the Southern District of Florida. For the avoidance of doubt, each Liquidating Trust shall be responsible for all costs associated with the posting of the foregoing bond, including the premium associated with such bond. In addition, the Liquidating Trustee is hereby authorized, out of funds available from the applicable Liquidating Trust, to obtain all reasonably necessary insurance coverage for himself and the Liquidating Trusts, their agents, representatives, employees or independent contractors whether as a named insured on the policies or otherwise, including, but not limited to, coverage with respect to (a) appropriate directors and officers/trustee liability insurance,(b) any property that is or may in the future become the property of the Liquidating Trusts, and (c) the liabilities, duties, and obligations of the Liquidating Trustee and the Liquidating Trusts. Such bond shall be subject to discharge and release upon an appropriate motion and order from the Bankruptcy Court upon the Liquidating Trustee's resignation, death or removal, or for other cause.

**7.13**    **Resignation, Death or Removal**.  The Liquidating Trustee may resign at any time; provided, however, that he shall file a motion with the Bankruptcy Court in connection therewith and request that a successor or replacement be appointed in accordance herewith, which motion shall be on notice to the top twenty (20) Creditors holding Allowed Claims and the Office of the United States Trustee. The Office of the United States Trustee or any party in interest, by motion filed with the Bankruptcy Court, or the Bankruptcy Court on its own order to show cause, may seek to remove the Liquidating Trustee for cause, including under Section 324 of the Bankruptcy Code, or, if Section 324 is deemed inapplicable, then for the same reasons that would otherwise suffice under Section 324, for the violation of any material provision of the Plans, or in the event the Liquidating Trustee becomes incapable of acting hereunder as a result of physical or mental disability and such physical or mental disability continues for a period in excess of thirty (30) days (except in the case of death, in which instance the procedures for replacement will begin immediately). In the event of a resignation or removal, the Liquidating Trustee, unless he is incapable of doing so, shall continue to perform his duties hereunder until such a time as a successor is approved by a Final Order of the Bankruptcy Court. In the event the Liquidating Trustee resigns or is removed, the Liquidating Trust Beneficiaries, shall have 90 days to select a successor Liquidating Trustee by filing a motion with the Bankruptcy Court. If the Liquidating Trust Beneficiaries do not select a successor Liquidating Trustee, then the Office of the United States Trustee may file a motion with the Bankruptcy Court seeking an order directing the United States Trustee to select such successor.

NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, THE VESTING IN AND TRANSFER OF THE LIQUIDATING TRUST ASSETS TO EACH APPLICABLE LIQUIDATING TRUST SHALL BE FREE AND CLEAR OF ANY AND ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS OF ANY KIND WHATSOEVER.

NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, UNDER THE LIQUIDATING TRUST ALTERNATIVE, NO ASSETS OF THE DEBTOR OR THE DEBTOR'S ESTATE SHALL VEST IN THE DEBTOR OR ANY OTHER PERSON OR

ENTITY FROM AND AFTER THE EFFECTIVE DATE OTHER THAN THE RESPECTIVE LIQUIDATING TRUSTS.

### ARTCLE VIII
### PRESERVATION OF CAUSES OF ACTION[5]

     Pursuant to the terms of the Plans, all Causes of Action are being transferred to the respective Reorganized Debtor.  On and as of the Effective Date, all Causes of Action shall be preserved and vested in the respective Reorganized Debtor.  After the Effective Date, each Reorganized Debtor will have the right, in its sole and absolute discretion, to pursue, not pursue, enforce, file, settle, compromise, release, withdraw, arbitrate or litigate any Cause of Action that vests in such Reorganized Debtor on the Effective Date without seeking any approval from the Bankruptcy Court.

     **THE PLANS DO NOT, AND ARE NOT INTENDED TO, RELEASE ANY CAUSE OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF THE APPLICABLE REORGANIZED DEBTOR.**  Creditors are advised that legal rights, claims and rights of action either Debtor may have against them, if they exist, are retained under the Plans for prosecution unless a specific order of the Bankruptcy Court authorizes the respective Debtor to release such claims.  As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plans, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plans as any indication that the Debtors or Reorganized Debtors do not possess or do not intend to transfer to or vest any Cause of Action in the respective Reorganized Debtors if a particular Creditor votes to accept the applicable Plan.  It is the expressed intention of each Plan to preserve rights, objections to Claims, and rights of action of the respective Debtor, whether now known or unknown, for the benefit of the applicable Reorganized Debtor.  A Cause of Action shall not, under any circumstances, be waived as a result of the failure of either Debtor to describe such Cause of Action with specificity in the Plans or in the Disclosure Statement; nor shall the Reorganized Debtors, as a result of such failure, be estopped or precluded under any theory from pursuing any such Cause of Action.  Nothing in the Plans operates as a release of any Cause of Action.

     The Debtors do not presently know the full extent of the Causes of Action and, for purposes of voting on the Plans, all Creditors and Holders of Limited Partner Equity Interests are advised that the Reorganized Debtors will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action.  Accordingly, neither a vote to accept either Plan by any Creditor or Holder of an Equity Interest nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity.  Confirmation of the Plans and entry of the Confirmation Order is not intended to and shall not be deemed to have any res judicata or collateral estoppel or other preclusive effect that

---

[5] The provisions of this Article VIII shall apply equally to the Liquidating Trust Alternative, provided that any references to the Reorganized Debtors shall be deemed to refer to the Liquidating Trusts or Liquidating Trustee, as the context requires.

would precede, preclude, or inhibit prosecution of such Cause of Action following Confirmation of the Plans.

For avoidance of doubt, the Debtors and the Reorganized Debtors specifically preserve any and all claims and Causes of Action against any of the following for actions taken or omitted to be taken that caused either of the Debtors damage or harm: (i) any Holders of Limited Partner Equity Interests, (ii) the Skinners in connection with the Skinner Claims asserted above, (iii) Acadaca, Jason Feingold, and related parties, related to the Acadaca Claims, including related in any way to the Acadaca Investment. the enforcement and collection of amounts owed in connection therewith to the Debtors and the avoidance of any releases provided by the Debtors or transfers of property interests of the Debtors, (iv) Global InterXchange, and related parties, (v) any of the investments held or owned by the Debtors to collect and/or realize on such investments, including the investments made through one or more of the Florence Capital entities, in each case as described in Exhibit 1 attached hereto, (vi) one or some combination of causes of action that may exist against Gregory Hersch and/or FloCap, including, without limitation, under or related to the Investment Services Agreement and for the avoidance and recovery of the Hersch Transfers, and (vii) one or some combination of causes of action that may exist against Dennis Hersch, Linden West Trust, and related parties regarding activities that may have harmed, the Debtors, and the Subsidiaries and affiliates.[6]

In addition to the above, the Causes of Action which are all specifically preserved under the Plans, including under the Liquidating Trust Alternative, include, without limitation, specifically the following:

a.    Any and all claims and causes of action, including Causes of Action, under state or federal law against the Skinners, Acadaca (and any related parties), Global InterXchange (and related parties), the Florence Capital entities, Gregory Hersch, FloCap, Dennis Hersch, the Linden West Trust, any and all present and former managers, partners (limited or general partners), directors, officers, shareholders, principals, employees, agents and affiliates of, the Debtors and of any affiliates of the Debtors, and any professionals employed by the Debtors, including accountants, auditors and lawyers, including without limitation, in any way related to, including providing aid and assistance in connection with: (i) the operation, management, funding and fund raising of the Debtors, including without limitation, breach of fiduciary duty, negligence, negligent management, fraud, civil theft, civil RICO or conspiracy, conversion, alter ego, misrepresentation, professional malpractice, corporate advantage, theft of corporate opportunities, wasting of corporate assets, equitable subordination of claims, breach of contract and federal or state statutory claims (including securities laws violations), as well as aiding and abetting any of the above; (ii) the sale, transfer, exchange or disposition of any property of or securities in the Debtors or any of their affiliates, or any partnership interests, preferred stock, common stock or equity or similar interest or securities therein, either prior to or after the

---

[6] Notwithstanding the specificity of the claims and causes of action described herein, nothing in the Plans or Disclosure Statement will limit or restrict in any way the rights of the Reorganized Debtors or the Liquidating Trustee, as applicable, in connection with pursuing any and all Claims and Causes of Action pursuant to the terms of the Plans.

Petition Date; or (iii) the conversion, misappropriation or misapplication of property of the Debtors or any of their affiliates or any products or proceeds therefrom.

      b.     Any and all claims, choses in action, causes of action suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payments and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether assertable directly or derivatively, in law, equity or otherwise, which are owned or held by, or have accrued to, the Debtors or the Estates, whether arising before or after the Petition Date, including without limitation, those which are: (i) property of the Estates of either Debtor under and pursuant to Section 541 of the Bankruptcy Code; (ii) for subrogation and contribution; (iii) for turnover; (iv) for avoidable transfers and preferences under and pursuant to Sections 542 through 550 and 553 of the Bankruptcy Code and applicable state law; (v) to determine the extent, validity and priority of liens and encumbrances; (vi) for surcharge under Section 506(c) of the Bankruptcy Code; (vii) for subordination under Section 510 of the Bankruptcy Code; (viii) related to federal or state securities laws; (ix) direct or derivative claims or causes of action of any type or kind; (x) for professional malpractice against professionals employed by the Debtor; (xi) against any and all former managers, partners (limited or general partners), officers and directors of the Debtor, including for breach of fiduciary duty or improper distributions; (xii) under and pursuant to any policies of insurance maintained by the Debtors, including without limitation, the directors' and officers' liability insurance policy; (xiii) for theft of corporate opportunity; (xiv) for collection on accounts, accounts receivables, loans, notes receivables or other rights to payment; (xv) for the right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under Section 505 of the Bankruptcy Code; (xvi) which arise under or as a result of any section of the Bankruptcy Code, including Section 362; and (xvii) against any lender of the Debtors related in any way to the lending relationship with the Debtors, and further including but not limited to claims against any such lender for exerting excessive or unreasonable control over the Debtors, for, charging, taking, reserving, collecting or receiving interest in excess of the highest lawful rate, for any breach of fiduciary duty, breach of any duty of fair dealing, breach of confidence, or any cause of action or defense based on the negligence of such lender, for any "lender liability" theories, breach of funding commitment, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, violations of the Racketeer Influenced and Corrupt Organizations Act, intentional or negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate governance or prospective business advantage, breach of contract, fraud, mistake, deceptive trade practices, libel, slander, conspiracy, fraudulent conveyance, or any claim for wrongfully taking any action in connection with the foregoing; and (xviii) all claims against any Person with any connections with or to the Debtors, based in law or equity, including, without limitation, under the Bankruptcy Code, federal law or state law, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date.

c.      Any and all claims and causes of action involving or in any way related to the collection of accounts receivables, notes receivables, loans receivables or other receivables owed to the Debtors.

d.      Any and all claims and causes of action seeking to subordinate, equitably or otherwise, Claims filed against the Estate, or to re-characterize such Claims as Equity Interests in the Debtors.

Each Estate shall remain open, even if the Chapter 11 Cases have been closed, as to any and all Causes of Action until such time as the Causes of Action have been fully administered and the recoveries therefrom have been received.

Each Reorganized Debtor (a) may commence or continue in any appropriate court, tribunal or any other appropriate setting (e.g., American Arbitration Association or other arbitration association) any suit or other proceeding for the enforcement of any Cause of Action which the applicable Debtor had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Cause of Action; provided, however, that from and after the Effective Date, the applicable Reorganized Debtor shall be authorized to compromise and settle any Cause of Action or objection to a Claim upon approval by the Bankruptcy Court after notice and a hearing.

## ARTICLE IX
## PROVISIONS GOVERNING DISTRIBUTIONS[7]

### 9.1    Manner of Cash Payments Under the Plans

Any Distribution pursuant to the Plans, to the extent posted in the United States mail, shall be deemed made when deposited by the Debtors or the Reorganized Debtors (or their respective agent(s)), as applicable, into the United States mail, or paid by wire transfer.  At the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made pursuant to the Plans shall be made, at the election of the Debtors or the Reorganized Debtors, as applicable, by check drawn on a domestic bank, by wire transfer, or by ACH, from a domestic bank, or other method mutually agreed upon by the holder of the Allowed Claim and the applicable Debtor or the Reorganized Debtor.  Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on that due date.

### 9.2  Entity Making Distributions

Except as otherwise provided in the Plans, Distributions to holders of Allowed Claims and Allowed Equity Interests shall be made by the respective Debtor, if before the Effective Date, or the respective Reorganized Debtor if on or after the Effective Date.  The Debtors and the Reorganized Debtors shall not be required to give any bond or surety or other security for the performance of their duties, unless otherwise ordered by the Bankruptcy Court.

---

[7] The provisions of this Article IX shall apply equally to the Liquidating Trust Alternative, provided that any references to the Reorganized Debtors shall be deemed to refer to the Liquidating Trusts or Liquidating Trustee, as the context requires.

### 9.3    Distribution Dates

Distributions to holders of Claims and Equity Interests shall be made as provided for in the Plans.  If any payment or act under the Plans is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 9.4    Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims or Equity Interests that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims or Equity Interests (as applicable) for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date.  The Debtors or Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of any Claim or Equity Interest occurring after the Record Date.  In making any Distribution with respect to any Claim or Equity Interest, the Debtors or Reorganized Debtors, as applicable, shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim or Equity Interest filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that was known to the Debtor as of the Record Date.

### 9.5    Delivery of Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims and Allowed Equity Interests shall be made by the Debtors or Reorganized Debtors, as applicable, at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim or Equity Interest filed by such holder or (b) the last known address of such holder if no proof of Claim or Equity Interest is filed or if the Debtors or Reorganized Debtors, as applicable, have not been notified in writing of a change of address.

### 9.6    Undeliverable and Unclaimed Distributions

In the event that any Distribution to any holder of an Allowed Claim or Allowed Equity Interest made by the Debtors or Reorganized Debtors, as applicable is returned as undeliverable, the Debtors or Reorganized Debtors, as applicable, shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Debtors or Reorganized Debtors, as applicable, has determined the then current address of such holder; provided, however, that all Distributions to holders of Allowed Claims or Allowed Equity Interests made by the Debtors or Reorganized Debtors, as applicable, that are unclaimed for a period of ninety (90) days after the date of the first attempted Distribution shall have its, his or her Claim or Equity Interest for such undeliverable Distribution deemed satisfied and will be forever barred from asserting any such Claim or Equity Interest against the Debtors or Reorganized Debtors, as applicable, or their property.  Any Distributions which are undeliverable or have not been negotiated within the time set forth above shall be deemed unclaimed property

under section 347(b) of the Bankruptcy Code and revested in the Debtors or Reorganized Debtors, as applicable. The Debtors or Reorganized Debtors, as applicable, shall have no further obligation to make any Distribution to the holder of such Claim or Equity Interest on account of such Claim or Equity Interest, and any entitlement of any holder of such Claim or Equity Interest to any such Distributions shall be extinguished and forever barred; provided, however, that the holder of such Claim or Equity Interest may receive future Distributions on account of such Claim or Equity Interest by contacting the Debtors or Reorganized Debtors, as applicable, at some point prior to the final Distribution.

### 9.7    Compliance with Tax Requirements

The Debtors or Reorganized Debtors, as applicable, may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or Distribution on account of Claims or Equity Interests; *provided*, *however*, that the Debtors or Reorganized Debtors, as applicable, shall not make any such withholdings described in this paragraph (other than routine tax withholdings with respect to employee-related claims (if any)) from any payment or Distribution on account of Claims or Equity Interests without first filing a notice with the Court (and serving such notice on the holder of the Claim or Equity Interest) describing the nature and amount of the proposed withholding and providing the Creditor or holder of Equity Interest an opportunity to object. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such holders of the Claims or Equity Interests. The Debtors or Reorganized Debtors, as applicable, shall be authorized to collect such tax information from the holders of Claims or Equity Interests (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan. In order to receive Distributions under the Plans, all holders of Claims or Equity Interests will need to identify themselves to the Debtors or Reorganized Debtors, as applicable, and provide all tax information the Debtors or Reorganized Debtors, as applicable, deem appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder). The Debtors or Reorganized Debtors, as applicable, may refuse to make a Distribution to any holder of a Claim or Equity Interest that fails to furnish such information within the time period specified by the Debtors or Reorganized Debtors, as applicable, and such Distribution shall be deemed an unclaimed Distribution under the Plans, and, provided further that, if the Debtors or Reorganized Debtors, as applicable, fail to withhold in respect of amounts received or distributable with respect to any such holder and such Debtor are later held liable for the amount of such withholding, such holder shall reimburse the Debtors or Reorganized Debtors, as applicable, for such liability. Notwithstanding any other provision of the Plan, each holder of an Allowed Claim or Equity Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit.

### 9.8    No Payments of Fractional Dollars

Notwithstanding any other provision of the Plans to the contrary, no payment of fractional dollars shall be made pursuant to the Plans. Whenever any payment of a fraction of a dollar under the Plans would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

### 9.9    Interest on Claims

Except as specifically provided for in the Plans or the Confirmation Order or required by the Bankruptcy Code, interest shall not accrue on Claims or Equity Interests and no holder of a Claim or Equity Interest shall be entitled to interest on any Claim accruing on or after the applicable Petition Date.  Interest shall not accrue on any General Unsecured Claim that is a Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim.  Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for post-petition interest or similar charges.

### 9.10    No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary contained in the Plans, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

### 9.11    Setoff and Recoupment

Each Debtor or Reorganized Debtor, as applicable, may setoff against, or recoup from, any Claim or Equity Interest and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that such Debtor or Reorganized Debtor, as applicable, or the applicable Estate may have against the holder of such Claim or Equity Interest, but neither the failure to do so nor the allowance of any Claim or Equity Interest under the Plans shall constitute a waiver or release by the Debtors or Reorganized Debtors, as applicable, or the Estates of any right of setoff or recoupment that any of them may have against the holder of any Claim or Equity Interest.  Any such setoffs or recoupments may be challenged in Bankruptcy Court.  Notwithstanding any provision in the Plans to the contrary, nothing therein shall bar any creditor from asserting its setoff or recoupment rights to the extent permitted under section 553 or any other provision of the Bankruptcy Code; provided, however, that such setoff or recoupment rights are timely asserted; provided further that all rights of the Debtors or Reorganized Debtors, as applicable, and the Estates with respect thereto are reserved.

### 9.12    De Minimis Distributions; Charitable Donation

Notwithstanding anything to the contrary in the Plans, the Debtors or Reorganized Debtors, as applicable, shall not be required to make a Distribution to any Creditor of holder of an Equity Interest if the dollar amount of the Distribution is less than $10 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution.  On or about the time that the final Distribution is made, the Debtors or Reorganized Debtors, as applicable, may make a donation of undistributable funds as defined by Local Rule 3011-1(C)(1), in the reasonable discretion of the Debtors or Reorganized Debtors, as applicable, to the following organizations (each of which qualifies for not-for-profit status under section 501(c)(3) of the Tax Code) with undistributable funds if, in the reasonable judgment of the Debtors or Reorganized Debtors, as applicable, the cost of calculating and making the final Distribution of the undistributable funds remaining is excessive in relation to the benefits to the or holders of Claims or Equity Interests who would otherwise be entitled to such Distributions: (i) the Bankruptcy Bar Foundation of the

Bankruptcy Bar Association of the Southern District of Florida; (ii) Legal Services of Greater Miami, Inc.; (iii) Dade Legal Aid- Put Something Back Program; or (iv)  Miami Foundation for Mental Health, Inc.

### 9.13    Withholding from Distributions

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions pursuant to the Plans.  The Debtors or Reorganized Debtors, as applicable, may withhold from amounts distributable pursuant to the Plans to any Person or Entity any and all amounts, determined in the reasonable discretion of the Debtors or Reorganized Debtors, as applicable, required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement.  The Debtors or Reorganized Debtors, as applicable, shall not make any such withholdings described in this paragraph (other than routine tax withholdings with respect to employee-related claims (if any)) from any payment or Distribution on account of Claims or Equity Interests without first filing a notice with the Court (and serving such notice on the holder of the Claim or Equity Interest) describing the nature and amount of the proposed withholding and providing the Creditor or holder an opportunity to object.

### 9.14    Distributions in Satisfaction; Allocation

Except for the obligations expressly imposed by the Plans and the property and rights expressly retained under the Plans, if any, the Distributions and rights that are provided in the Plans shall be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and Equity Interests in the Debtors and their Estates, whether known or unknown, that arose or existed prior to the Effective Date.  Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest (if any).

### 9.15    No Distributions on Late-Filed Claims

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a proof of Claim was required to be filed and was first filed after the applicable bar date in the Chapter 11 Cases shall automatically be deemed a late-filed Claim that is disallowed in the Chapter 11 Cases, without the need for (a) any further action by the Debtors or Reorganized Debtors, as applicable, (b) an order of the Bankruptcy Court.  Nothing in this paragraph is intended to expand or modify the applicable bar dates or any orders of the Bankruptcy Court relating thereto.

### ARTICLE X
### DISPUTED CLAIMS[8]

### 10.1  Resolution of Disputed Claims

The Debtors or the Reorganized Debtors, as applicable, shall have the right to make and file objections to Claims or Equity Interests in the Bankruptcy Court.  Unless otherwise ordered

---

[8] The provisions of this Article X shall apply equally to the Liquidating Trust Alternative, provided that any references to the Reorganized Debtors shall be deemed to refer to the Liquidating Trusts or Liquidating Trustee, as the context requires.

by the Bankruptcy Court after notice and a hearing, all Disputed Claims or Equity Interests shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

### 10.2  Objection Deadline

All objections to Disputed Claims or Equity Interests shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

### 10.3  Estimation of Claims

At any time, the Debtors or Reorganized Debtors, as applicable, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim or Equity Interests to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors, as applicable, have previously objected to such Claim or Equity Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim or Equity Interest at any time during litigation concerning any objection to such Claim or Equity Interest, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim or Equity Interest, that estimated amount shall constitute either the Allowed amount of such Claim or Equity Interest or a maximum limitation on the Claim or Equity Interest, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim or Equity Interest, the Debtors or Reorganized Debtors, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim or Equity Interest.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 10.4  No Distributions Pending Allowance

Notwithstanding any other provision in the Plans, if any portion of a Claim or Equity Interest is disputed, no payment or Distribution provided under the Plans shall be made on account of such Claim or Equity Interest unless and until such Disputed Claim or Equity Interest becomes an Allowed Claim or Allowed or Equity Interest.

To the extent that a Disputed Claim or Equity Interests ultimately becomes an Allowed Claim or Equity Interest, Distributions (if any) shall be made to the holder of such Allowed Claim or Equity Interest in accordance with the provisions of the Plans.  Upon allowance, a holder of the Allowed Disputed Claim or Equity Interest shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim or Equity Interest been allowed on the Effective Date.

### 10.5  Resolution of Claims

On and after the Effective Date, the Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims or Equity Interests, and to compromise,

settle, or otherwise resolve any Disputed Claims or Equity Interests without approval of the Bankruptcy Court.

## ARTICLE XI
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES[9]

**11.1  General Treatment: Rejected if not Previously Assumed.**

**Within fourteen (14) days prior to the Confirmation Hearing, each Debtor shall file and serve a Notice of all contracts and unexpired leases that it intends to assume together with a Schedule of Cure Amounts for any leases or contracts that will be assumed under the Plan (the "Cure Schedule").  Any party objecting the proposed cure amount as set forth in the Cure Schedule shall file an objection within three (3) days prior to the Confirmation hearing.  If no objection is filed, then the proposed cure amount will be deemed approved. Each Debtor shall have forty-five (45) days from the Effective Date to supplement the Cure Schedule and the Bankruptcy Court will determine any disputes regarding. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, upon the Effective Date, all executory contracts and unexpired leases that exist between either Debtor and any Person or Entity shall be deemed rejected, unless included on the Cure Schedule or previously assumed. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumption or rejection pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption or rejection is in the best interests of the Debtors, the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases.**

**11.2  Bar to Claims Arising from Rejection, Termination or Expiration**

**Claims created by the rejection of executory contracts or unexpired leases (including, without limitation, the rejection provided in herein ("General Treatment; Rejected if not Previously Assumed") or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Debtors or Reorganized Debtors, as applicable, no later than thirty (30) days after (a) the *date of the entry of any order of the Bankruptcy Court authorizing rejection*, with respect to any executory contract or unexpired lease rejected by the Debtors or otherwise pertaining to such order, or (b) *the Confirmation Date*, with respect to any executory contract or unexpired lease that is deemed rejected pursuant hereto ("General Treatment; Rejected if not Previously Assumed").  Any rejection claim for which a proof of claim is not filed and served within the time provided herein will be forever barred from assertion and shall not be enforceable against the Debtors, or the Estates, assets, properties, or interests in property, or the Reorganized Debtors, or the Estates, assets, properties, or interests in property. Nothing contained herein shall be deemed an admission by the Debtors that such rejection**

---

[9] The provisions of this Article XI shall apply equally to the Liquidating Trust Alternative, provided that any references to the Reorganized Debtors shall be deemed to refer to the Liquidating Trusts or Liquidating Trustee, as the context requires.

**gives rise to or results in a Claim or shall be deemed a waiver by the Debtors or the Reorganized Debtors of any objections to such Claim if asserted.**

### 11.3  Assumption of Executory Contracts and Unexpired Leases

11.3.1.1        <u>Rejection of Executory Contracts and Unexpired Leases; Schedule of Assumed Executory Contracts and Unexpired Leases</u>.  On the Effective Date, the Debtors will reject all of the executory contracts and unexpired leases not listed on the Cure Schedule.

11.3.1.2        <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>.  Unless otherwise provided in the Plans, each executory contract or unexpired lease that is assumed pursuant to the Plans will include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated pursuant to the Plans or separate motion and Final Order of the Bankruptcy Court.

11.3.1.3        <u>Proof of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed</u>.  Any and all proofs of claim relating to executory contracts or unexpired leases that have been assumed in the Chapter 11 Cases will be deemed amended and superseded by the amount of Cure Claim identified in the Plans, the Confirmation Order or other order of the Bankruptcy Court authorizing assumption of executory contracts to the Debtors or the Reorganized Debtors.

11.3.1.4        <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>.   All Allowed Cure Claims will be satisfied by the applicable Debtor by payment of the Cure in Cash to (i) holders of such Cure Claims or on the Effective Date or as soon as reasonably practicable thereafter, or (ii) on such other terms as may be either ordered by the Bankruptcy Court or agreed by the Debtors and the applicable contract counter-party without any further notice to or action, order, or approval of the Bankruptcy Court.  Any provisions or terms of executory contracts or unexpired leases to be assumed and assigned pursuant to the Plans that are, or may be, alleged to be in default, shall be satisfied solely by the Cure, or by an agreed-upon waiver of the Cure.

11.3.1.5        <u>Confirmation Order</u>.   Entry of the Confirmation Order will constitute a finding of adequate assurance of future performance by the Reorganized Debtors within the meaning of section 365 of the Bankruptcy Code.  Any objections relating to adequate assurance of future performance, or any other matters relating to the assumption and assignment of executory contracts and unexpired leases (other than Cure Claim disputes) must be asserted as an objection to confirmation of the Plans.  Assumption of any executory contract or unexpired lease pursuant to the Confirmation Order or other order of the Bankruptcy Court will limit the Claims of any such contract counter-party to the (i) Allowed Cure Claim and (ii) Claims for ongoing performance under the unexpired lease or executory contract by Reorganized Debtor pursuant to section 365(k) of the Bankruptcy Code.

**11.4  Indemnification and Reimbursement.**

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtors for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtors against any Claims, costs, liabilities or causes of action as provided in the Debtors' operating agreement, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be paid only to the extent of any applicable insurance coverage.  Nothing contained in the Plans shall affect the rights of partners, managers, directors, officers or employees under any insurance policy or coverage with respect to such Claims, costs, liabilities or Causes of Action or limit the rights of the Debtors or the Debtors' Estates to object to or otherwise contest or challenge Claims or rights asserted by any current or former partner, manager, officer, director or employee of the Debtors.

## ARTICLE XII
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE[10]

**12.1  Conditions Precedent**

The following are conditions precedent to the Effective Date that must be satisfied or waived by the applicable Debtor:

12.1.1  The Court shall have entered the Confirmation Order in form and substance acceptable to the applicable Debtor confirming and approving each of the FF Fund Plan and the F5 Business Plan in all respects.

12.1.2  There shall be no stay or injunction in effect with respect to the Confirmation Order.

12.1.3  The Debtors shall have entered into the Exit Financing Documents with the Exit Lender and shall have access to the Exit Financing.

12.1.4  The Investment Guarantee shall have been fully funded and available to the Debtors to meet their obligations under the Plans as of the Effective Date, including having been deposited in the attorneys' trust account of Genovese Joblove & Battista, P.A. as Debtors' counsel no later than five (5) business days prior to the Confirmation Hearing.

12.1.5  The Plan Documents shall be in a form and substance reasonably acceptable to the Debtors, and have been duly executed and delivered; provided, however, that no party to

---

[10] The provisions of this Article XII shall apply equally to the Liquidating Trust Alternative, provided that any references to the Reorganized Debtors shall be deemed to refer to the Liquidating Trusts or Liquidating Trustee, as the context requires.

any such agreements and instruments, may unreasonably withhold its execution and delivery of such documents to prevent this condition precedent from occurring.

## 12.2  Waiver

Notwithstanding the foregoing conditions, each Debtor reserves, in its sole discretion, the right to waive the occurrence of any condition precedent or to modify any of the foregoing conditions precedent.  Any such written waiver of a condition precedent set forth in the Plans may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plans.  Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## ARTICLE XIII
## EFFECT OF CONFIRMATION; INDEMNIFICATION, INJUNCTIVE AND RELATED PROVISIONS

### 13.1  Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plans, the provisions of the Plans shall constitute a good faith compromise of all Claims and Equity Interests.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromises or settlements are fair, equitable, reasonable and in the best interests of the Debtors, the Estates and holders of Claims and Equity Interests.  This provision shall also apply in the Liquidating Trust Alternative.

### 13.2  Vesting of Assets

Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property of each Debtor shall vest in the respective Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests.  From and after the Effective Date and except as provided in this Plans, each Reorganized Debtor may operate the respective Debtor's business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.  In the event that a Reorganized Debtor's Chapter 11 Case is converted to a case under chapter 7 for any reason, any property held by either Debtor or Reorganized Debtor at any time, other than property that already has been distributed under the applicable Plan prior to conversion of the case from chapter 11 to chapter 7, shall revest in the applicable Debtor.  This provision shall not apply in the Liquidating Trust Alternative.

### 13.3  Title to Assets; Discharge of Liability

Except as otherwise provided in the Plans, including, but not limited to any limitations set forth in the Plans, on the Effective Date, title to all assets and properties and interests in property dealt with by each Plan shall vest in the applicable Reorganized Debtor free and clear of all Claims,

Equity Interests, Liens, encumbrances, charges, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of such Debtor arising prior to the Effective Date, except as may be otherwise provided in the Plans.  This provision shall not apply in the Liquidating Trust Alternative.

### 13.4  Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of each Plan shall bind the applicable Debtor, Reorganized Debtor, and any holder of a Claim against, or Equity Interest in, such Debtor and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the applicable Plan and whether or not such holder has accepted such Plan.

### 13.5  Discharge of Claims

Except as provided herein, the rights afforded in the Plan and the payments and Distributions to be made hereunder shall discharge all existing debts, Claims and Equity Interests, of any kind, nature, or description whatsoever against or in each Debtor or any of its assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided herein, upon the Effective Date, all existing Claims against and Equity Interests in each Debtor shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the applicable Reorganized Debtor, its successors or assignees, or any of its assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of claim or proof of equity interest, and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting against each Reorganized Debtor any such discharged Claim against or Equity Interest in the applicable Debtor.

### 13.6  Discharge of each Debtor

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plans or in the Confirmation Order in respect of the Liquidating Trust Alternative, the Distributions and rights that are provided in the Plans will be in complete satisfaction, discharge, and release, of any and all Claims and Equity Interests, whether known or unknown, against each Debtor or Reorganized Debtor or any of their assets or properties, regardless of whether the property has been distributed or retained pursuant to the Plans.  Without limiting the generality of the foregoing, each Debtor or Reorganized Debtor will be discharged from any and all Claims, Equity Interests and debts of the kind specified in sections 502(g), 502(h) of 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Equity Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim or Equity Interest accepted the applicable Plan.  Except as otherwise provided in the Plans, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors arising before the Effective Date.  Under section 524 of the Bankruptcy Code, the discharge granted under this section shall avoid

any judgment against each Debtor at any time obtained (to the extent it relates to a discharged Claim or Equity Interest), and operates as an injunction against the prosecution of any action against such Debtor or its Estate (to the extent such action relates to a discharged claim). Nothing in this Article should be interpreted as a discharge of each Debtor's or Reorganized Debtor's rights or obligations under the applicable Plan.

### 13.7 Exculpation

**Notwithstanding anything contained herein the contrary, the CRO, KapilaMukamal and Genovese Joblove & Battista, P.A. (and their respective employees, attorneys, professionals and agents) shall neither have nor incur any liability relating to the Chapter 11 Cases to any Entity for any and all Claims and Causes of Action arising after the applicable Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plans or distributing property thereunder, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plans or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however, that the foregoing provisions of this Article shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, fraud or willful misconduct. This provision shall also apply in the Liquidating Trust Alternative.**

### 13.8 Limitations on Exculpation

Nothing in the Plans shall be construed to release or exculpate any Person from, or require indemnification of any Person against losses arising from criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or limit the liability of the professionals of the Debtors to the Debtors pursuant to Rule 4-1.8(h) of the Florida Rules of Professional Conduct ("Limiting Liability for Malpractice"). This provision shall also apply in the Liquidating Trust Alternative.

### 13.9 Injunction[11]

From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Reorganized Debtors, the Estates, and their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied pursuant to the Plan or the Confirmation Order.

Except as otherwise expressly provided for in the Plans or in obligations issued pursuant to the Plans, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, the Reorganized Debtors, the Estates, and their successors and assigns and their assets

---

[11] This provision shall apply equally to the Liquidating Trust Alternative, provided that any references to the Reorganized Debtors shall be deemed to refer to the Liquidating Trusts or Liquidating Trustee, as the context requires.

and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plans or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plans or the Confirmation Order.

The rights afforded in the Plans and the treatment of all Claims and Equity Interests in the Plans shall be in exchange for and in complete satisfaction of Claims and Equity Interests against the Debtors or any of their assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to the Plans or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to the Plans or the Confirmation Order.  On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full.

Except as otherwise expressly provided for in the Plans or in obligations issued pursuant to the Plans, all Persons and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released pursuant to the Plans or Confirmation Order, from:

-commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, the Reorganized Debtors, the Estates and their successors and assigns and their assets and properties;

-enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtors, the Reorganized Debtors, the Estates and their successors and assigns and their assets and properties;

-creating, perfecting or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Estates and their successors and assigns and their assets and properties; and

-commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder).

**13.10   Release of Liens**

Except as otherwise provided in the Plans or in any contract, instrument, release or other agreement or document created pursuant to the Plans, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estates distributed under the Plans shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the applicable Debtor.  This provision shall also apply in the Liquidating Trust Alternative, if applicable.

## ARTICLE XIV
## RETENTION OF JURISDICTION[12]

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, the Reorganized Debtors, and the Plans as is legally permissible, including, without limitation, jurisdiction to:

14.1     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim against or Equity Interest in the Debtors, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interest;

14.2     grant, deny or otherwise resolve any and all applications of Professionals or Persons retained in the Chapter 11 Cases by the Debtors for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plans, for periods ending on or before the Effective Dates

14.3     resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired leases to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

14.4     ensure that Distributions to holders of Allowed Claims or Equity Interests are accomplished pursuant to the provisions of the Plans, including by resolving any disputes regarding, as applicable, each Debtor's or Reorganized Debtor's entitlement to recover assets held by third parties;

14.5     decide or resolve any motions, contested or litigated matters (including but not limited to any adversary proceeding) and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date;

14.6     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plans and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plans or the Disclosure Statement;

14.7     issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plans, except as otherwise provided in the Plans;

14.8     enforce Articles within the Plans;

---

[12] The provisions of this Article XIV shall apply equally to the Liquidating Trust Alternative, provided that any references to the Reorganized Debtors shall be deemed to refer to the Liquidating Trusts or Liquidating Trustee, as the context requires.

14.9    resolve any cases, controversies, suits or disputes with respect to the injunction and other provisions contained in the Plans, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

14.10    resolve any issues or matters related to the Liquidating Trust Alternative and/or the Liquidating Trusts;

14.11    enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

14.12    resolve any other matters that may arise in connection with or related to the Plans, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plans or the Disclosure Statement; and

14.13    enter an order and a Final Decree closing the Chapter 11 Cases.

## ARTICLE XV
## RISK FACTORS IN CONNECTION WITH THE PLANS

The holders of Claims against and Equity Interests in each Debtor should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject their respective Plan.  These risk factors should not, however, be regarded as constituting the only risks associated with the Plans and their implementation.

### A.    Business Risk

The holders of Claims should consider the following business risk factors associated with the Plans:

i.    The Debtors may not meet the Financial Projections as set forth in Exhibit 3; and

ii.    The Debtors' business performance may be negatively impacted by outside factors that may adversely affect their direct and indirect investments.

### B.    Bankruptcy Considerations.

Although the Debtors believe the Plans will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plans as proposed.  Moreover, there can be no assurance that modifications of the Plans will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

### C.    Failure to Obtain the Investment Guarantee Amount or the Exit Financing or Failure to Receive Requisite Acceptances

The Plans are contingent on the Debtors receiving the Investment Guarantee Amount from FF Management and the Exit Financing from the Exit Lender.  In the event the funds from the Investment Guarantee Amount are not received prior to the Confirmation Hearing as set forth herein, or the Exit Financing is not in place prior to the Confirmation Hearing, then Debtors will not proceed with confirmation of the Plans.  In that situation, the Debtors may elect to proceed with the Liquidating Trust Alternative.

In addition, Classes 2, 3 and 5 in the FF Fund Plan and Class 2 in the F5 Business Plan are the only Classes that are entitled to vote to accept or reject the Plans.  If the requisite acceptances are not received by at least one Impaired Class, the Debtors will not be able to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, because at least one Impaired Class will not have voted in favor of the Plans as required by section 1129(a)(10) of the Bankruptcy Code.  Further, if the requisite acceptances are not received, the Debtors may elect to proceed with the Liquidating Trust Alternative.  In addition, the Debtors may seek to accomplish an alternative restructuring of their capitalization and obligations to creditors and obtain acceptances to an alternative plan of reorganization for the Debtors, or otherwise, the Debtors may be required to liquidate the Estates under chapter 7 or 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors and equity holders as those proposed in the Plans.

D.     **SEC Action**

As set forth above, the SEC is conducting an investigation into the Debtors and perhaps others related to or affiliated with the Debtors. In the event that the SEC brings an action and obtains injunctive relief in connection therewith, then such injunctive relief may impact the Debtors' ability to confirm the Plans.

E.     **No Duty to Update Disclosures**.

The Debtors have no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtors are required to do so pursuant to an order of the Bankruptcy Court.  Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

F.     **Representations Outside this Disclosure Statement**.

This Disclosure Statement contains representations concerning or related to the Debtors and the Plans that are conditionally approved by the Bankruptcy Code and the Bankruptcy Court. Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plans should not be relied upon by holders of Claims that are entitled to vote to accept or reject the applicable Plan.

G.     **Tax and Other Related Considerations**.

A discussion of potential tax consequences of the Plans is provided below; however, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice.  Holders of Claims and/or Equity Interests should seek

advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS[13]

### A.    Modification of Plan

Subject to the limitations contained in the Plans, each Debtor reserves the right in its sole discretion, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plans prior to the entry of the Confirmation Order, including amendments or modifications to (i) satisfy section 1129(b) of the Bankruptcy Code, or (ii) proceed with the Liquidating Trust Alternative; provided, however, that (1) any pre-Confirmation Date amendments shall not materially or adversely affect the interests, rights or treatment of any Allowed Claims or Equity Interests under the Plans as required under and in accordance with Section 1127 of the Bankruptcy Code or applicable Bankruptcy Rules; and (2) after the entry of the Confirmation Order, each Reorganized Debtor may, upon order of the Bankruptcy Court, amend or modify the Plans, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plans.

### B.    Revocation of Plan

Each Debtor reserves the right in its sole discretion to revoke or withdraw the respective Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans.

### C.    Binding Effect

On the Effective Date, the provisions of the Plans shall bind any holder of a Claim against, or present or former direct or indirect holder of an Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plans, whether or not such holder has accepted the Plans and whether or not such holder is entitled to a Distribution under the Plans.

### D.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### E.    Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other

---

[13] The provisions of this Article XVI shall apply equally to the Liquidating Trust Alternative, provided that any references to the Reorganized Debtors shall be deemed to refer to the Liquidating Trusts or Liquidating Trustee, as the context requires.

agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida without giving effect to the principles of conflict of laws thereof.

### F.    Reservation of Rights

The Plans shall have no force or effect unless and until the Effective Date occurs. Neither the filing of the Plans, any statement or provision contained therein, nor the taking of any action by the Debtors or any Entity with respect to the Plans shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

### G.    Section 1125(e) Good Faith Compliance

Confirmation of the Plans shall act as a finding by the Bankruptcy Court that the Debtors and each of their representatives have acted in "good faith" under sections 1125(e) and 1129(a)(3) of the Bankruptcy Code.

### H.    Further Assurances

The Debtors, all holders of Claims receiving Distributions hereunder, and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plans or the Confirmation Order.

### I.    Service of Documents

Any pleading, notice or other document required herein to be served on or delivered to the Debtor shall be sent by both email and first class, certified U.S. mail, postage prepaid as follows:

**If before the Effective Date or under the Liquidating Trust Alternative, to:**

> **FF Fund I, L.P./F5 Business Investment Partners, LLC**
> c/o Soneet R. Kapila
> KapilaMukamal
> 1000 South Federal Highway, Suite 200
> Ft. Lauderdale, FL 33316
> Telephone: (954) 761-1011
> Email:  skapila@kapilamukamal.com
>
> With a copy to (which shall not constitute notice)
>
> GENOVESE JOBLOVE & BATTISTA, P.A.
> Attn:  Paul J. Battista, Esq.
> Attn:  Heather L. Harmon, Esq.
> 100 SE 2nd Street, 44th Floor
> Miami, FL 33131Telephone: (305) 349-2300

Facsimile: (305) 349-2310
Email: pbattista@gjb-law.com
Email:  hharmon@gjb-law.com

**If after the Effective Date under the Plans, to:**

Andrew Franzone
FF Fund Management, LLC
429 Lenox Avenue
Miami Beach, FL 33139

### J.      Filing of Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

### K.      No Stay of Confirmation Order

The Debtors shall request that the Court waive stay of enforcement of the Confirmation Order otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e), 6004(h) and 7062.

### L.      Bankruptcy Rule 9019 Request; Impact

The Plans, including the Plan Supplements or other Plan Documents, may provide for one or more compromises or settlements.  Pursuant to Bankruptcy Rule 9019, the Debtors hereby request approval of all compromises and settlements included in the Plans, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of any such compromise or settlement.

### L.      Automatic Stay

The automatic stay provided for under section 362 of the Bankruptcy Code shall remain in effect in the Chapter 11 Cases until the Effective Date.

### ARTICLE XVII
### CONFIRMATION REQUIREMENTS

In order for each Plan to be confirmed, the Bankruptcy Code requires that the Bankruptcy Court determine that each Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning such Plan have been adequate and have included information concerning all payments made or promised in connection with such Plan and these Chapter 11 Cases.  The Bankruptcy Code also requires that: (1) each Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) each Plan is feasible (that is, there is a reasonable probability that the respective Debtor will be able to perform its obligations under its Plan without needing

further financial reorganization not contemplated by such Plan); and (3) each Plan is in the "best interests" of all Creditors in that Chapter 11 Case (that is, Creditors will receive at least as much under such Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code). To confirm each such Plan, the Bankruptcy Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm such Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

Set forth below is a summary of the relevant statutory confirmation requirements.

### 1.    Best Interests Test

Each Holder of a Claim or Interest in an Impaired Class must either (i) accept the applicable Plan or (ii) receive or retain under such Plan Cash or property of a value, as of the Effective Date of such Plan, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the Cash and property issued under such Plan to each Holder of a Claim or Interest equals or exceeds the value that would be allocated to such Holders in a liquidation under chapter 7 of the Bankruptcy Code (the "Best Interests Test"). The Debtors' Liquidation Analysis for each Debtor is attached as Exhibit 4 hereto. The Debtors believe the Holders of Claims against and Equity Interests in the Debtors will have an equal or greater recovery as a result of an orderly chapter 11 reorganization as discussed herein and under both Plan than could be realized in a chapter 7 liquidation for either Debtor for the following reasons.

To determine the value that a Holder of a Claim or Interest in an Impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' Property if the Debtors' Chapter 11 Cases had been converted to chapter 7 liquidation cases and the Debtors' Property were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value would consist of the net proceeds from the disposition of the Debtors' Assets, augmented by Cash held by the Debtors and reduced by certain increased costs and Claims that arise in a chapter 7 liquidation case that do not arise in a chapter 11 reorganization case.

As explained below, the Liquidation Value available for satisfaction of Claims and Equity Interests in the Debtors would be reduced by: (a) the costs, fees and expenses of the liquidation under chapter 7, which would include disposition expenses and the compensation of a trustee and his or her counsel and other professionals retained, (b) the fees of the chapter 7 trustee, and (c) certain other costs arising from conversion of the Chapter 11 Cases to chapter 7. However, the Liquidation Value will not include the Investment Guarantee Amount or the proceeds from the Exit Financing, and the Estates will not have the benefit of the agreed subordination of the FF Management claim.

The Debtors believe that Holders of Allowed General Unsecured Claims will clearly benefit from the reorganization of the Debtors under the terms of the Plans, including because of the funding of the Investment Guarantee Amount and the Exit Financing. If the Debtors' Assets were liquidated by a chapter 7 trustee, the Debtors project that under the FF Fund Plan that there would be no recovery for Holders of Allowed General Unsecured Claims or Allowed Interests,

59

while under the F5 Business Plan, FF Management projects that the maximum recovery for Holders of Allowed General Unsecured Claims would be $3,450,000 in the aggregate and there will be no recovery Holders of Allowed Interests. Under both Plans, if the Projections can be achieved, then the Debtors project a recovery of 100% for Holders of Allowed General Unsecured Claims over a three year period, while the FF Fund Plan anticipates a $2 million aggregate recovery for Holders of Limited Partner Equity Interests over five years.

Moreover, under the Plans, the Debtors will avoid the increased costs and expenses of a chapter 7 liquidation, including the fees payable to a chapter 7 trustee and his or her professionals. The Cash to be distributed to Creditors would be reduced by the chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the chapter 7 trustee. Bankruptcy Code § 326(a) permits reasonable compensation not to exceed 3% of the proceeds in excess of $1 million distributable to creditors.[14] The chapter 7 trustee's professionals, including legal counsel and accountants, would add substantial administrative expenses that would be entitled to be paid ahead of Allowed Claims and Equity Interests against the Debtors. These chapter 7 trustee fees would reduce the funds available for distribution to the Debtors' Creditors from additional recoveries such as preferential payments, expunged Administrative Expense Claims and the proceeds of successful Estate litigation or settlement.

It is also anticipated that a chapter 7 liquidation would result in a significant delay in payments being made to Creditors. Bankruptcy Rule 3002(c) provides that conversion of a chapter 11 case to chapter 7 will trigger a new bar date for filing claims against the Debtor, and that the new bar date will be 90 days after the first date set for the meeting of creditors called under section 341 of the Bankruptcy Code. Not only would a chapter 7 liquidation delay distribution to Creditors, but it is possible that additional claims that were not asserted in the Chapter 11 Cases, or were late-filed, could be filed against the Debtors. Reopening the bar date in connection with conversion to chapter 7 would provide these and other claimants an additional opportunity to file claims against the Estates. Furthermore, because the Debtors' principal assets – their investments – are illiquid by nature, it can take years before such investments can be fully liquidated. Finally, under the FF Fund Plan, as part of the consideration for retaining its equity interest, FF Management is consenting to subordinate its $2 million claim to General Unsecured Claims and, provided it is the Exit Lender, reduce its claim to $1 million. The hypothetical liquidation analysis takes into account that FF Management has not consented to the subordination or reduction of its claim in that scenario.

For the reasons set forth above, the Debtors believe that the Plans provide a superior recovery for Holders of Claims and Interests, and the Plans meet the requirements of the Best Interests Test.

In the event of the Liquidating Trust Alternative, the Debtors believe the Liquidating Trust Alternative will provide a superior recovery for Holders of Claims and Interests as compared to a Chapter 7 liquidation because (i) the Liquidating Trustee and his Professionals are familiar with

---

[14] Bankruptcy Code § 326(a) permits a chapter 7 trustee to receive 25% of the first $5,000 distributed to creditors, 10% of additional amounts up to $50,000, 5% of additional distributions up to $1 million and reasonable compensation up to 3% of distributions in excess of $1 million.

the Assets of the Estates, resulting in a substantial savings in additional professional fees for a Chapter 7 trustee and his/her professionals, and (ii) the Debtors have obtained the agreement of FF Management and all affiliated parties to subordinate their respective Allowed Claims to the payment in full of all Allowed General Unsecured Claims under both Plans.

## 2. Financial Feasibility Test

Even if the Plans are accepted by each Class of Claims and Interests voting on the Plans, and even if the Bankruptcy Court determines that the Plans satisfy the Best Interests Test, the Bankruptcy Code requires that, in order for the Plans to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plans are not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

As part of this analysis, FF Management has prepared projections of the financial performance of the Reorganized Debtors (the "Financial Projections"). The Financial Projections, and the assumptions on which they are based, are set forth in Exhibit 3 hereto.

FF Management believes that, under its direction and control, the Debtors will be able to make all payments required pursuant to the Plans while conducting ongoing business operations and, therefore, that confirmation of the Plans is not likely to be followed by liquidation or the need for further reorganization.

## 3. Acceptance by Impaired Classes

Bankruptcy Code § 1129(b) provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it. The process by which nonaccepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown." The Bankruptcy Court may confirm the Plans at the request of the Debtors notwithstanding either the Plan's rejection (or deemed rejection) by impaired classes as long as such Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to classes of equal rank.

A class of claims under a plan accepts the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote on the plan. A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (i) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified, or (ii) the effect of any default is cured and the original terms of the obligation are reinstated.

A plan is fair and equitable as to a class of secured claims that rejects the plan if the plan provides (i)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to

another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (ii) for the sale, subject to Bankruptcy Code § 363(k), of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (i) or (ii) of this paragraph; or (iii) for the realization of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (ii) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (ii) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.  The Debtors believe the Plan to be both fair and equitable.

## ARTICLE XVIII
## ALTERNATIVES TO THE PLANS

If the Plans are not confirmed and consummated, the alternatives include first the Liquidating Trust Alternative more fully described herein.  In the event the Plans in respect of the Liquidating Trust Alternative are not confirmed or consummated, then the alternatives are as follows:

### A.    Liquidation Under the Bankruptcy Code

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code.  The Debtors believe that liquidation would result in lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis discussed above and attached as Exhibit 4 to the Disclosure Statement.

### B.    Alternative Plan(s) of Reorganization

The Debtors believe that failure to confirm the Plans will lead inevitably to expensive and protracted Chapter 11 Cases.  In formulating and developing the Plans, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process with FF Management.

The Debtors believe that not only do the Plans fairly adjust the rights of various Classes of Claims, but also that the Plans provides superior recoveries to the Debtors' creditors over any

alternative capable of rational consideration (such as a chapter 7 liquidation), thus enabling many stakeholders to maximize their returns.  Rejection of the Plans in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class of Claims or Interests.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLANS IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLANS INCLUDE THE INVESTMENT GUARANTEE AMOUNT AND THE EXIT FINANCING, AND THEREFORE MAXIMIZE THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND INTERESTS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLANS WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES. **THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLANS VOTE TO ACCEPT THE PLANS.**

**C,    Dismissal of the Debtors' Chapter 11 Cases**

Dismissal of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the status quo ante.  Upon dismissal of the Debtors' Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiation with the creditors of the Debtors, and possibly resulting in costly and protracted litigation in various jurisdictions.  The Debtors believe that these actions would seriously undermine its ability to obtain financing and could lead ultimately to the liquidation of the Debtor under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Debtors' Chapter 11 Cases is not a viable alternative to the Plans.

**ARTICLE XIX**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion summarizes certain federal income tax consequences expected to result from the consummation of the Plans.  This discussion is only for general information purposes and only describes the expected tax consequences to Holders entitled to vote on the Plans. It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws.  This discussion is based on the Internal Revenue Code of 1986, as amended, Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the IRS, all as in effect on the date of the Disclosure Statement.  These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below.  No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below.  There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plans or that any contrary position would not be sustained by a court.

This discussion does not address all federal income tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances or to Holders subject to

special rules under the federal income tax laws, such as financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, foreign corporations, foreign trusts, foreign Estate, Holders who are not citizens or residents of the U.S., Holders subject to the alternative minimum tax, and Holders who have a functional currency other than the U.S. dollar.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLANS, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS.

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (a) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THE DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (b) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (c) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

Payments of interest, dividends and certain other payments are generally subject to backup withholding at the applicable withholding rate unless the payee of such payment furnishes such payee's correct taxpayer identification number (social security number or employer identification number) to the payor.  The Debtors may be required to withhold the applicable percentage of any payments made to a Holder who does not provide his, her or its taxpayer identification number. Backup withholding is not an additional tax, but an advance payment that may be refunded to the taxpayer by the IRS to the extent that the backup withholding results in an overpayment of tax by such taxpayer in such taxable year.

In accordance with the Plans, each Holder of an Allowed General Unsecured Claim against the Debtors shall be entitled to receive his, her or its Distributions under the Plans. Each Holder of an Allowed General Unsecured Claim may recognize gain or loss upon receipt of such Distributions equal to the difference between the "amount realized" by such Creditor and such Creditor's adjusted tax basis in his, her or its Claim.  The amount realized is equal to the value of such Creditor's Distributions.   Any gain or loss realized by an Unsecured Creditor should constitute ordinary income or loss to such creditor unless such Claim is a capital asset in the hands of such Unsecured Creditor.  If a Claim is a capital asset and it has been held for more than one year, such Creditor may realize long-term capital gain or loss.

The federal income tax consequences to such Creditors may differ and will depend on factors specific to each such Creditor, including, but not limited to:  (i) whether the Creditor's Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the Creditor's Claim, (iii) the type of consideration received by the Creditor in exchange for the Claim, (iv) whether the Creditor is a United States person or a foreign person for United States federal

income tax purposes, (v) whether the Creditor reports income on the accrual or cash basis method, and (vi) whether the Creditor has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

**THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCES TO EACH SUCH CREDITOR OR EQUITY INTEREST HOLDER. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLANS ARE COMPLEX AND IN SOME CASES UNCERTAIN.  THEREFORE, IT IS IMPORTANT THAT EACH CREDITOR AND EQUITY INTEREST HOLDER OBTAIN HIS, HER OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE PLAN**

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN.  NEITHER THE DEBTORS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLANS OR THE FOREGOING DISCUSSION.

## ARTICLE XX
## CONCLUSION

The Debtors believe that confirmation and implementation of the Plans are preferable because they will provide the greatest recovery to Holders of Claims and Equity Interests.  Other alternatives do not include the Investment Guarantee Amount or the Exit Financing, and could involve significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to creditors who hold Claims and holders of Equity Interests. The Debtors urge the Holders of Claims and Equity Interests who are entitled to vote on the Plans to vote to accept the Plans.

Dated:  February 1, 2021

FF FUND I, L.P.


By:   _/s/  Soneet R. Kapila_
Name:  Soneet R. Kapila
Title:    Chief Restructuring Officer

F5 BUSINESS INVESTMENT PARTNERS,
LLC


By:   _/s/  Soneet R. Kapila_
Name:  Soneet R. Kapila
Title:    Chief Restructuring Officer


GENOVESE JOBLOVE & BATTISTA, P.A.
*Counsel for the Debtor*
100 SE 2nd Street, 44th Floor
Miami, FL 33131-2100
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

By:    /s/  *Paul J. Battista*
        Paul J. Battista
        Florida Bar No. 884162
        pbattista@gjb-law.com
        Heather L. Harmon
        Florida Bar No. 013192
        hharmon@gjb-law.com

# **EXHIBIT 1**

**FF FUND I, LP & F5 BUSINESS INVESTMENT PARTNERS, LLC**
**CASE NO. 19-22744-BKC-LMI - UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA - MIAMI DIVISION**

**Investment Summary for FF Fund I, LP and F5 Business Investment Partners, LLC**
**Greg Hersch / Florence Capital Advisors -- Summary of Introduced Investments**

The below analysis is based on the CRO and KM's preliminary findings. The CRO has not valued the investments nor has he confirmed the value of the investments are accurately reflected prior to his appointment. Any value attributed to the investments was made prior to the CRO's appointment. Additionally, KM has not reconciled the amounts reflected herein to the bank records. This preliminary analysis is based on the current available information. Additional documents and information may be made available or reviewed, and certain facts currently not available may come to light, which may impact the analysis and findings herein.

| Investment Name | Owner | Investment Type (Debt / Equity) | Equity | Original Amount Invested / Loaned / Contributed (Note 1) | Capital Call Obligations (Note 2) | Description of Investment |
|---|---|---|---|---|---|---|
| Florence Capital Advisors SPV IV -- Cura Partners **(Note 3)** | FF Fund | Equity | 22.50% | $        275,000 | $       - | F5 invested into SPV IV, that pooled other FCA investor funds to participate in an investment with a company called Cura Partners, Inc. In or around February 2020, there was a merger between Cura and Curaleaf (OTCMKTS: CURLF), whereby, the investors in CURA (including FCA SPV IV) would receive restricted shares in Curaleaf over an extended time with some ability to monetize the shares. |
| SCP Opportunities Fund, LLC **(Note 3)** | FF Fund | Equity | 2.82% | 400,000 | - | SCP is an investor in WM Holding Company ("WMH") that has signed a definitive agreement to go public on the Nasdaq through a merger with Silver Spike Acquisition Corp. Per SCP, the earliest shares will be delivered to the SCP will be much later in 2021. |
| CoreWeave / Atlantic Crypto Corp **(Note 3)** | FF Fund | Equity | 1.95% (250,000 Seed Preferred Shares) | 250,000 | | CoreWeave is in the cryptocurrency business and is the third largest miner of Ethereum. |
| **Total** | **FF Fund** | | | $        925,000 | $       - | |
| | | | | | | |
| 69th Street Garage **(Note 3)** | F5 | Equity | 5% | $        100,000 | $       - | According to the investment principal, the property is currently being operated as small 40-space valet public parking garage.  The space is being transformed into a 22 space self park condominium garage by sub-dividing the garage into 22 condominium parking spaces which will be sold individually. |
| 7524 LLC | F5 | Equity (Real Estate) | 43.97% | 535,345 | - | Residential Real Estate  - 43.97% equity in LLC that owned a new construction home in Miami. In August 2019, F5 received $191,655 (pre-petition). In June 2020 (post-petition), the property was sold and F5 received $359,116. |
| Acadaca | F5 | Debt / Equity | 10% | 7,202,420 | - | Website design and ecommerce IT company. |
| Aldwych Capital Partners LLC | F5 | Debt / Equity | 15.5% | 1,531,000 | 384,000 | An investment in a fund that holds interests in several underlying investments including (i) Aldwych, LLC, an advisory firm for emerging markets brand development, (ii) Anvil Capital Partners, a direct lender to energy companies, and (iii) a 5G light infrastructure / telecom development. F5 holds a 15.5% equity interest and promissory note for $1.9 million, of which F5 funded $1.5 million and Aldwych made a Capital Call on the $384,000 remaining. |
| American Commercial - Cherry Tree | F5 | Equity (Real Estate) | 8.46% | 100,000 | - | Investment in Cherry Tree Shopping Center in Washington (Peoria), IL |
| American Commercial - University Boulevard West | F5 | Equity (Real Estate) | 9.76% | 100,000 | - | Membership interest in UBW- Investors, LLC which owns the UBW Shopping Center - 5839-5909 University Blvd West, Jacksonville, FL 32216. |
| Autodromo California, LLC | F5 | Debt | | 100,000 | - | Racetrack in California.  According to the investment principal, Autodromo is a development concept, so it has not generated any revenue. |
| CC-FF | F5 | Equity (Real Estate) | 50% | 1,986,321 | - | F5 is a 50% Partner in CC-FF. The other 50% partner Tangoroa Partners, LLC. CC-FF has interests in approx. 10 different commercial real estate projects. Properties include Class A office space and a multi tenant retail center. |
| Club Union Panama Holdings, LLC (Panama Hotel) | F5 | Equity | TBD | 200,000 | - | F5 invested $200,000 in ACP CU I, LLC that holds an interest in Club Union Panama Holdings, LLC ("Club Union"), the entity that is constructing a hotel in Panama.  The CRO has been informed that the hotel is near completion - 159 room Sofitel Legend Hotel Antiguo Club Union located in Casco Viejo, old town of Panama City. |
| Creatis Select Entertainment Fund LLC | F5 | Equity | 17.50% | 100,000 | - | Fund facilitates private investments in media and entertainment projects,  production companies. F5 investment is directly in the CSEF TEREZIN - THE BOYS OF TEREZIN PROJECT film. |

Exhibit 1

**FF FUND I, LP & F5 BUSINESS INVESTMENT PARTNERS, LLC**
**CASE NO. 19-22744-BKC-LMI - UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA - MIAMI DIVISION**

**Investment Summary for FF Fund I, LP and F5 Business Investment Partners, LLC**
**Greg Hersch / Florence Capital Advisors -- Summary of Introduced Investments**

The below analysis is based on the CRO and KM's preliminary findings. The CRO has not valued the investments nor has it confirmed the value of the investments are accurately reflected prior to his appointment. Any value attributed to the investments was made prior to the CRO's appointment. Additionally, KM has not reconciled the amounts reflected herein to the bank records. This preliminary analysis is based on the current available information. Additional documents and information may be made available or reviewed, and certain facts currently not available may come to light, which may impact the analysis and findings herein.

| Investment Name | Owner | Investment Type (Debt / Equity) | Equity | Original Amount Invested / Loaned / Contributed (Note 1) | Capital Call Obligations (Note 2) | Description of Investment |
|---|---|---|---|---|---|---|
| Dapp Ventures, LLC | F5 | Equity | 48% | 243,500 | 306,500 | Boutique music publishing Company specializing in helping artists further their careers through its music sync and licensing program. |
| Duckworth | F5 | Equity | TBD | 50,000 | - | Retailer of Duckworth brand socks, vapor, powder and comet fabrics. Duckworthco.com |
| E2 Performance Technologies Inc | F5 | Unknown | | 100,000 | - | Privately held shares in technology infused products and wearables. |
| Elegant Medical - Stethos | F5 | Equity / Convertible Securities | TBD | 105,000 | 145,000 | Developer of the Stethos Ecosystem - modern stethoscope. |
| Faveit | F5 | Debt Convertible PNs | TBD | 318,000 | - | Investment in convertible promissory notes of Faveit (mobile app). |
| Florence Capital Advisors SPV II -- Title Arbitrage (Note 3) | F5 | Equity | 23.72% | 750,000 | - | F5's investment is in FCA SPV II, whose underlying equity investment is in  Title Arbitrage (GP) for Fort Trinidad Investors, LLC which develops leases on proven undeveloped oil and gas fields. |
| Florence Capital Advisors SPV V -- Global InterXchange (Note 3) | F5 | Equity | TBD | 591,706 | - | GIX entered into a lease agreement with the Port Authority of New York and the New Jersey to install fiber optic cable in existing PATH conduit, to build a network from 4 World Trade Center to 1 Path Park Plaza. |
| Florence Capital Advisors SPV VI -- Five Four Ventures (Note 3) | F5 | Equity | TBD | 120,000 | 180,000 | Focused on making incubation-stage, early-stage and other similar investments in private companies. |
| GE&P Recycling | F5 | Debt | N/A | 3,271,500 | 1,740,000 | Developing a permit for a waste transfer station which is an industrial facility where municipal solid waste is temporarily held and sorted before heading to a landfill or waste-to-energy plant. Lease payments in arrears since June 2018, Landlord denying access to finalize permit.<br>• Project on hold and rent in arrears since June 2018 (approx. $79K p/month). Landlord has not defaulted on the lease.<br>• Permit pending add 'l testing, but cannot complete because landlord won't allow access to the property.<br>• Per the 12/29/18 Amended PN: (i) GE&P requested remaining capital call obligation of $1,740,000 to fund the rent in arrears and going forward, and (ii) Maturity Date is December 29, 2023.<br>• $3,271,500 loaned to GE&P as of 9/30/19. |
| Genesis (Note 3) | F5 | Equity | N/A | 500,000 | | Investment in the hedge fund Megalodon Media, LP. Genesis is an AdTech company.<br>Genesis Media LLC contributed its business into Adgenesis Holdings LLC in August 2017 in return for an interest in Adgenesis Holdings LLC (which became the sole asset of GenesisMedia).  Adgenesis Holdings LLC ceased operations in March 2018 when its senior lender sold all its remaining assets in a foreclosure action. |
| HALO (Note 3) | F5 | Equity | 692,895 shares or about 0.8265% of the company | 519,185 | | Equity investment of privately held shares of a Maritime Defense Company. |
| Joss Realty Partners - 2233 Wisconsin | F5 | Equity (Real Estate) | 7.14% | 500,000 | - | Direct equity investment in class A office space in Washington DC - "Georgetown Plaza" located at 2215 and 2233 Wisconsin Ave, NW, Washington DC. |
| Krasin | F5 | Debt | N/A | 800,000 | - | F5 loaned $800,000 to Krasin, that was subsequently invested by Krasin in three separate companies. Per the investment principal of Krasin, the three companies have ceased operating and Krasin has an $867,000 judgment against one of the companies. |

Kapila Mukamal
CPAs, Forensic and Insolvency Advisors

Exhibit 1

**FF FUND I, LP & F5 BUSINESS INVESTMENT PARTNERS, LLC**
**CASE NO. 19-22744-BKC-LMI - UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA - MIAMI DIVISION**

**Investment Summary for FF Fund I, LP and F5 Business Investment Partners, LLC**
**Greg Hersch / Florence Capital Advisors -- Summary of Introduced Investments**

The below analysis is based on the CRO and KM's preliminary findings. The CRO has not valued the investments nor has he confirmed the value of the investments are accurately reflected prior to his appointment. Any value attributed to the investments was made prior to the CRO's appointment. Additionally, KM has not reconciled the amounts reflected herein to the bank records. This preliminary analysis is based on the current available information. Additional documents and information may be made available or reviewed, and certain facts currently not available may come to light, which may impact the analysis and findings herein.

| Investment Name | Owner | Investment Type (Debt / Equity) | Equity | Original Amount Invested / Loaned / Contributed (Note 1) | Capital Call Obligations (Note 2) | Description of Investment |
|---|---|---|---|---|---|---|
| LANDC Corporation | F5 | Equity | TBD | - | | LANDC is the sole member or contemplated member of broker-dealer FPCG, LLC (FocusPoint Private Capital Group LLC fka Forbes Private Capital Group LLC). |
| LDT Online | F5 | Equity | | 289,000 | - | Luxury Product line - dog travel needs, the website is not operational. |
| Livery Loans LLC | F5 | Equity / Conv Debt | N/A | 150,000 | - | CNH Limousine Consulting LLC and Livery Loans LLC are branded as one combined company.  Livery Loans provides Uber drivers with unsecured, non credit based loans of $1,500, repayments through weekly loan deductions from Uber's payroll. Investment principal provided a final 2018 tax return and confirmed the company is no longer operating. |
| Local Motors | F5 | Equity | .04% 40,384 Series A4 Shares | 150,000 | - | World's first manufacturer of 3D-printed cars. |
| Medicare One, LLC | F5 | Debt | N/A | 50,000 | - | Licensed insurance agency for Medicare. • 2/6/20: $50K Promissory Note (unexecuted by Borrower), matured on 1/31/2020. |
| Metropolitan Merchant Capital, Inc (MetMC) | F5 | Conv Debt | | 148,790 | - | Investor in participation rights in merchant advances. |
| Metropolitan Partners Fund IV | F5 | Debt | 0.07% | 30,000 | - | Fund focused on originating and investing in short term collateralized private debt. |
| MiMedia Inc (Note 3) | F5 | Debt / Equity | TBD | 410,000 | - | Personal cloud based storage platform designed so that users can store all digital content (photos, media, music, etc.) in one place. |
| Modern Guild Inc | F5 | Convertible Notes | TBD | 50,000 | - | Modern Guild partners with companies (e.g. Citi, Deloitte, Morgan Stanley) and trains college students for free to help with job placement. |
| MSP, LLC | F5 | Equity | 50% | 1,046,000 | - | Investments in several participation agreements with Mike Skinner Properties, LLC ("MSP") whereby F5 provided capital to MSP to invest in real estate, promissory notes and other investment opportunities that were designated and/or controlled by MSP, including a hangar known as Cessna ($795k), a condominium known as Cornell ($176k) and an individual promissory note known as Hoobler ($72k). |
| NCP II | F5 | Equity / Debt | 50% | 1,435,000 | 679,000 | NCP II's source of revenue is from 35% of revenues generated by Niosi's relationships and referrals to Roberts & Ryan, a Service Disabled Veteran Owned institutional broker dealer, per an agmt provided by Niosi. • Per July 2017 Unsecured PN & Aug 2017 Settlement & Exchange Agmt: ○ $1.435M debt from loan to NCP was transferred to NCP II per a PN maturing in June 2037, and then subsequently shortened in maturity to November 2023; ○ F5 rec'd 50% equity in NCP II; and ○ F5 rec'd a transfer of the $200K investment in LANDC from NCP. • R&R confirmed an agmt between NCP II and R&R exists. |
| North River IV LLC | F5 | Equity (Real Estate) | 0.41% | 100,000 | - | Entity organized in January 2015 to acquire 2 office/retail buildings in Portland, Maine. |
| PerOs Biosciences | F5 | Debt | | 100,000 | - | Company manufactures tableted gum, tablets, lozenges, candy etc., including dietary supplements. PerOs Bio redeemed the $100,000 promissory note due to F5 for $60,000 in August 2019. |
| R&R Partners Holdings | F5 | Equity | 0.09% | 100,000 | - | In November 2017, R&R Holdings Co LLC acquired a minority equity interest in Roberts & Ryan Investments Inc, a licensed broker-dealer. https://roberts-ryan.com/ |

Exhibit 1

**FF FUND I, LP & F5 BUSINESS INVESTMENT PARTNERS, LLC**
**CASE NO. 19-22744-BKC-LMI - UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA - MIAMI DIVISION**

**Investment Summary for FF Fund I, LP and F5 Business Investment Partners, LLC**
**Greg Hersch / Florence Capital Advisors -- Summary of Introduced Investments**

The below analysis is based on the CRO and KM's preliminary findings. The CRO has not valued the investments nor has it confirmed the value of the investments are accurately reflected prior to his appointment. Any value attributed to the investments was made prior to the CRO's appointment. Additionally, KM has not reconciled the amounts reflected herein to the bank records. This preliminary analysis is based on the current available information. Additional documents and information may be made available or reviewed, and certain facts currently not available may come to light, which may impact the analysis and findings herein.

| Investment Name | Owner | Investment Type (Debt / Equity) | Equity | Original Amount Invested / Loaned / Contributed (Note 1) | Capital Call Obligations (Note 2) | Description of Investment |
|---|---|---|---|---|---|---|
| Refugee Ltd | F5 | Equity | 30.4% of net profits until 100% of investment value recouped, then 17.2% of net profits after recoupment and deferments | 79,211 | - | Refugee Doc Ltd. is a documentary production company, which F5 fund invested in June 2017 as part of an investment in our documentary feature film Refugee. |
| RSE Markets - Rally Road | F5 | Equity | 26,373 shares Series Seed 2 Preferred | 25,000 | - | Rally Rd is a tech platform that allows users to invest directly in rare alternative assets e.g. Classic cars. |
| Sandhill | F5 | Equity | 4.29% | - | 150,000 | Start-up investment, F5 did not fund anything for this investment committed to in March 2019. |
| Skyline Development | F5 | Equity | 44% | 236,000 | 364,000 | Presto Garden is a vertical hollow grow tower with water flow features that Jay Arnold invented and have been bringing to market and widespread distribution since 2017. The grow tower is a patent pending design (patent pending application). It can help speed up, and also improve, the growth of all sorts of plant and agriculture products. |
| Solemates LLC | F5 | Debt | 0.71% (Class B Member) | 50,000 | - | Solemates is a consumer brand that produces shoe and foot care products and accessories. The line is sold in CVS, DSW, and many other retailers, as well as on Amazon and the company website. Current status is business is operating and growing. |
| Soundtrapper | F5 | Equity | 10% | 100,000 | - | Privately held shares in music licensing company. |
| Tanz | F5 | Equity | 21% | 600,000 | - | Equity investment (privately held shares) in a producer of live music and entertainment events. The company's website is not active. |
| Vitalis | F5 | Equity | 14,216 Units, 1.2062% of series A Preferred Shrs (including $500k unfunded capital call) | 475,000 | 566,728 | Privately held shares in pharmaceutical company which is developing 3 different drugs.  Main drug is a side effect reduced version of the largest multiple sclerosis drug category, fumarates. |
| Waves Technologies, Ltd | F5 | Equity | | 254,890 | - | Privately held shares in European aviation company. Company was dissolved last year. Out of business, confirmed with Investment principal who provided insolvency proceeding documents. |
| **Total** | **F5** | | | $    25,702,868 | $ 4,515,228 | |

| Greg Hersch / Florence Capital Advisors ("FCA") - Introduced  Investments for FF Fund and F5 (Note 3): | | | | | | |
|---|---|---|---|---|---|---|
| **SCP Opportunities Fund** | | | | | | |
| Atlantic Crypto Corp/ CoreWeave | FF Fund | | | $      250,000 | | |
| Genesis | F5 | | | 500,000 | | |
| HALO | F5 | | | 519,185 | | |
| MiMedia Inc | F5 | | | 410,000 | | |
| SCP Opportunities Fund | FF Fund | | | 400,000 | | |
| 69th Street Garage | F5 | | | 100,000 | | |
| | | | | $    2,179,185 | | |

Kapila|Mukamal
CPAs, Forensic and Insolvency Advisors

Exhibit 1

**FF FUND I, LP & F5 BUSINESS INVESTMENT PARTNERS, LLC**
**CASE NO. 19-22744-BKC-LMI - UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA - MIAMI DIVISION**

**Investment Summary for FF Fund I, LP and F5 Business Investment Partners, LLC**
**Greg Hersch / Florence Capital Advisors -- Summary of Introduced Investments**

The below analysis is based on the CRO and KM's preliminary findings. The CRO has not valued the investments nor has he confirmed the value of the investments are accurately reflected prior to his appointment. Any value attributed to the investments was made prior to the CRO's appointment. Additionally, KM has not reconciled the amounts reflected herein to the bank records. This preliminary analysis is based on the current available information. Additional documents and information may be made available or reviewed, and certain facts currently not available may come to light, which may impact the analysis and findings herein.

| Investment Name | Owner | Investment Type (Debt / Equity) | Equity | Original Amount Invested / Loaned / Contributed (Note 1) | Capital Call Obligations (Note 2) | Description of Investment |
|---|---|---|---|---|---|---|
| **Greg Hersch / FCA - Introduced Investments for FCA SPVs (Note 3):** | | | | | | |
| FCA SPV II - Title Arbitrage | F5 | | | 750,000 | | |
| FCA SPV IV - Cura | FF Fund I, LP | | | 275,000 | | |
| FCA SPV V - Global InterXchange | F5 | | | 591,706 | | |
| FCA SPV VI - Five Four Ventures | F5 | | | 120,000 | | |
| | | | $ | 1,736,706 | | |
| | | | | | | |
| **Total Introduced Investments for FF Fund and F5** | | | $ | 3,915,891 | | |

**1)** The investment, loan or contribution amount (collectively, the "Contribution Amount") was obtained from the investment records or information provided by the investment principals. The CRO is still missing a significant amount of bank records and is unable to reconcile the Contribution Amounts to the bank records for verification. The Contribution Amount is the original principal investment or loan made that is outstanding, excluding accrued or paid dividends and does not account for the original Contribution Amount made less any redemptions or return of principal.

**2)** Capital Calls - all Capital Call obligations have been requested from the Investment principals.

**3)** These investments were introduced by Greg Hersch or Florence Capital Advisors and are based on the investment records provided and reviewed.

**EXHIBIT 2**

| Count | Limited Partner | As of January 21, 2021 | Estimated % of Limited Partnership Interest |
|---|---|---|---|
| 2 | PENSCO Trust Company Custodian FBO Dennis S. Hersch IRA | 1,653,774.44 | 11.5983% |
| 3 | William A. Freydberg | 1,375,294.19 | 9.6452% |
| 4 | Blake Mallen 2013 Trust | 1,341,183.71 | 9.4060% |
| 6 | Northbrook Real Estate Partners, LLC | 875,043.14 | 6.1369% |
| 7 | Aaron & Danielle Bernthal | 562,435.95 | 3.9445% |
| 8 | Kimple 2009 Trust | 521,744.16 | 3.6591% |
| 9 | WeHaBe Beheer BV | 513,224.22 | 3.5993% |
| 10 | Deborah L. Palmer | 466,136.31 | 3.2691% |
| 11 | PENSCO Trust Company Custodian FBO Kenneth Eng, IRA | 458,107.00 | 3.2128% |
| 12 | Hope Brown | 355,140.05 | 2.4907% |
| 13 | Nicholas & Kathryn Stein | 290,030.50 | 2.0340% |
| 14 | Ellen I. Sykes | 260,206.66 | 1.8249% |
| 15 | Ann Lewin Revocable Trust | 237,276.87 | 1.6641% |
| 16 | Ware & Amalia Sykes | 236,092.09 | 1.6558% |
| 17 | PENSCO Trust Company Custodian FBO Kenneth P. Lisiak, IRA | 214,406.38 | 1.5037% |
| 18 | PENSCO Trust Company FBO Anthony T. Niosi, IRA | 206,580.96 | 1.4488% |
| 19 | Susan Grausman | 204,183.33 | 1.4320% |
| 20 | Adrian E. Ulrich | 196,457.09 | 1.3778% |
| 21 | PENSCO Trust Company Custodian FBO Kathryn M. Gregory, IRA | 170,309.57 | 1.1944% |
| 22 | Timothy M. Evans | 167,438.90 | 1.1743% |
| 23 | The Pyne Co.'s Ltd. Profit Sharing Plan FBO Amalia P. Sykes | 161,338.81 | 1.1315% |
| 24 | Paul McCarthy | 156,575.76 | 1.0981% |
| 25 | PENSCO Trust Company FBO James V.V. Burke, IRA | 145,418.31 | 1.0198% |
| 26 | Jennifer Grausman | 143,311.53 | 1.0051% |
| 27 | Elkie Freydberg | 140,010.28 | 0.9819% |
| 28 | Vinay S. Kolla | 134,957.55 | 0.9465% |
| 29 | Keith M. Rosenbloom | 132,571.92 | 0.9298% |
| 30 | Richard B. Baer | 132,222.44 | 0.9273% |
| 31 | Fiona M. Caldow | 130,700.79 | 0.9166% |
| 32 | Deborah Grausman | 124,508.34 | 0.8732% |
| 33 | Richard Grausman | 124,508.34 | 0.8732% |
| 34 | Arthur Millholland | 124,460.45 | 0.8729% |
| 35 | Jonathan Stein | 122,573.93 | 0.8596% |
| 36 | PENSCO Trust Company Custodian FBO Dale Schlather | 105,445.77 | 0.7395% |
| 37 | PENSCO Trust Company Custodian FBO Brian Stein | 100,027.10 | 0.7015% |
| 38 | PENSCO Trust Company Custodian FBO Andrew T. Franzone, IRA | 99,954.35 | 0.7010% |
| 39 | TD Ameritrade Custodian. FBO Vinay Kolla - IRA | 97,738.11 | 0.6855% |
| 40 | PENSCO Trust Company Custodian FBO Matthew R. Evans, IRA | 96,253.03 | 0.6750% |
| 41 | PENSCO Trust Company Custodian FBO Anna M. Alaimo, IRA | 89,104.76 | 0.6249% |
| 42 | PENSCO Trust Company FBO Robin S. Kelleher, IRA | 86,734.42 | 0.6083% |
| 43 | F. Perlberg Consulting Inc. | 78,916.82 | 0.5535% |
| 44 | Susan S. Andelman | 77,443.54 | 0.5431% |
| 45 | PENSCO Trust Company Cust. FBO Daniel J. Delaney, IRA | 75,043.91 | 0.5263% |
| 46 | Benner A. Ulrich | 74,894.34 | 0.5252% |
| 47 | Joseph P. Habboushe | 73,667.91 | 0.5166% |
| 48 | Roee & Melissa Wiczyk | 72,451.72 | 0.5081% |
| 49 | Maher Al Jallad | 66,698.68 | 0.4678% |
| 50 | Rafi Hovsepian | 66,108.35 | 0.4636% |
| 51 | Brave Equity Ventures, LLC | 55,529.97 | 0.3894% |
| 52 | PENSCO Trust Company Custodian FBO Richard J. Pacheco, IRA | 52,969.78 | 0.3715% |
| 53 | PENSCO Trust Co. FBO Lynne Kushnirenko, IRA | 51,057.93 | 0.3581% |
| 54 | Antony J. Ellis | 50,489.06 | 0.3541% |
| 55 | Nicholas F. Cohen | 50,136.69 | 0.3516% |
| 56 | PENSCO Trust Co. Cust. FBO James P. Sletteland, Jr., IRA | 42,835.44 | 0.3004% |
| 57 | PENSCO Trust Company Custodian FBO Grant M. Kornman, IRA | 40,378.95 | 0.2832% |
| 58 | PENSCO Trust Co. Cust FBO Michael F. Streicker IRA | 36,768.56 | 0.2579% |
| 59 | PENSCO Trust Company Custodian FBO Emily A. Farley, IRA | 36,371.07 | 0.2551% |
| 60 | PENSCO Trust Company Custodian FBO Joseph P. Habboushe, IRA | 35,052.20 | 0.2458% |
| 61 | Sheryl Parkin | 31,080.86 | 0.2180% |
| 62 | PENSCO Trust Co. Custodian FBO Charles H. Majors, IRA | 30,487.24 | 0.2138% |
| 63 | PENSCO Trust Company Custodian FBO Amalia P. Sykes, IRA | 27,460.28 | 0.1926% |
| 64 | Stephen A. Koldyke | 26,634.68 | 0.1868% |
| 65 | TD Ameritrade Custodian FBO Stalene C. Hall, IRA | 25,774.17 | 0.1808% |
| 66 | PENSCO Trust Company Custodian FBO Ashleigh K. Aungst, IRA | 24,223.20 | 0.1699% |
| 67 | Peter B. Bernagozzi | 24,049.68 | 0.1687% |
| 68 | PENSCO Trust Company Custodian FBO Rafi Hovsepian, IRA | 23,864.52 | 0.1674% |
| 69 | PENSCO Trust Co. Custodian FBO Kate R. Ullman, IRA | 22,573.50 | 0.1583% |
| 70 | Ronald & Renee Steinberg | 18,570.62 | 0.1302% |
| 71 | PENSCO Trust Company Custodian FBO Christine A. Avery, IRA | 16,137.00 | 0.1132% |
| 72 | Michael J. Rosenthal | 15,881.06 | 0.1114% |
| 73 | PENSCO Trust Co. Custodian FBO Ameet B. Amin, IRA | 14,401.03 | 0.1010% |
| 74 | Lewis & Stalene Hall | 14,146.79 | 0.0992% |
| 75 | TD Ameritrade FBO Rachel Lee, IRA | 14,129.77 | 0.0991% |
| 76 | Michael J. Skinner | 13,645.89 | 0.0957% |
| 77 | TD Ameritrade Custodian FBO Jeffrey Lasky, IRA | 11,743.54 | 0.0824% |

| Count | Limited Partner | As of January 21, 2021 | Estimated % of Limited Partnership Interest |
|---|---|---|---|
| 78 | Andrew T. Franzone, LLC | 10,368.46 | 0.0727% |
| 79 | TD Ameritrade Custodian FBO Jeffrey Lasky, IRA | 9,327.43 | 0.0654% |
| 80 | Adrien G. Fraise | 8,677.92 | 0.0609% |
| 81 | PENSCO Trust Company Custodian FBO Rafi Hovsepian, IRA | 8,471.63 | 0.0594% |
| 82 | Dustin Skinner | 8,419.09 | 0.0590% |
| 83 | FF Fund Management, LLC | 7,555.44 | 0.0530% |
| 84 | FF Reserve Account, LLC | 6,784.52 | 0.0476% |
| 85 | Guy Butler | 5,398.35 | 0.0379% |
| 86 | Richard Pacheco | 5,130.60 | 0.0360% |
| 87 | James M. Dawson | 4,815.61 | 0.0338% |
| 88 | Margaux Lisiak | 4,407.18 | 0.0309% |
| 89 | Jarrah Venables | 4,196.11 | 0.0294% |
| 90 | Dale Schlather | 3,338.88 | 0.0234% |
| 91 | PENSCO Trust Company Custodian FBO Kenneth Eng IRA | 2,971.04 | 0.0208% |
| 92 | Jeanne M. Franzone, MD | 2,884.90 | 0.0202% |
| 93 | Andrew & Margaret Franzone | 2,840.85 | 0.0199% |
| 94 | Northern Trust Company FBO Raymond L. Floyd, IRA | 2,782.03 | 0.0195% |
| 95 | James & Jennifer Franzone | 2,650.09 | 0.0186% |
| 96 | Mike C. Skinner | 1,966.03 | 0.0138% |
| 97 | Philip E. Gaucher, Jr. | 1,930.16 | 0.0135% |
| 98 | Evans & Son, Ltd. | 1,325.70 | 0.0093% |
| 99 | James A Franzone Custodian Until Age 21 | 1,249.39 | 0.0088% |
| 100 | James A Franzone Custodian Until Age 21 | 1,249.39 | 0.0088% |
| 101 | James A Franzone Custodian Until Age 21 | 1,249.26 | 0.0088% |
| 102 | James V.V. Burke | 1,234.59 | 0.0087% |
| 103 | Jeffrey H. Lasky | 758.17 | 0.0053% |
| 104 | Franklin Weil | 609.95 | 0.0043% |
| 105 | Aron & Penina Schoenfeld | 303.82 | 0.0021% |
| 106 | Matthew S. Magnuson | 255.93 | 0.0018% |
| 107 | FF Reserve Account, LLC -- Class C | 109.69 | 0.0008% |
| 108 | Millennium Trust Company Custodian FBO Michael A. Beck, IRA | 96.94 | 0.0007% |
| 109 | TD Ameritrade FBO O'Donnell Lee, IRA | 95.48 | 0.0007% |
| 110 | TD Ameritrade Custodian FBO Andrew T. Franzone, IRA | 107.67 | 0.0008% |
| 111 | Andrew & Kate Ullman | 71.52 | 0.0005% |
| 112 | Andrew T. Franzone, LLC -- Class C | 64.77 | 0.0005% |
| 113 | PENSCO Trust Company Cust FBO Ashleigh K Aungst, ROTH IRA | 20.19 | 0.0001% |
| | | $          14,258,819.04 | 1.00 |

# **EXHIBIT 3**

**FF Fund and F5 Consolidated Projections**
**PROJECTED**

| | | November 30, 2020 | Effective Date | Year 1 January 2022 | Year 2 January 2023 | Year 3 January 2024 | Year 4 January 2025 | Year 5 January 2026 |
|---|---|---|---|---|---|---|---|---|
| **Sources** | | | | | | | | |
| Cash | Beginning Cash on Hand | | $ 5,200,000 | $ 2,560,000 | $ 280,000 | $ 300,000 | $ 980,000 | $ 6,040,000 |
| | Cash From Sale of Investments **(Note 1)** | | $ 500,000 | $ 1,500,000 | $ 5,000,000 | $ 10,000,000 | $ 7,500,000 | |
| | Litigation Recoveries | | | | | | | |
| Investments | Return on Investments **(Note 2)** | | | | $ 1,000,000 | $ 2,000,000 | $ 3,000,000 | $ 1,000,000 |
| Credit | Draw of $1.5m Line of Credit | | | $ 100,000 | $ 1,400,000 | | | |
| | **Total Sources (Assets)** | | $ 5,200,000 | $ 3,160,000 | $ 4,180,000 | $ 7,300,000 | $ 13,980,000 | $ 14,540,000 |
| **Uses** | | | | | | | | |
| Cash | Plan Distributions | | | | | | | |
| | Admin/Class 1 Distributions (Both Plans) | | $ 1,200,000 | | | | | |
| | Class 2 Distributions (Both Plans) | | $ 1,440,000 | $ 1,440,000 | $ 1,440,000 | $ 2,880,000 | | |
| | Class 3 Distributions (FF Fund Plan) | | | | | | $ 1,000,000 | |
| | Class 5 Distributions (FF Fund Plan) | | $ 40,000 | $ 40,000 | $ 40,000 | $ 40,000 | $ 2,040,000 | |
| | Operating Expenses **(Note 3)** | | $ 400,000 | $ 400,000 | $ 400,000 | $ 400,000 | $ 400,000 | |
| Investments | Investments | | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 2,000,000 | $ 2,300,000 | |
| Credit | Paydown of $1.5m Line of Credit | | | | | $ 1,500,000 | | |
| | **Total Uses** | | $ 2,640,000 | $ 2,880,000 | $ 2,880,000 | $ 4,320,000 | $ 4,940,000 | $ 4,740,000 |
| **Balances** | | | | | | | | |
| | Balance on Line of Credit | | $ 100,000 | $ 1,500,000 | $ 1,500,000 | | | |
| | Admin/Class 1 (Both Plans) | $ 1,200,000 | | | | | | |
| | Class 2 (Both Plans) | $ 7,200,000 | $ 5,760,000 | $ 4,320,000 | $ 2,880,000 | | | |
| | Class 3 (FF Fund Plan) | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | | |
| | Class 5 (FF Fund Plan) | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | |
| | **Total Liabilities** | $ 11,400,000 | $ 8,760,000 | $ 7,420,000 | $ 7,380,000 | $ 4,500,000 | $ 2,000,000 | $ - |
| | **Net Liquidity (excludes Return on Investments)** | | $ 2,560,000 | $ 280,000 | $ 300,000 | $ 980,000 | $ 6,040,000 | $ 8,800,000 |

SEE ACCOMPANYING NOTES

**Note 1:**

In addition to the monetization of investments described below, the Fund receives periodic distributions and/or dividend payments from a few of the limited partnership interests held (e.g. North River IV LLC, American Commercial Realty - Cherry Tree and UBW, and Metropolitan Partners Fund IV).

**Year 1)** Assumes the recovery of funds currently in settlement negotiations for the MSP, LLC investment, redemption of funds in the Cruiser Capital hedge fund and potentially a combination of monetizing the Fund's interest in North River IV, LLC, or a sale of a portion of interest or stock in SCP Opportunity Fund (Ticker symbol: SSPK) and FCA SPV IV - Cura (Ticker symbol: CURLF), assuming the shares are available to the Fund to monetize.

**Year 2)** Assuming the shares are available to the Fund to monetize, the Debtor intends to sell of a portion of interest or stock in SCP Opportunity Fund (Ticker symbol: SSPK) and FCA SPV IV - Cura (Ticker symbol: CURLF).

**Year 3, 4 and 5)** Assumes the Debtors may liquidate the interest (or a portion of the interest) held in Vitalis, GE&P, Aldwych, Joss Realty, American Commercial Realty, 69th Garage, Clay Cove -Urbana, Halo, RSE Markets - Rally Road at various points in time as the investments mature or as shares become publicly traded and the Debtors assume the monetization of the Acadaca investment upon maturity.

**Note 2:**

The estimated return on investments assumes the interest held in certain investments continues to appreciate. For example, the Debtors assume the following investments will appreciate over the five year period or prior to monetizing the investment as discussed above: SCP Opportunity Fund (Ticker symbol: SSPK), FCA SPV IV - Cura (Ticker symbol: CURLF), Clay Cove-Urbana, American Commercial Realty - Cherry Tree and UBW, Atlantic Crypto Corp, Halo and RSE Markets - Rally Road.

**Note 3:**

The $400,000 estimated annual operating expenses includes assumed payments to service providers for accounting, administrator, IT systems, banking, legal, auditing and tax services.

**Disclosures and General Assumptions for Projections**

The Plans and the Projections are based on the Debtors receiving (i) the Investment Guarantee Amount from FF Management, the general partner of FF Fund I, LP, on the Effective Date, and (ii) the Exit Financing from the Exit Lender on the Effective Date. Such funding will enable the Debtors to emerge from Chapter 11 as Reorganized Debtors. Pursuant to the Plans, control over the Reorganized Debtors and their operations will vest in FF Management and the CRO will resign as of the Effective Date. As a result, the Projections have been prepared solely by FF Management and have not been reviewed or confirmed by the CRO or any of the Debtors' pre-Effective Date Professionals.

The Plans contain forward-looking Projections that relate to the business and operations of the Debtors. These Projections are based on FF Management's current expectations and assumptions and may be affected by subsequent developments, regulatory actions and business conditions that are not within the Reorganized Debtors' control. Accordingly, there can be no assurance that future business and operations will not differ materially from those described herein. Without limiting the generality of the foregoing, any and all projected financial information contained herein is based upon estimates and assumptions about circumstances and events that have not yet taken place and are subject to change. Actual results may significantly vary from projected results. Interested parties should conduct their own investigation and analysis of the proposed business and data described herein.

FF Management developed a multi-year business plan covering the time from January 1, 2021 through the Projection Period. The Projection Period is based on forecasted revenues and estimated future operating, overhead costs, and capital expenditures. For purposes of these Projections, FF Management employed a simplifying assumption that emergence from the Chapter 11 Cases occurs on or before December 31, 2020. If the Effective Date is significantly delayed, then additional expenses, including Professional Fees Claims, may be incurred and operating results may be negatively impacted.

These Projections are reflective of the current state of the markets under the current COVID-19 pandemic. These Projections include consideration of the general macroeconomic factors in areas the Debtor may operate their investment decisions.

**General Notes:**

The following is a list of key assumptions that were utilized in the Projections (which are consolidated).

- The basis for the Projections is (a) information included in the Disclosure Statement, and (b) the Debtors' books and records.

- The Effective Date entries take into account Cash on hand and the expected Effective Date distributions for Allowed Administrative Claims, Professional Fee Claims and the initial Distributions to Holders of Allowed Claims.

- A five year time horizon to realize all of the Reorganized Debtors' investments.

5582803-1

- The Reorganized Debtors will fully draw the $1.5 million Exit Financing by the end of 2022.

- The Debtors expect to begin selling existing assets/investments in 2021 to help raise cash to make Distributions required under the Plans and to fund operations and new and existing investments. The Projections do not anticipate the sale of any new investments in the event new investments are made.

- The Reorganized Debtors expect to begin noticeably realizing growth upon investment returns by 2023.

- The Reorganized Debtors expect to make certain new investments, and add to existing investments, including through funding capital calls to help manage existing investments beginning in 2021.

- Expenses are expected to approximate $400,000 annually.  The expenses are solely for third party vendors, including accounting, administrator, IT systems, banking, legal, auditing and tax services.  None of such funds are allocated to be paid to FF management of Mr. Franzone.

- The Reorganized Debtors expect to realize a return on the Acadaca Investment sometime before 2024.

**Specific Notes referenced in the Projections:**

**Note 1 –** In addition to the monetization of investments described below, the Reorganized Debtors expect to receive periodic distributions and/or dividend payments from a few of the limited partnership interests held (e.g. North River IV, LLC, American Commercial Realty – Cherry Tree and UBW, and Metropolitan Partners Fund IV).

In Year 1, the Projections assume the recovery of funds currently in settlement negotiations for the MSP, LLV investment (including in the event litigation is required), redemption of funds in the Cruiser Capital hedge fund and potentially a combination of monetizing some or all of the Reorganized Debtors' interest in North River IV, LLC, or a sale of a portion of the stock in SCP Opportunity Fund (Ticker symbol: SSPL) and Florence Capital Partners SPV IV,LLC (Cura – ticker symbol: CURLF), assuming such share become unrestricted so as to enable the Reorganized Debtors to monetize them.

In Year 2, the Projections assume the shares of stock in the following will be available to the Reorganized Debtors to monetize in part or in whole: SCP Opportunity Fund (Ticker symbol: SSPL) and Florence Capital Partners SPV IV,LLC (Cura – ticker symbol: CURLF).

2

<u>In Years 3, 4 and 5</u>, the Projections assume that the Reorganized Debtors may liquidate some or all of the interests held in Vitalis, GE&P, Aldwych, Joss Realty, American Commercial Realty, 69th Garage, Clay Cove- Urbana, Halo, RSE Markets – Rally Road, all at various points in time as the investments mature or as shares become publically traded.  The Reorganized Debtors also assume that the Acadaca Investment will be realized in respect of the loan.

**Note 2** – The estimated return on investment in the Projections assumes the interest held in certain investments continues to appreciate. For example, the Reorganized Debtors assume the following investments will appreciate over the five year period of the Projections or prior to monetizing the investments as set forth above;  SCP Opportunity Fund (Ticker symbol: SSPL) and Florence Capital Partners SPV IV,LLC (Cura – ticker symbol: CURLF), Clay Cove- Urbana, American Commercial Realty, Cherry Tree, UBW, Atlantic Crypto Corp., Halo and RSE Markets – Rally Road.

**Note 3** – The $400,000 in estimated annual operating expenses includes assumed payments to service providers for accounting, administrator, IT systems, banking, legal, auditing and tax services.  None of such funds are allocated to be paid to FF management of Mr. Franzone.

3

5582588-1

5582803-1

# **EXHIBIT 4**

**Liquidation Analysis FF Fund Debtor**

**The tables below summarize the recovery estimates for proceeds that would be available for distribution in FF Fund hypothetical chapter 7 bankruptcy case.**

| | | Carrying value as of the Petition Date | Carrying value as of 11/30/2020 | Estimated Liquidation Value |
|---|---|---|---|---|
| **Assets** | | | | |
| | Cash & Cash Equivalents | $ 300,000 | | $ 300,000 |
| | F5 Investments | $ 46,000,000 | | $ - |
| | Non-F5 Investments | $ 2,650,000 | | $ 500,000 |
| | **Total Assets** | $ 48,950,000 | | $ 800,000 |
| | | | | |
| **Liabilities** | | | | |
| | Priority/Administrative Claims | | $ 600,000 | |
| | General Unsecured Claims (includes GP and Intercompany Claims) | | $ 9,000,000 | |
| | **Total Liabilities** | | $ 9,600,000 | $ - |
| | | | | |
| **Potential Recovery** | | | | |
| | Estimated Liquidation Value | | | $ 800,000 |
| | Less: Priority /Administrative Claims | | | $ (600,000) |
| | Less: Shutdown costs/Chapter 7 costs | | | $ (200,000) |
| | **Net Estimated Liquidation Proceeds of Unsecured Claims** | | | $ - |

| Recovery % Comparison by Class | | | |
|---|---|---|---|
| Class 1 - Priority/Administrative Claims | | $ 600,000 | 100% |
| Class 2 - General Unsecured Claims (includes Incompany Claims) | | $ 7,000,000 | 0% |
| Class 3 - GP Claim (not subject to the cap) | | $ 2,000,000 | 0% |
| Class 4 - Existing GP Equity Interests | | N/A | 0% |
| Class 5 - Existing LP Equity Interests | | N/A | 0% |

**Liquidation Analysis F5 Business Debtor**

**The tables below summarize the recovery estimates for proceeds that would be available for distribution in F5 Business hypothetical chapter 7 bankruptcy case.**

| | | Carrying value as of the Petition Date | Carrying value as of 11/30/2020 | | Estimated Liquidation Value |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| | Cash & Cash Equivalents | $ 800,000 | | $ | 800,000 |
| | Investments | $ 46,000,000 | | $ | 3,450,000 |
| | **Total Assets** | $ 46,800,000 | | $ | 4,250,000 |
| **Liabilities** | | | | | |
| | Priority/Administrative Claims | | $ 600,000 | | |
| | General Unsecured Claims | | $ 4,500,000 | | |
| | **Total Liablilities** | | $ 5,100,000 | $ | - |
| **Potential Recovery** | | | | | |
| | Estimated Liquidation Value | | | $ | 4,250,000 |
| | Less: Priority /Administrative Claims | | | $ | (600,000) |
| | Less: Shutdown costs/Chapter 7 costs | | | $ | (200,000) |
| | **Net Estimated Liquidation Proceeds of Unsecured Claims** | | | $ | 3,450,000 |

**Recovery % Comparison by Class**

| | | | |
|---|---|---|---|
| Class 1 - Priority/Administrative Claims | | $ 600,000 | 100% |
| Class 2 - General Unsecured Claims | | $ 4,500,000 | 77% |
| Class 3 - Existing Equity Interests | | N/A | 0% |

**General Assumptions for Hypothetical Liquidation Analysis**

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired allowed claim or interest either (a) accept the plan of reorganization or (b) receive or retain, under the plan, property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the applicable Debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date.  This requirement is referred to as the "best interests" test.

To demonstrate compliance with the "best interests" test, the Debtors estimated a range of proceeds that would be generated from a hypothetical chapter 7 liquidation ("*Liquidation Analysis*"), which Liquidation Analysis is attached to the Disclosure Statement as Exhibit 2.  The Liquidation Analysis was prepared by the Debtors with assistance from their financial and other advisors and represents the Debtors' best estimate under the circumstances of these Chapter 11 Cases of the proceeds that would be realized if the Debtors Chapter 11 Cases were converted to cases under Chapter 7 and thereafter liquidated in accordance with chapter 7 of the Bankruptcy Code.  The Liquidation Analysis also assumes that the chapter 7 trustee would seek to liquidate the assets promptly to the extent such assets are subject to liquidation.  During the Chapter 7 proceedings, the Debtors anticipate that the Chapter 7 trustee would likely need to continue using cash and proceeds from the liquidation of the assets in order to effect winding down the affairs of the Estates.

**The Liquidation Analysis is premised upon a number of estimates and assumptions that, although developed and considered reasonable by the Debtors under the circumstances of these Chapter 11 Cases, are inherently subject to significant business, economic, and competitive uncertainties beyond the control of the Debtors and, as discussed below, may be subject to change.  Thus, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo liquidation. In addition, any liquidation ultimately undertaken would take place under future circumstances that cannot be predicted with certainty.  Accordingly, although the Liquidation Analysis that follows is necessarily presented with numerical specificity, if the Debtors' estates were in fact liquidated as described herein, the actual proceeds from such liquidation could vary significantly from the amounts set forth in the Liquidation Analysis. The actual liquidation proceeds could be materially higher or lower than the amounts set forth in the Liquidation Analysis, and no representation or warranty can be or is being made with respect to the actual proceeds that would be generated from the liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code.  The Liquidation Analysis has been prepared solely for the purposes of estimating the proceeds that would be available if the Debtors liquidated under chapter 7 of the Bankruptcy Code for purposes of the "best interests" test and does not represent values that may be appropriate for any other purpose, including the values applicable in the context of the Plans.  Nothing contained in the Liquidation Analysis is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical liquidation analysis, as required by the "best interests" test.**

As presented in the illustrative Liquidation Analysis, the Debtors believe that a liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code would result in reductions in the

value to be realized by constituents as compared to the distributions that are contemplated by FF Management under the Plans.  Based on the Projections prepared by FF Management, the Plans provide a substantially greater return to constituents than would any liquidation under Chapter 7 of the Bankruptcy Code.

**General Notes:**

The following is a list of key assumptions that were utilized in the Liquidation Analysis:

- The basis for the Liquidation Analysis is (a) information included in the Disclosure Statement, and (b) the Debtors' books and records.

- The Liquidation Analysis assumes that the liquidation of the Debtors would commence on January 1, 2021 under the direction of a court-appointed chapter 7 trustee.

- The Liquidation Analysis assumes that all of the Debtors' assets are liquidated.

- The "carrying value" of the investments presented in the Liquidation Analysis are based on the book value of such investments as reflected on the pre-petition books and records of the Debtors under the direction and control of FF Management.

- Cash & Cash Equivalents are forecasted as of December 31, 2020.

- The estimated liquidation value of the investments is based on an estimated 7.5% recovery, and may or may not reflect the fair value of such investments.  Such estimate is solely an estimate because the investments are of a type that do not allow the Debtors to make any meaningful prediction as to such recovery from the liquidation of such investments.

- The Liquidation Analysis assumes that proceeds realized from a chapter 7 liquidation would be reduced by administrative costs incurred during the wind down of operations, the stabilization and protection of assets, the disposition of assets and the reconciliation of claims.  These costs include professional fees, trustee fees, corporate wind down costs and post-conversion date trade claims.

- The Liquidation Analysis assumes that the net proceeds from the liquidation of the assets under Chapter 7 would be distributed in accordance with the Bankruptcy Code and that no distributions would be made to junior creditors or equity holders until all senior creditors are paid in full.

- Fees to the chapter 7 trustee are estimated to be 3.0% of the total gross liquidation proceeds.

- The fees and costs associated with the chapter 7 trustee's legal counsel and professional advisors are estimated by the Debtors to be $400,000.

2

5575066-1

- The F5 Business Debtor's assets are comprised of cash and illiquid investments. The Liquidation Analysis takes into account approximately 46 investments, many of which are either illiquid, consist of non-tradeable privately held shares in early stage or start-up companies, are minority interests in real estate partnerships, or are unsecured promissory notes with maturities substantially longer than six months.

- The Liquidation Analysis also assumes that several of the investments consist of interests in various companies which require approval from either the manager or members of such companies in order for the Debtors to be able to sell, assign or transfer F5 Business' interest therein.  The Debtors do not know the impact of such approvals on the liquidation value of such investments.

- Because of the nature of the investments, the CRO is unable to project the timing of the liquidation of such investments and for purposes of the hypothetical liquidation of the F5 Business Debtor's investments utilized a period of two to five years (the "Liquidation Period").  The recoveries in the hypothetical liquidation analysis assume a payout will not be complete until the end of the Liquidation Period.

- While the Liquidation Analysis assumes full liquidation over the Liquidation Period commencing January 1, 2021, it is probable that the disposition and recovery from certain assets could take several years.  The potential impact of litigation and actions by other parties could increase the amount of time required to realize recoveries assumed in this analysis.  Such events could also add costs to the liquidation in the form of higher legal and professional fees to resolve these potential events.

- The General Unsecured Claim amounts used in the Liquidation Analysis are based on the Debtors' books and records and the proofs of claims filed in the Chapter 11 Cases by the applicable bar dates.  The actual amount of Allowed General Unsecured Claims could vary materially from these estimates.  No order has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Allowed General Unsecured Claims.

- Where the Plans provide for the voluntary subordination of FF Management's claim, the Liquidation Analysis treats the claim as a general unsecured claim.

- Based on the above assumptions and notes, the Liquidation Analysis evidences that under a chapter 7 liquidation there would be a recovery of 77% to the Holders of Allowed General Unsecured Claims against the F5 Business Debtor.

- The Liquidation Analysis further estimates that the F5 Business Debtor will not be able to distribute any funds to the FF Fund Debtor on account of its equity interest in the F5 Business Debtor.

3